530

1    **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

E-filing

2    Name____SINN_____GARY_____

      (Last)                    (First)                    (Initial)

3    Prison Number___D57219_____

4

FILED

MAR 2 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Institutional Address P.O. Box 689, Soledad, CA 93960-0689

6    ==================================================================

7                        **UNITED STATES DISTRICT COURT**
                        **NORTHERN DISTRICT OF CALIFORNIA**

8    Gary Sinn_____     )
      (Enter the full name of plaintiff in this action.)     )
9                                              )
                                               )
10                   vs.                       )    Case No._____
                                               )    (To be provided by the Clerk of the Court)
11   B. Curry, Warden (A)_____          )
                                               )    **PETITION FOR A WRIT**
12   Board of Parole Hearings_____            )    **OF HABEAS CORPUS**
                                               )
13   _____              )
                                               )
14   (Enter the full name of respondent(s) or jailor in this action)  )

CV 08 1706 MMC (PR)

15   ==================================================================

16                    **Read Comments Carefully Before Filling In**

17   **When and Where to File**

18        You should file in the Northern District if you were convicted and sentenced in one of these

19   counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20   San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma.  You should also file in

21   this district if you are challenging the manner in which your sentence is being executed, such as the

22   loss of good time credits, and you are confined in one of these counties.  Habeas L.R. 2254-3(a).

23        If you are challenging your conviction or sentence and you were not convicted and sentenced in

24   one of the above-named fifteen counties, your petition will likely be transferred to the United States

25   District Court for the district in which the state court that convicted and sentenced you is located.  If

26   you are challenging the execution of your sentence and you are not in prison in one of these counties,

27   your petition will likely be transferred to the district court for the district that includes the institution in

28   which you are confined.  Habeas L.R. 2254-3(b).

1    Who to Name as Respondent

2        You must name the person in whose actual custody you are. This usually means the Warden or

3    jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4    you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

5        If you are not presently in custody pursuant to the state judgement against which you seek relief

6    but may be subject to such custody in the future (e.g. detainers), you must name the person in whose

7    custody you are now <u>and</u> the Attorney General of the state in which the judgement you seek to attack

8    was entered.

9    A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

10       1. What sentence are you challenging in this petition

11           (a)    Name and location of court that imposed sentence (for example, Alameda

12                 County Superior Court, Oakland):

13

14             Los Angeles County Superior Court      Los Angeles, CA

15                 (Court)                  (Location)

16          (b) Case number, if known    A 627726

17          (c) Date and terms of sentence    25 years to life, March 1987.

18          (d) Are you now in custody serving this time? (Custody meaning being in jail,

19          on parole or probation, etc.)              Yes X _____    No _____

20          Where?

21          Name of institution:    Correctional Training Facility

22          Address:    P.O. Box 686, Soledad, CA 93960-0686

23        2. For what crime were you given this sentence? (If your petition challenges a sentence for

24    more than one crime, list each crime separately using Penal Code numbers if known. If you are

25    challenging more than one sentence, you should file a different petition for each sentence.)

26    Penal Code § 187, First-degree Murder

27    Penal Code § 12022.5 Use of a Firearm

28    Penal Code § 211 Robbery

3. Did you have any of the following?

Arraignment:                                        Yes  X      No _____

Preliminary Hearing:                                Yes  X      No _____

Motion to Suppress:                                 Yes  X      No _____

4. How did you plead?

Guilty _____   Not Guilty  X      Nolo Contendere _____

Any other plea (specify) _____

5. If you went to trial, what kind of trial did you have?

Jury  X         Judge alone _____   Judge alone on transcript _____

6. Did you testify at your trial?                   Yes _____   No _____

7. Did you have an attorney at the following proceedings:

(a)    Arraignment                                  Yes  X      No _____

(b)    Preliminary hearing                          Yes  X      No _____

(c)    Time of plea                                 Yes _____   No _____

(d)    Trial                                        Yes  X      No _____

(e)    Sentencing                                   Yes  X      No _____

(f)    Appeal                                       Yes  X      No _____

(g)    Other post-conviction proceeding             Yes _____   No _____

8. Did you appeal your conviction?                  Yes _____   No _____

(a)    If you did, to what court(s) did you appeal?

Court of Appeal                                     Yes _____   No _____

Year:  U/K        Result: Denied _____

Supreme Court of California                         Yes _____   No _____

Any other court                                    Yes _____   No _____

(b)    If you appealed, were the grounds the same as those you are raising in this

1                        Petition?     Different issue.           Yes _____     No _____

2                        Was there an opinion?                 Yes _____     No _____

3           (c)      Did you seek permission to file a late appeal under Rule 31(a)?

4                                                               Yes _____     No _____

5                        If you did, give the name of the court and the result:

6

7                                           _____

8          9. Other than appeals, have you previously filed any petitions, application or motions with

9 respect to this conviction in any court, state of federal?         Yes _____    No _X_

10        [Note; if you previously filed a petition for a writ of habeas corpus in federal court that

11 challenged the same conviction you are challenging now and if that petition was denied or dismissed

12 with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13 for an order authorizing the district court to consider this petition. You may not file a second or

14 subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15 U.S.C. §§ 2244(b).]

16          (a)     If you sought relief in any proceeding other than an appeal, answer the following

17                questions for each proceeding. Attach extra paper if you need more space.

18               I.        Name of Court: _Los Angeles County Superior Court_

19                        Type of Proceeding: _Writ of habeas corpus_

20                        Grounds raised (Be brief but specific):

                             a. _Immutable facts of the crime do not support finding Petitioner_

21                              currently poses an unreasonable risk to public safety if released.

22                        b. _No other facts reliably support parole denial._

23                        c. _____

24                        d. _____

25                        Result: _Denied_             Date of Result: _05/04/07_

26               II.       Name of Court: _Calif. Court of Appeals_

27                        Type of Proceeding: _Habeas Corpus_

28                        Grounds raised (Be brief but specific):

1          a. Same as in Superior Court _____ _____ _____ _____

2          b._____ _____ _____ _____

3          c._____ _____ _____ _____

4          d._____ _____ _____ _____

5          Result: Denied _____ _____ Date of Result: 08/01/07

6    III.  Name of Court: Calif. Supreme Court _____ _____ _____

7          Type of Proceeding: Habeas corpus petition _____ _____

8          Grounds raised (Be brief but specific):

9          a. Same as in Superior Court _____ _____ _____ _____

10         b._____ _____ _____ _____

11         c._____ _____ _____ _____

12         d._____ _____ _____ _____

13         Result: Denied _____ _____ Date of Result: 02/20/08

14   IV.   Name of Court: _____ _____ _____ _____ _____

15         Type of Proceeding: _____ _____ _____ _____

16         Grounds raised (Be brief but specific):

17         a._____ _____ _____ _____

18         b._____ _____ _____ _____

19         c._____ _____ _____ _____

20         d._____ _____ _____ _____

21         Result:_____ _____ _____ Date of Result:_____ _____

22   (b)   Is any petition, appeal or other post-conviction proceeding now pending in any court?

23                                                          Yes _____   No _X_

24         Name and location of court: _____ _____ _____ _____ _____

25   B. GROUNDS FOR RELIEF

26         State briefly every reason that you believe you are being confined unlawfully. Give facts to

27   support each claim. For example, what right or privilege were you denied? What happened? Who

28   made the error? Avoid legal arguments with numerous case citations. Attached extra paper if you

1  need more space.  Answer the same questions for each claim.

2  [Note:  You must present ALL your claims in your first federal habeas petition.  Subsequent

3  petitions may be dismissed without review on the merits.  28 U.S.C. §§ 2244(b); **McCleaskey v. Zant**,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5  Claim One: Sole reliance on the predictive value of a 22 year old offense to deny parole,
   despite an exemplary prison record, violates Petitioner's 14th Amendment right to due process.

6
   Supporting Facts: Petitioner, who has an exemplary prison record and no prior criminal

7  record, seeks relief from the Board's third denial.  A decision to deny parole that was

8  based solely on the facts of a 18 year old crime whose age has rendered nil its value for

9  for predicting future similar acts.  (Continued on page 8.)

10 Claim Two: N/A

11

12

13 Supporting Facts: 

14

15

16

17 Claim Three: N/A

18

19 Supporting Facts: 

20

21

22

23 If any of these grounds were not previously presented to any other court, state briefly which

24 grounds were not presented and why:

25 N/A

26

27

28

    Continued List, by name and citation only, any cases that you think are close factually to yours so that

they are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning of these cases:

See Supporting Facts and Memorandum of Points and Authorities.  Also see Hayward v.

Marshall (9th Cir. 2008) 512 F.3d __ 2008 WL 43716.

Do you have an attorney for this petition?                          Yes _____          No _XXX_

If you do, give the name and address of your attorney:

In Pro Persona

WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled

in this proceeding.  I verify under the penalty of perjury that the foregoing is true and correct.

Executed on  3 - 26 - 08

Date                                    Signature of Petitioner

1

INTRODUCTION

2    Prior to 1983 Petitioner had no criminal history. He was a hard working family man employed
3   in the Los Angeles area by Lucky Stores Inc. That year the members of his union went on strike. As
4   the strike lengthened Petitioner experienced financial difficulties. Through a series of foolish
5   misguided steps, Petitioner and another Lucky Stores' (on strike) employee who was also
6   experiencing a money shortage foolishly decided to rob members of a Los Angeles motorcycle gang
7   of what they believed to be stolen tools. Two neighborhood associates of the second Lucky store
8   employee were supposedly familiar with the gang's operations and the location of the tools. The
9   quartet devised a plan to show up at the location, which only one or two gang members supposedly
10  frequented at one time, identify themselves as police officer's looking for stolen tools, to handcuff the
11  local gang members, and remove some of the tools as evidence. Petitioner had previously obtained a
12  police badge and handcuffs from friends who were members of an Orange County police department.
13  Although four persons would participate in the robbery, only two, including Petitioner, would enter
14  the dwelling and handcuff the two gang members, after identifying themselves as police. The two
15  others, known to some of the gang, would locate themselves in a separate car parked near the location.
16  Their role was to point out the gang's residence used for tool storage. Unfortunately, during the
17  robbery a third member of the gang happened to walk down the street and noticed the two individuals
18  sitting in the car. He approached them and demanded to know why they were parked in that location.
19  At least one of these two accomplices appeared at the time to be high on drugs. Petitioner's
20  knowledge of what occurred derives solely from their description of the events. One of the two
21  members exited the car waving a gun, and began yelling at the unexpected third gang member. The
22  two began fighting, and during that fight the motorcycle gang member was shot and killed. When
23  Petitioner heard the shot, he and his partner left the handcuffed gang members and fled the area in
24  their own car. Petitioner and his partner later foolishly engaged in another robbery. Subsequently, the
25  gang located the shooter and killed him. After hearing about the gang's revenge killing, and fearing
26  for his life, Petitioner left the state with his family. As the record shows he was subsequently arrested,
27  charged with his crimes, and convicted.

28    Petitioner accepts unmitigated responsibility for these offenses and the felony murder which

8

resulted from his misguided steps. His robbery act resulted from the circumstantial stress he was experiencing due to an unusual financial predicament – and while that does not excuse his actions, it does explain them. Prior to these crimes Petitioner had no criminal history. While in prison he has never engaged in criminal or violent acts, and has remained disciplinary free since 1993. The CDCR psychologists who evaluated him for the Board found he is suitable for parole and would not pose an unreasonable threat to public safety if released. He has solid parole plans, a history of participation in self-help, and recent to his hearing participated in the Alternatives to Violence (AVP) program.

While Petitioner does not minimize a loss of any life, the one occurring in this case resulted from felony type murder circumstances. Murder related circumstances up to the time of the gunshot, which occurred out of Petitioner's sight, without his knowledge, and certainly without his agreement, plan, or participation. Therefore, from the prospective of Petitioner's individual culpability, his conviction for murder is supported by no more than the minimum necessary factual elements. In fact, the crime rises to first-degree murder only because it occurred peripherally to a separately occurring robbery attempt being carried out by Petitioner and his co-partners.

The fact that there is some evidence a crime was committed in a certain way at a certain time does not necessarily mean that a crime provides "some evidence" the prisoner's release on parole will pose an unreasonable risk of danger to the public at the present time. Whether it possess the necessary predictive value depends on both the nature of the crime and how long ago it happened. Under these In re Lee (2006) 143 Cal.App.4th 1400, 1408, 1412-1413, noted guidelines, due to the comparative minimal nature of the instant non-premeditated, felony first-degree murder and because it occurred 22 years ago, its facts no longer provide the minimum some evidence needed to support parole denial in this case. Combined with his positive prison record, this failure of the crime to continue to provide some evidence supporting parole denial requires Petitioner be found parole suitable and his term accordingly fixed.

## STATEMENT OF FACTS

1. On December 6, 2005, the Board of Parole Hearings (BPH) denied Petitioner parole for one-year based solely on the unchanging circumstances of his crime. (See Exh. A, Transcript of Petitioner's December 6, 2005, parole hearing.)

2. Petitioner was convicted in 1987 of first-degree murder under the felony murder rule; an attempted robbery underlying the December 12, 1983 felony murder and robbery stemming from a January 5, 1984 robbery of an illegal gaming establishment.

3. Petitioner previously appeared before the Board in 2003 and 2004. See Exh. B, chronologically arranged copies of these previous decisions provided for informational purposes only. This writ appeals only the Board's denial at the 2005 parole hearing.

4. The Board's finding the commitment offense was dispassionate and calculated (i.e. premeditated) is not supported by the conviction or the evidence. In fact, a felony murder of this nature by definition is not a premeditated offense (In re Rosenkrantz (2002) Cal.4th 616, 689), and it clearly constitutes the minimum necessary to support the conviction for a first-degree murder. It does not involve as required more than the minimum elements of a first-degree murder, in fact, to the contrary, it involves less elements than the normal first-degree murder.

5. Prior to the instant offenses Petitioner had neither a juvenile record or any adult convictions. (See Exh. A, p. 15.)

6. During his imprisonment he received only one CDC-115, in 1993, and had remained disciplinary free for the past 12 years as of the 2005 hearing at issue herein, and since.

7. Petitioner has completed multiple vocational-training programs while in prison. He currently works as a maintenance plumber, and has received laudatory chronos for his positive work attitude. (Exh. A, pp. 67-81.) He has also participated in self-help programs. (Ibid.)

8. The CDC psychological evaluation of Petitioner, prepared for the Board, unequivocally supports his release onto parole. (See Exh. C, September 2, 2005, psychological evaluation of Petitioner prepared for the Board, as well as previous evaluations on which it partially relies.) The psychologists found in part Petitioner's "prognosis for successful community adjustment is excellent" (Exh. C, p. 4), he expressed remorse for committing his crime (Id, p.2), takes responsibility for his actions (Id, at p. 2), "and his violence potential is no higher than that of the average citizen in the community." (Id. at p.3.)

9. Petitioner has received numerous letters from family and friends supporting his being released on parole. These letters contain both job offers and offers of residence. (See Exh. A, pp. 17-

1  30, also Exh. D, copies of these letters.)

2      10.  The sole basis on which the Board relied to deny Petitioner parole suitability was the

3  circumstances of the crimes he committed.  However, the validity of the predictive value of the

4  unchanging circumstances of a murder offense of this nature, committed over 22 years ago as an

5  indicator of future dangerousness is nil at best, precluding those crime factors being used in this case

6  to support a finding of current dangerousness.  See In re Lee 143 Cal.App.4th at 1408, 1412-1413,

7  holding the factors of the crimes in that case involving multiple shooting victims, including one

8  murder and one premeditated attempted murder, lack predictive value after almost 20 years, when

9  accompanied by positive prison performance and lack of a [significant] criminal record, as in this

10  case.

11  PRAYER

12      1.  Issue a writ of habeas corpus or order to show cause to Respondent to inquire into the

13  legality of Petitioner's continued imprisonment;

14      2.  Order the state parole authority to hold a new hearing within 45-days, and if no new

15  information establishes that Petitioner currently poses a threat of violence, to find Petitioner suitable

16  for parole, set his release date, and on that date parole him;

17      3.  Conduct an evidentiary hearing to resolve any disputed factual matters, and after the

18  hearing, issue and an order directing the Board to act as set forth in paragraph 2, above;

19      4.  Allow Petitioner an opportunity to orally argue in support of this petitioner;

20      5.  Allow Petitioner an opportunity to develop or to offer additional evidence;

21      6.  Grant such other relief as justice may require.

22

23  Date March 26, 2008

24                                          Respectfully submitted,

25

26

27                                          Gary Sinn
                                        Petitioner In pro per

28

MEMORANDUM OF POINTS AND AUTHORITIES

STANDARD OF REVIEW

A parole denial decision in California comports with due process only when some evidence demonstrates that upon release the prisoner would currently poses a threat to public safety. (Hayward v. Marshall (9th Cir. 2008) 512 F.2d___, WL 43716 at *5, relying on In re Lee (2006) 143 Cal.App. 446 1400, 1408, In re Scott (2005) 133 Cal.App.4th 573, 595; et al.) Absent that, it matters not whether some evidence appears to support application of one or more of the regulatory state law circumstances to the facts of the case. While the facts of a crime may after five to ten years (Lee at 1412), constitute a sufficient basis for supporting a parole denial decision, if the prisoner has programmed in a positive manner almost 20 years or more, the predictive value of their offense circumstances become very questionable, therefore continued parole denial decisions based solely on crime factors merit especially close scrutiny. (In re Elkins (2006) 144 Cal.App.4th 475, 523; In re Scott 133 Cal.App.4th 573, 595.) Simply put, the presence of some evidence "does not necessarily equate to some evidence that the [prisoner's] release unreasonably endangers public safety." (In re Lee 143 Cal.App.4th at p. 1408.) A review of the record and crime factors in this case will demonstrate Petitioner's release will not unreasonably endanger public safety. Further, in this case that review will show the circumstances of Petitioner's role in this murder offense were not more violent than minimally necessary to support conviction for that crime (In re Rosenkrantz (2002) 29 Cal.4th 616, 683), therefore, as the facts of Petitioner's felony first degree murder offense can by definition constitute no more than the minimum (violence) necessary to support that conviction, they are not available to support a parole denial decision. (Rosenkrantz, Ibid.

LEGAL ARGUMENT

I     PETITIONER HAS A FEDERALLY PROTECTED
LIBERTY INTEREST IN PAROLE RELEASE.

It is well established that all indeterminately sentenced prisoners possess a federally protected liberty interest. See McQuillion v. Duncan (9th Cir. 2002) 3069 F.3d 895, 901-902 and Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910, 914-915, relying on Greenholtz v. Nebrska (1979) 441 U.S. 1 and Board of Pardons v. Allen (1987) 482 U.S. 369, 377-378, clearly reasoning that the similar

structure and phrasing of California's parole statutes (Penal Code § 3041, subd. (b)) when compared to those of the Nebraska and Montana statutes produce the same result in this state – a federally protected liberty interest. A liberty interest the Biggs court held on pp. 914-915, arise "upon the incarceration of the inmate." Also see Sass v. California Parole Board (9th Cir. 2006) 461 F.3d 1132, 1127-1128, confirming previous holdings that the mandatory language of the Penal Code § 3041, sub-section (b) creates a liberty interest in parole.

II    DENIAL OF PAROLE BASED SOLELY ON THE
IMMUTABLE CIRCUMSTANCES OF AN OFFENSE
WHICH OCCURRED OVER 22 YEARS AGO, IN THE
FACE OF A RECORD DEMONSTRATING
REHABILITATION DEPRIVES A PRISONER OF DUE
PROCESS.

State and federal courts are repeatedly holding that even if the offense circumstances considered under regulatory law appear to support parole denial, due process may preclude the crime alone justifying repeated parole denial after the passage of a long period of time, when accompanied by a Petitioner's prison record demonstrating rehabilitation. (See e.g. In re Lee, supra, 143 Cal.App.4th at 1408; In re Elkins (2006) 144 Cal.App.4th 475, 499; In re Weider (2006) 145 Cal.App.4th 570, 582-583; In re Smith (2003) 11 Cal.App.4th 343, 372; Biggs v. Terhune, 334 F.3d at 916-917; In re Scott (2005) 133 Cal.App.4th at 595; Rosenkrantz v. Marshall (C.D. Cal. 2006) 444 F.Supp.1063.) In fact, use of crime factors as supporting denial requires more than merely noting their presence, even if the evidence supports the presence of one or more regulatory law findings. The evidence must clearly demonstrate the prisoner would pose an unreasonable threat to public safety if released. A clear nexus must somehow be established. Assisting in establishing that nexus, both state and federal courts are now holding that after an almost 20 year period, depending on the facts of the case and nature of the crime (Hayward, WL 43716 at fn. 10), offense facts "lo[ose] much of their usefulness in foreseeing the likelihood of future offenses than if [the prisoner] had committed the offense five or ten years ago." In re Lee, supra, at 1412 relying on In re Scott, 133 Cal.App.4th at 595 [past crimes predicting future crimes diminishes over time.][1]

---

[1] See In re Hofferber (1980) 28 Cal.3d 161, 177 wherein the State Supreme Court itself held, "the passage of time diminishes the validity of an assumption [a prisoner's] dangerousness continues unabated."

13

1    As previously noted, the Board relied on the alleged predictive value of Petitioner's offense as

2    the basis for their parole denial decision at his third parole consideration hearing. Assessing a similar

3    chronological situation, for a far more serious first-degree type offense and associated crimes then the

4    offense committed by Petitioner a Federal District Court Judge reasoned that:

> Whether the facts of the crime of conviction, or other unchanged criteria,
> affect the parole eligibility decision can only be predicted by the
> 'predictive value' of the unchanging circumstances. Otherwise, if the
> unchanged circumstances per se can be used to deny eligibility, sentencing
> is taken out of the judge and reposited in the hands of the BPT. That is,
> parole eligibility could indefinitely and forever be delayed based on the
> nature of the crime even though the sentence given set forth the possibility
> of parole – a sentence given with the facts fresh in the mind of the judge.
> While it would not be a constitutional violation to forgo parole altogether
> for certain crimes, what the state cannot do is have s sham system where
> the judge promises the possibility of parole, but because of the nature of
> the crime, the BPT effectively deletes such from the system. Nor can a
> parole system, where parole is mandated to be determined on someone's
> future potential harm to the community, constitutionally exist where
> despite 20 or more years of prison life which indicates the absence of
> danger to the community in the future, the BPT commissioner's revulsion
> toward the crime itself, or some other unchanged circumstances must
> indicate a present danger to the community if released, and this can only be
> assessed not in a vacuum, but counterpoised against the backdrop of prison
> events. (Relying on Blair v. Folsom State Prison, 2005 WL 2219220* 12,
> 3081634 (E.D. Cal. 2005).)

16    Given the previously noted nature and factual circumstances of this case, the Board's repeated

17    reliance on the circumstances of Petitioner's crime and their de facto characterizing his culpability as

18    far more serious than that factually found by the court violates Petitioner's due process. (See Martin

19    v. Marshall (N.D. Cal. 2006) 431 F.Supp.2d 1038.) This continued reliance by the Board on

20    unchanging factors makes a sham of the state's parole system, and amounts to an arbitrary denial of

21    Petitioner's liberty interest by punishing him for an offense of a far more serious nature. See Hayward

22    v. Marshall, 512 F.3d ___, WL 43716 at Fn. 10, noting that federal courts take into consideration the

23    "nature of [a] particular conviction offense' when making a "holding on the facts of [a] case" when

24    determining if an indeterminately sentenced prisoner's release would unreasonably endanger public

25    safety.

26    By defining Petitioner's culpability as higher than found by the jury, and by continuing to rely

27    on those factors 22 years after the offense as an indicator of present dangerousness, given his being

28    free of violence and criminal acts while in prison, the Board in this case violated due process. The

1   ability to predict Petitioner's future dangerousness based on the circumstances of his 1983 felony

2   first-degree murder commitment offense is now nil. See In re Scott, 133 Cal.App.4th at 595, holding:

> "The commitment offense can negate suitability only if the circumstances
> of the crime reliably established by evidence in the record rationally
> indicate tat the offender will present an unreasonable risk to public safety if
> released from prison. Yet, the predictive value of the commitment offense
> may be very questionable after a long period of time" (Id. at 920.)
> "Therefore, an unsuitability determination must be predicated on 'some
> evidence that the particular circumstances of [the prisoner's] crime –
> circumstances beyond the minimum elements of this conviction – indicate
> exceptional callousness and cruelty with trivial provocation, and thus
> suggest he remain a danger to public safety.' (In re Dannenberg, supra, 34
> Cal.4th at 1098.)" (Id. at 992.)

9       There simply is no available evidence in this case which shows "that the particular

10  circumstances of [Petitioner's] crime…beyond the minimum elements of [this conviction indicate

11  exceptional cruelty callousness and cruelty with trivial provocation…suggest[ing] he remain[s] a

12  danger to public safety," as required by Dannenberg, 34 Cal. at 2098; Scott, 133 Cal.App.4th at 595.

13  Also see In re Elkins 144 Cal.App.4th at 499, as cited by Hayward, WL 43716 at *5 which is

14  instructive in this matter. Therein, the state court found that after 26 years the predictive value of the

15  immutable facts of petitioner Elkins' far more serious and violent first-degree murder and robbery

16  offense to be very questionable. Elkins intended to, and did, rob a sleeping victim. When the victim

17  awoke during the robbery, petitioner Elkins used a baseball bat to repeatedly strike the victim in the

18  head. As the victim kept moving, Elkins kept hitting him. After personally murdering the victim,

19  Elkins then took his money, wallet and drugs. The next morning Elkins drove the body to Donner's

20  Pass and dumped down a steep grade. He also stole another item from the victim's property and fled

21  the state. The court found that after 20+ years the predictive value of these acts were nil (Ibid.) given

22  the low probability of re-offending. While this Petitioner's post-conviction imprisonment record is as

23  sufficiently good as Elkins, the nature of his criminal acts (while serious) do not rise to the violence

24  level exhibited by Elkins, therefore, the nature of Petitioner's crime cannot require the length of

25  imprisonment required of Elkins.

26      As a federal court judge noted, while Biggs does not explicitly state when reliance on an

27  unchanging factor no longer has predictive value, this determination is made on a case-by-case basis.

28  Therefore, repeated application of the severity of the crime to deny parole will violate due process

1  when the crime for which incarceration was required grows more remote. (See e.g. Hayward v.

2  Marshall WL 43716 at *5; Martin v. Marshall (N.D. Cal. 2006) 341 F.Supp.2d 1038, 1042;

3  Rosenkrantz v. Marshall (C.D. 2006) 444 F.Supp.2d 1063.) A time which will vary given the nature

4  and facts of a prisoner's offense related action. (Hayward, Id., at fn. 10.) In this case, criminal acts,

5  which while serious, do not rise above the minimum necessary to sustain a first-degree murder

6  conviction. Therefore, since Petitioner's post-conviction record provides the appearance of his

7  rehabilitation, that 22 year period that has passed since the offense occurred has rendered nil the

8  predictive value of its circumstances, rendering the Board's decision to deny parole on the offense

9  circumstances arbitrary. (In re Elkins, 144 Cal.App.4th at 498.) A position affirmed in Rosenkrantz

10  v. Marshall, 444 F.Supp.2d at 1084-1085, wherein the court held, "after nearly twenty years of

11  rehabilitation, the ability to predict a prisoner's dangerousness simply on the circumstances of his or

12  her crime is nil."

III  DUE PROCESS AS SPECIFIED BY STATUE AND
13   REGULATION REQUIRES CALIFORNIA'S
14   INDETERMINATELY SENTENCED PRISONERS
     APPEARING BEFORE THE BOARD BE GRANTED
15   PAROLE ON AN OVERALL BASIS.

16  The McQuillion court noted on p. 901 that under California's Penal Code § 3041(b), "the

17  panel or Board shall set a release date unless it determines that the gravity of the current convicted

18  offense or offenses are such that consideration of the public safety requires a more lengthy period of

19  incarceration for th[e] inmate." (Emphasis added.) Furthermore, in In re Rosenkrantz (2002) 29

20  Cal.4th at 683, which Dannenberg at 1094-1095 cites approvingly, the court held case-by-case parole

21  denial decisions cannot be used to override the requirements that parole should be normally granted.

22  Similarly, in In re Mark Smith, (2003) 104 Cal.App.4th 489, 503, the court held, "In sum the

23  governing law [Penal Code § 3041(b)] provides that the Board must grant parole unless it determines

24  public safety requires a lengthier period of incarceration for an individual because of the gravity of the

25  offense underlying the conviction. [citation] (In re Rosenkrantz, supra, 29 Cal.4th at pp. 653-654.)"

26  (Emphasis added.) Therefore, as held by In re Ramirez 94 Cal.App.4th 549, 569-570, and In re Ernest

27  Smith (2003) 114 Cal.App.4th 343, 366, an offense must be particularly egregious (especially grave)

28  to support a parole denial decision, requiring that Petitioner must have intentionally carried out his

1 offense in a manner meant to torment, terrorize, or inflict prolonged pain and suffering on the victim,

2 or demonstrated behavior that could support a finding of special circumstances to be denied based on

3 the seriousness of his crime. (In re Van Houten 166 Cal.App.4th 339.) Rosenkrantz however, notes

4 this lengthened term cannot be a period of years solely established for a higher degree of the same

5 crime. (Id. at pp. 689-690, conc. opn. By J. Moreno.) The facts and nature of both the crime in this

6 case and Petitioner's individual culpability simply do not constitute the exception to the "shall

7 normally grant parole" rule, as they cannot not, under any conceivable measurement yardstick, rise to

8 the level of "particularly egregious" behavior.

9 Placing this type of decision in a mathematical perspective indicating thereby the frequency at

10 which it would occur, the court in In re Ernest Smith, supra, at p. 353, held that "parole is the rule, not

11 the exception," while the court in In re Rosenkrantz, supra, 29 Cal.4th at p. 683, held"

> "The Board's [exception to the requirement of setting parole date] based
> on the gravity of a life term inmates current or past offenses should not
> operate as to swallow the rule that parole is 'normally' to be granted.
> Otherwise, the Board's case-by-case rulings would destroy the
> proportionally contemplated by Penal Code section 3041, subdivision
> (a)...therefore, a life term offense or any other offenses underlying the
> indeterminate sentence must be particularly egregious to justify the denial
> of a parole date.' (In re Ramirez, supra, 94 Cal.App.4th at p. 570,)"

17 See In re Dannenberg, supra, at pp. 1092-1094, noting that its decision does not contravene

18 Rosenkrantz, while further agreeing with the Rosenkrantz, p. 683 requirement that overall, "parole is

19 'normally' granted." Ignoring the requirement that over an extended period parole is the rule, i.e., the

20 norm, and that only the exception – particularly egregious (especially violent, torturous) – offenses

21 support parole denial, the state parole executive ignored Petitioner's offense acts were not particularly

22 egregious in nature, and denied parole in this matter, in this case, basing their decision solely on the

23 gravity of the crime. Contrary to its due process standards, as demonstrated by this case, parole denial

24 has instead become the norm, i.e. the rule, and parole grants the exception.

## CONCLUSION

26 Since no reliable evidence of the nature required by statute and regulation supports finding

27 Petitioner would currently pose an unreasonable danger to socially, if released, the continued denial of

28 parole suitability in this case violates his state and federal right to due process and deprives him of his

17

1    federally protected liberty interest.  Accordingly, Petitioner respectfully submits his writ should be

2    granted.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS


In the matter of the Life )
Term Parole Consideration )
Hearing of:               )          CDC Number  D-57219
                          )
GARY SINN                 )
                          )
_____)

INMATE
COPY


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

DECEMBER 6, 2005

9:00 A.M.


PANEL PRESENT:

TOM SAWYER, Presiding Commissioner
BRUCE MITCHELL, Deputy Commissioner

OTHERS PRESENT:

GARY SINN, Inmate
STEVE DEFILIPPIS, Attorney for Inmate
CAROL ROSE, Deputy District Attorney
TWO CORRECTIONAL OFFICERS, unidentified


CORRECTIONS TO THE DECISION HAVE BEEN MADE

        _____   No      See Review of Hearing
        _____   Yes     Transcript Memorandum


**Ramona Cota**              **Peters Shorthand Reporting**

ii

## INDEX

PAGE

Proceedings........................................... 1

Case Factors......................................... 11

Pre-Commitment Factors.............................. 15

Post-Commitment Factors............................. 30

Parole Plans........................................ 17

Closing Statements.................................. 47

Recess.............................................. 66

Decision............................................ 67

Adjournment......................................... 82

Transcriber Certification........................... 83

--oOo--

1

1   **P R O C E E D I N G S**

2   **DEPUTY COMMISSIONER MITCHELL:** We are on

3   record.

4   **PRESIDING COMMISSIONER SAWYER:** Okay.

5   This is the Subsequent Parole Consideration

6   Hearing for Gary Sinn, S-I-N-N, CDC number D as

7   in David 57219. Today's date is Tuesday,

8   December 6, it's 9 a.m., we are located at the

9   Correctional Training Facility in Soledad. Date

10  received was 5/22 of 1987. The date the life

11  term started was 7/24/1987, county of Los

12  Angeles. The offense was murder in the first

13  degree with a firearm, case number A as in Adam

14  627726. Count number one was 187 as well as

15  12022(a) PC, 25 years to life plus one year.

16  The minimum eligible parole date was 3/19/04.

17  There are other commitment offenses, same case

18  number on all these offenses. Count two was

19  211, attempted robbery, 211/664 of the Penal

20  Code, attempted robbery in the second degree.

21  Also count two had a 12022.5, use of a firearm

22  as well as an attempted robbery in count three,

23  664. The next one was count four, attempted

24  robbery, 211/664 of the Penal Code. Count five

25  was 211, robbery in the second degree. Count

26  six was 211 robbery in the second degree. Count

27  seven was 211 robbery in the second degree.

2

1  Count eight, 211 robbery in the second degree;

2  count nine, 211 robbery in the second degree;

3  and count ten, 211 robbery in the second degree.

4  This hearing is being tape-recorded and for the

5  purpose of voice identification each of us is

6  required to state our first and last name,

7  spelling our last name.  When it comes to the

8  inmate's turn you will spell your last name,

9  Mr. Sinn and then give us your CDC number.  I'll

10  start and go to my left.  Tom Sawyer, S-A-W-Y-E-

11  R, Commissioner.

12      **DEPUTY COMMISSIONER MITCHELL:**  Bruce

13  Mitchell, M-I-T-C-H-E-L-L, Deputy Commissioner.

14      **DEPUTY DISTRICT ATTORNEY ROSE:**  Carol

15  Rose, R-O-S-E, LA County District Attorney's

16  Office, Deputy DA.

17      **ATTORNEY DEFILIPPIS:**  Steve Defilippis,

18  D-E-F-I-L-I-P-P-I-S.  I am the attorney for

19  Mr. Sinn.

20      **INMATE SINN:**  Gary Sinn, S-I-N-N,

21  D-57219.

22      **PRESIDING COMMISSIONER SAWYER:**  Thank

23  you.  We also have two correctional peace

24  officers in the room for security purposes.

25  Mr. Sinn, you signed a BPT Form 1073, which is a

26  Reasonable Accommodation Notice in accordance to

27  the provisions of the Americans with

3

1   Disabilities Act.  It indicates here you do not
2   have any disabilities, however, I notice you're
3   wearing glasses.
4          **INMATE SINN:**  I have dyslexia and stuff
5   but I don't count that as a disability.
6          **PRESIDING COMMISSIONER SAWYER:**  Okay.
7   You're also dyslexic?
8          **INMATE SINN:**  Yes.
9          **PRESIDING COMMISSIONER SAWYER:**  Yeah,
10  I've got a little of that myself.  But you do
11  wear glasses.
12         **INMATE SINN:**  Yes.
13         **PRESIDING COMMISSIONER SAWYER:**  And the
14  purpose of those glasses?
15         **INMATE SINN:**  I'm far-sighted.
16         **PRESIDING COMMISSIONER SAWYER:**  You're
17  far-sighted?
18         **INMATE SINN:**  Yes.
19         **PRESIDING COMMISSIONER SAWYER:**  Okay.  So
20  you need them for?
21         **INMATE SINN:**  Close-up.
22         **PRESIDING COMMISSIONER SAWYER:**  Okay.  So
23  you can -- Can you read with those glasses?
24         **INMATE SINN:**  Yes.
25         **PRESIDING COMMISSIONER SAWYER:**  Okay.
26  I'm going to send this form over to you.  It's
27  dated 2/18 of '05.  And if you'd just look at

4

1  that and make sure that it's current and

2  correct.

3         **INMATE SINN:** It's fine.

4         **PRESIDING COMMISSIONER SAWYER:** Okay,

5  thank you. I also have a document indicates

6  that you and your attorney, Mr. Defilippis --

7  Mr. Defilippis, did you go over the reasonable

8  accommodation as well as the outline of the

9  Board, of the hearing procedures?

10        **ATTORNEY DEFILIPPIS:** Yes I have, yes I

11 have.

12        **PRESIDING COMMISSIONER SAWYER:** The

13 inmate's rights and the confidential material

14 and both of you signed off on it today, 12/6 of

15 '05. Are you asking to waive the reading?

16        **ATTORNEY DEFILIPPIS:** That's correct.

17        **PRESIDING COMMISSIONER SAWYER:** Thank

18 you. I'm going to pass the hearing checklist

19 over to you, it's marked Exhibit One. Pass that

20 to Mr. Defilippis and then if you'd pass it on

21 to Ms. Rose. Make sure we all have the same

22 documents.

23        **ATTORNEY DEFILIPPIS:** It doesn't check

24 letters of employment but there are --

25        **PRESIDING COMMISSIONER SAWYER:** You

26 brought --

27        **ATTORNEY DEFILIPPIS:** Confirmation.

5

1       **PRESIDING COMMISSIONER SAWYER:** You

2  brought a document to us today.

3       **ATTORNEY DEFILIPPIS:** In number six it

4  has Other checked but nothing is filled in. Do

5  you know what that was in reference to?

6       **PRESIDING COMMISSIONER SAWYER:** Yesterday

7  I gave you a late --

8       **ATTORNEY DEFILIPPIS:** Right.

9       **PRESIDING COMMISSIONER SAWYER:** The late

10  mail. And in that was the BPT 1001, that was

11  your postponement from the last hearing date.

12       **ATTORNEY DEFILIPPIS:** Right.

13       **PRESIDING COMMISSIONER SAWYER:** September

14  27. And then I did notice that they had our

15  worksheet on that. And on that worksheet it was

16  different than the worksheet I just used.

17  Because that indicates the stayed, other

18  commitment offenses other than the commitment

19  offense. It indicated all the armed with a

20  firearm were stayed. That was different than

21  the one I had in the file.

22       **ATTORNEY DEFILIPPIS:** Yeah. Other than

23  the 25 to life and the one year on the 25 to

24  life all other terms in this case were stayed.

25  I think that is accurate.

26       **PRESIDING COMMISSIONER SAWYER:** Well they

27  only indicated here that every other one, the

6

1  use of the firearm was stayed but the 211s were

2  still active.

3      **ATTORNEY DEFILIPPIS:** No, everything was

4  stayed.  It was all --

5      **PRESIDING COMMISSIONER SAWYER:** So we

6  don't have count two through ten?

7      **ATTORNEY DEFILIPPIS:** There are no --

8  There are no terms set on those that were not

9  stayed.  All of those terms were stayed.

10     **PRESIDING COMMISSIONER SAWYER:** The terms

11 were?

12     **ATTORNEY DEFILIPPIS:** Yeah.

13     **PRESIDING COMMISSIONER SAWYER:** Okay.

14     **DEPUTY DISTRICT ATTORNEY ROSE:** They may

15 have been made concurrent.

16     **ATTORNEY DEFILIPPIS:** No they were

17 stayed.

18     **DEPUTY DISTRICT ATTORNEY ROSE:** And how

19 do you know that?  Do you have -- Does it

20 indicate that in the documentation?

21     **ATTORNEY DEFILIPPIS:** Yes it does.

22     **DEPUTY DISTRICT ATTORNEY ROSE:** Where?

23     **ATTORNEY DEFILIPPIS:** Well with the

24 exception of that box checked of other in

25 section six I have all materials that are listed

26 in the Exhibit One.

27     **PRESIDING COMMISSIONER SAWYER:** Okay.

7

1          **DEPUTY DISTRICT ATTORNEY ROSE:**  Actually

2    it indicates -- it indicates on the -- If I may?

3          **PRESIDING COMMISSIONER SAWYER:**  The

4    controlling document indicates, doesn't indicate

5    those ten counts were stayed.

6          **DEPUTY DISTRICT ATTORNEY ROSE:**  It

7    indicates concurrent on the prison package from

8    the abstract, that they are concurrent.  In the

9    legal documents.  And they even indicate the

10   number of years that they were sentenced and

11   made concurrent.

12         **DEPUTY COMMISSIONER MITCHELL:**  If I may,

13   I have the abstract of judgements.  Are you

14   looking at those?

15         **DEPUTY DISTRICT ATTORNEY ROSE:**  Yes.

16         **ATTORNEY DEFILIPPIS:**  Oh, I'm sorry, I

17   stand corrected.  Counts three and four were

18   stayed and the balance of the counts were run

19   concurrent.  The enhancements in counts five

20   through ten were stayed.

21         **PRESIDING COMMISSIONER SAWYER:**  Right,

22   okay, and that's the way I read it.

23         **ATTORNEY DEFILIPPIS:**  Yeah.

24         **DEPUTY DISTRICT ATTORNEY ROSE:**  The

25   abstract indicates that three and four are

26   concurrent.

27         **ATTORNEY DEFILIPPIS:**  Counts three and

8

1   four, the defendant is sentenced to state prison

2   for the midterm of 18 months plus two years each

3   pursuant to 12022.5.  Stayed pursuant to Section

4   654.

5        **DEPUTY DISTRICT ATTORNEY ROSE:**  That's

6   not the abstract, if I may.

7        **ATTORNEY DEFILIPPIS:**  Counts three and

8   four are the -- I'd have to find it.  I think

9   three and four are the robbery that formed the

10  basis for the felony murder, in which case under

11  654 they have to be stayed.

12       **DEPUTY DISTRICT ATTORNEY ROSE:**  May I

13  speak?  Because I'm not seeing that.

14       **PRESIDING COMMISSIONER SAWYER:**  I don't

15  see it either.

16       **DEPUTY DISTRICT ATTORNEY ROSE:**  No, I'm

17  seeing only the minute order.

18       **ATTORNEY DEFILIPPIS:**  Well first of all I

19  certainly appreciate the district attorney

20  speaking but one thing that's absolutely

21  prohibited in a Board hearing is the district

22  attorney giving legal advice to the Board.

23       **PRESIDING COMMISSIONER SAWYER:**  She's not

24  giving legal advice.  She's just merely trying

25  to straighten this out.  She's being helpful.

26       **ATTORNEY DEFILIPPIS:**  Well legal advice

27  is often helpful too but there is an absolute

9

1  prohibition against giving legal advice.

2        **PRESIDING COMMISSIONER SAWYER:**  I
3  understand that.

4        **DEPUTY DISTRICT ATTORNEY ROSE:**  Excuse
5  me.

6        **ATTORNEY DEFILIPPIS:**  And what the effect
7  of the sentence was is in fact legal advice.

8        **DEPUTY DISTRICT ATTORNEY ROSE:**  Counsel.

9        **ATTORNEY DEFILIPPIS:**  The district
10  attorney is entitled to be present here for one
11  purpose and one purpose alone, which is to state
12  the People's position regarding suitability.

13        **PRESIDING COMMISSIONER SAWYER:**  Well, two
14  purposes, one to ask questions and then --

15        **ATTORNEY DEFILIPPIS:**  No, it's solely to
16  state the People's position as to suitability.

17        **DEPUTY DISTRICT ATTORNEY ROSE:**  If
18  counsel misstates something it's my obligation
19  to speak up.

20        **ATTORNEY DEFILIPPIS:**  No it is not.

21        **PRESIDING COMMISSIONER SAWYER:**  No,
22  actually it isn't.

23        **DEPUTY DISTRICT ATTORNEY ROSE:**  Okay.

24        **PRESIDING COMMISSIONER SAWYER:**  That
25  would be my job.

26        **DEPUTY DISTRICT ATTORNEY ROSE:**  Okay.

27        **PRESIDING COMMISSIONER SAWYER:**  Well

10

1  we're not here to retry this case as it is.
2  We're still -- The documents are the documents.
3        **ATTORNEY DEFILIPPIS:**  Yeah.  And I don't
4  think it makes any appreciable difference for
5  purposes of what we're doing here today.
6        **PRESIDING COMMISSIONER SAWYER:**  It
7  doesn't, no.  We're just here to determine
8  whether he's suitable for parole.  Okay, thank
9  you.  And thank you, Ms. Rose, for offering your
10  advice.
11        **DEPUTY DISTRICT ATTORNEY ROSE:**  You're
12  welcome.
13        **PRESIDING COMMISSIONER SAWYER:**  Ms. Rose,
14  did you get a chance to look at the hearing
15  checklist?
16        **DEPUTY DISTRICT ATTORNEY ROSE:**  Yes I
17  have and I have everything, thank you.
18        **PRESIDING COMMISSIONER SAWYER:**  Okay, are
19  there any additional documents, counsel, to be
20  submitted?
21        **ATTORNEY DEFILIPPIS:**  None other than the
22  updated parole plans, which were previously
23  provided to you.
24        **PRESIDING COMMISSIONER SAWYER:**  Okay, and
25  are there any preliminary objections?
26        **ATTORNEY DEFILIPPIS:**  Not at this time.
27        **PRESIDING COMMISSIONER SAWYER:**  Okay.

11

1  Will the inmate be speaking with the panel?

2       **ATTORNEY DEFILIPPIS:**  Yes he will.  He

3  will not be discussing the commitment offense

4  but he will discuss all other issues.  We'll

5  submit the issue of the commitment offense on

6  the probation report and the two prior hearing

7  transcripts where he testified fully regarding

8  that.

9       **PRESIDING COMMISSIONER SAWYER:**  Okay.

10  And the psych report?

11       **ATTORNEY DEFILIPPIS:**  Sure.  I think he's

12  discussed it also in the psych report, several

13  of the psych reports.

14       **PRESIDING COMMISSIONER SAWYER:**  Yes.

15  Okay, I am going to be reading from the Board

16  Report.  And this is the Board Report dated

17  February '03 and the subsequent Board Reports

18  refer back to that in terms of the commitment

19  offense.  Summary of the crime, page one:

20           "On 12/12 of 1983 at approximately

21           7:15 p.m. Sinn and codefendants

22           Rodney Harris, H-A-R-R-I-S, Tyrone

23           Reed Miller, M-I-L-L-E-R, now

24           deceased, went to the rear of 143

25           East 129th Street, Los Angeles,

26           California and identified

27           themselves as police officers.

12

1        They handcuffed their victims

2        Bolton, B-O-L-T-O-N, and Henry, H-

3        E-N-R-Y.  Victims Bolton and Henry

4        and Turner, T-U-R-N-E-R, were

5        taken inside the house by Sinn and

6        codefendant Harris while

7        codefendant Miller remained

8        outside the house as a lookout.

9        Shortly after this victim Russell,

10       R-U-S-S-E-L-L, came to the house

11       and was shot by codefendant

12       Miller.  Sinn and codefendants

13       Harris and Miller fled the scene.

14       On 1/7 of 1984 Sinn and

15       codefendant Byron, B-Y-R-O-N,

16       Jackson, J-A-C-K-S-O-N, gained

17       entry into a gambling

18       establishment located at 92nd

19       Street and Central Avenue, Los

20       Angeles, California, where they

21       robbed the patrons at gunpoint.

22       Sinn attempted to avoid

23       prosecution by fleeing the court's

24       jurisdiction.  Sinn was arrested

25       12/21 of 1986 in Fort Wayne,

26       Indiana and eventually transported

27       back to California to stand

13

```
 1        trial."
 2  In the prisoner's version:
 3            "Initially denies guilt.  Claimed
 4            during the course of this activity
 5            Sinn sold a blackjack, holster and
 6            handcuffs to Samuel Douglas, D-O-
 7            U-G-L-A-S, a janitor at a Lucky
 8            store where Sinn was employed.
 9            For reasons unknown to him Sinn
10            stated Douglas contacted police
11            officers and said that Sinn was
12            involved in a robbery and a
13            killing in Compton, California.
14            Sinn further stated that Douglas
15            was working with and covering for
16            a man named Greg Medira, M-E-D-I-
17            R-A, who was also employed at
18            Lucky Stores.  Sinn denies having
19            anything to do with the incident
20            and as a result of what Douglas
21            did Sinn was arrested in 1983.
22            Sinn made bail, $1,000, and left
23            California.  Sinn said he left
24            California because the man who was
25            killed was apparently a member of
26            a motorcycle gang whose
27            acquaintances threatened him and
```

14

1     his family, including his children

2     and mother.  On 11/15 of '02 Sinn

3     was given an opportunity to review

4     his Central File.  Additionally he

5     was requested to provide his

6     version of the offense.  Sinn now

7     admits his involvement in the

8     crime.  His involvement was

9     strictly financial as he had a

10    hard time making ends meet and had

11    lost his job.  He said he did not

12    plan for someone to get hurt or

13    killed, however, he shares the

14    responsibility.  He left

15    California because he and his

16    family were threatened by

17    acquaintances of the deceased

18    victim.  Sinn has no previous

19    convictions, whether juvenile --"

20    **ATTORNEY DEFILIPPIS:**  Mr. Sawyer.

21    **PRESIDING COMMISSIONER SAWYER:**  Yes.

22    **ATTORNEY DEFILIPPIS:**  There's just one

23    thing I do want to clarify regarding the

24    statement of facts.  Because it does sound like

25    the initial denial of guilt was by Mr. Sinn at

26    the time of this LPER being prepared in 2003.

27    But you'll note that three-quarters of the way

15

1  down through that version is where he admits

2  involvement in the offense at this time.

3      **PRESIDING COMMISSIONER SAWYER:**  That's

4  correct.

5      **ATTORNEY DEFILIPPIS:**  That introductory

6  part is not actually the prisoner's version,

7  certainly not the prisoner's version while he

8  has been incarcerated in prison.  That

9  information was taken from the probation report.

10      **PRESIDING COMMISSIONER SAWYER:**  Okay.

11  When did he first admit guilt?  When did he

12  first admit guilt?

13      **ATTORNEY DEFILIPPIS:**  I don't have a

14  specific date.  It would be, it should be

15  reflected in the file.  There was a period he

16  didn't talk about the crime but he did

17  acknowledge it at all the points that he's

18  talked to either counselors or psychologists

19  here in the prison, as well as at his Initial

20  Board Hearing and first Subsequent.

21      **PRESIDING COMMISSIONER SAWYER:**  Thank

22  you.  I read it that way too.  As I said, no

23  juvenile record, no adult convictions.  Personal

24  factors, he was born July 5, 1952 in Youngstown,

25  Ohio.  Sinn is the middle of three children born

26  to the marriage of Walter George Sinn and Donna

27  Rosenberg.  Sinn stated that his father, who

16

1    worked as a truck driver and a saddle shop owner

2    died of a heart attack.  His mother was employed

3    at a department store and presently lives in

4    Anaheim.  Is she still living in Anaheim, sir?

5        INMATE SINN:  Correct.

6        PRESIDING COMMISSIONER SAWYER:  He

7    received his high school diploma through a GED

8    program in 1973.  He was unemployed at the time

9    of the arrest and the present offense.  Why were

10   you unemployed when you were arrested?

11       INMATE SINN:  I wasn't, we were on

12   strike.

13       PRESIDING COMMISSIONER SAWYER:  When you

14   were arrested or when the offense went down?

15       INMATE SINN:  When the offense went down.

16   When I was arrested I was employed.

17       PRESIDING COMMISSIONER SAWYER:  You were?

18       INMATE SINN:  Yes.

19       PRESIDING COMMISSIONER SAWYER:  Okay, so

20   this isn't correct.

21       INMATE SINN:  No.

22       PRESIDING COMMISSIONER SAWYER:  What were

23   you doing in Ohio or wherever you went?

24       INMATE SINN:  Indiana.

25       PRESIDING COMMISSIONER SAWYER:  Indiana.

26       INMATE SINN:  I was self-employed as a

27   truck driver, a moving company.

17

1          **PRESIDING COMMISSIONER SAWYER:**  Okay.

2    Future plans are to live with your mother Donna

3    Sinn, and your wife Rachel Sinn in Anaheim,

4    California.  Is that still --

5          **INMATE SINN:**  That's one option.  My

6    employment both have housing available.

7          **PRESIDING COMMISSIONER SAWYER:**  Okay.  I

8    know you've submitted your parole plans to us.

9    Now you've got three companies in Ohio that

10   you've worked for before?

11         **INMATE SINN:**  Well they're family

12   companies.

13         **PRESIDING COMMISSIONER SAWYER:**  Family

14   companies?

15         **INMATE SINN:**  Yes.

16         **PRESIDING COMMISSIONER SAWYER:**  Okay.  In

17   California at Folk Wood Apartments as a

18   handyman/plumber with an apartment available for

19   you to live in.  Are your children still at

20   home?

21         **INMATE SINN:**  No, all my children are

22   grown and married.

23         **PRESIDING COMMISSIONER SAWYER:**  How old

24   are they?

25         **INMATE SINN:**  The youngest is 23 and the

26   oldest is 30.

27         **PRESIDING COMMISSIONER SAWYER:**  Okay.

18

1  Are they staying out of trouble?

2  　　　INMATE SINN:  Never been a problem.

3  　　　PRESIDING COMMISSIONER SAWYER:  Never

4  been, okay good.  Do you have any grandchildren?

5  　　　INMATE SINN:  I have four grandchildren.

6  　　　PRESIDING COMMISSIONER SAWYER:  Do your

7  children visit with you or correspond with you?

8  　　　INMATE SINN:  Constantly, yes.

9  　　　PRESIDING COMMISSIONER SAWYER:  Okay.

10  How about your wife?

11  　　　INMATE SINN:  Every week.

12  　　　PRESIDING COMMISSIONER SAWYER:  Every

13  week a visit or every week --

14  　　　INMATE SINN:  I mean every weekend, yeah,

15  a visit.  A visit.

16  　　　PRESIDING COMMISSIONER SAWYER:  She

17  visits with you?

18  　　　INMATE SINN:  Yes.

19  　　　PRESIDING COMMISSIONER SAWYER:  Drives up

20  here?

21  　　　INMATE SINN:  Uh-huh.

22  　　　PRESIDING COMMISSIONER SAWYER:  And where

23  is she living now?

24  　　　INMATE SINN:  Anaheim.

25  　　　PRESIDING COMMISSIONER SAWYER:  With your

26  mother?

27  　　　INMATE SINN:  With my mother, yeah.  She

19

1  takes care of my mother.

2        PRESIDING COMMISSIONER SAWYER:   Okay.

3  How old is your mother?

4        INMATE SINN:   Seventy-four.

5        PRESIDING COMMISSIONER SAWYER:   You have

6  also been offered a position with Pascan, P-A-S-

7  C-A-N, Management Corporation as an apartment

8  manager.  Responsibilities for managing and

9  maintenance of one of their apartment complexes.

10  And that includes an apartment for yourself.

11  You also have the family home.  That's three

12  bedrooms.

13        INMATE SINN:   Yeah, that's where my

14  mother and my wife are right now.

15        PRESIDING COMMISSIONER SAWYER:   You plan

16  to work at one of the above firms until you

17  establish yourself back in the community.  You

18  plan to return to your previous employment in

19  the funeral home business until you retire.

20  That's your long-term plan?

21        INMATE SINN:   Correct.

22        PRESIDING COMMISSIONER SAWYER:   You want

23  to establish a funeral home business?

24        INMATE SINN:   I want to establish myself

25  back in the community and then get back into the

26  mortuary.  Also mortuaries, they all supply

27  housing also.

20

1        PRESIDING COMMISSIONER SAWYER:  Because

2    you're on call a lot.

3        INMATE SINN:  Yeah, every other night.

4        PRESIDING COMMISSIONER SAWYER:  And

5    you've got a license?

6        INMATE SINN:  I'm a licensed mortician/

7    funeral director.

8        PRESIDING COMMISSIONER SAWYER:  Is that

9    expired?

10        INMATE SINN:  Yes it expired, it just has

11    to be updated.

12        PRESIDING COMMISSIONER SAWYER:  How do

13    you update it?

14        INMATE SINN:  It's like a state

15    certification.  You just have to retake your

16    test again.

17        PRESIDING COMMISSIONER SAWYER:  I see.

18    What's the term for --

19        INMATE SINN:  Excuse me?

20        PRESIDING COMMISSIONER SAWYER:  What's

21    the term for morticians inside the house?  What

22    do morticians call each other?

23        INMATE SINN:  Embalmer.  You mean

24    embalmer or mortician?  We go by funeral

25    director.

26        PRESIDING COMMISSIONER SAWYER:  Isn't

27    there a lot more crude saying for it?

21

1          INMATE SINN:  No, that's what we use.

2          PRESIDING COMMISSIONER SAWYER:  Is that

3    right?

4          INMATE SINN:  Yes.

5          PRESIDING COMMISSIONER SAWYER:  Ever

6    heard of cotton-stuffer?

7          INMATE SINN:  No, I have not.

8          PRESIDING COMMISSIONER SAWYER:  Get out

9    of town.

10          INMATE SINN:  What was that again?

11   Cotton-stuffer?

12          PRESIDING COMMISSIONER SAWYER:  Cotton-

13   stuffer.

14          INMATE SINN:  I know the term we use it

15   for but I never heard it as a slang.

16          PRESIDING COMMISSIONER SAWYER:  Yeah,

17   (inaudible).

18          ATTORNEY DEFILIPPIS:  I'm not even going

19   to ask what that means.

20          INMATE SINN:  You don't want to know.

21          PRESIDING COMMISSIONER SAWYER:  Upon your

22   release from parole you have a $20,000

23   certificate of deposit and transportation.  Your

24   wife also has a new Honda CRV which is available

25   for your transportation to and from work.  Now

26   where did the $20,000 certificate of deposit

27   come in?

22

1        **INMATE SINN:**  It was a savings account

2    from my mother.

3        **PRESIDING COMMISSIONER SAWYER:**  Okay.  Is

4    this a kind of pre-inheritance?

5        **INMATE SINN:**  Yeah, it's an inheritance,

6    you know, it's waiting, yeah.

7        **PRESIDING COMMISSIONER SAWYER:**  Okay.

8    Several employment opportunities available to

9    you as well as housing and you believe that -- I

10   can't read the date on this.

11       **INMATE SINN:**  Oh, that's 5/23/05.

12       **PRESIDING COMMISSIONER SAWYER:**  And it's

13   signed by you?

14       **INMATE SINN:**  Correct.

15       **PRESIDING COMMISSIONER SAWYER:**  Page two

16   of that document indicates supervisors' work

17   reports as well as your health training program

18   and an excerpt from your latest psych, which

19   I'll get into in a minute.  Also your

20   educational/vocational achievements which

21   Commissioner Mitchell will talk about.  You

22   received a copy of this, didn't you?

23       **DEPUTY COMMISSIONER MITCHELL:**  Yes.

24       **PRESIDING COMMISSIONER SAWYER:**  He's done

25   all your work for you.

26       **DEPUTY COMMISSIONER MITCHELL:**  Yes.

27       **PRESIDING COMMISSIONER SAWYER:**  And then

23

1  the Impact weekly plan.  Why is this attached?

2        **INMATE SINN:**  That's the program, the new

3  updated program on Impact, the latest one.  All

4  the different courses that we study, the

5  Alternatives to Violence, Victims' Rights.

6  Actually this is the best class of anything in

7  prison is this class right here.

8        **PRESIDING COMMISSIONER SAWYER:**  Ever have

9  any trouble with alcohol or drugs?

10       **INMATE SINN:**  Never.

11       **PRESIDING COMMISSIONER SAWYER:**  Okay. In

12  the psych report, I read this last night, this

13  is September 2 of '05.  It really -- I'm not

14  going to read it all but here in the review of

15  the life crime I think the psychologist did a

16  far better job than the counselor in documenting

17  that.  Well, you don't want to talk about other

18  than -- Do you have any comments that you would

19  like to make regarding the psych report?  Have

20  you read this?

21       **INMATE SINN:**  Yes, yes.  I spent an

22  extensive time with the psychs and actually

23  enjoyed talking to them.  It was the first time

24  I really got to talk about the crime and how I

25  was feeling at the time.  I think they made a

26  pretty good assessment.

27       **ATTORNEY DEFILIPPIS:**  In this last one

24

1  you mean?

2      **INMATE SINN**:  In all three of them.

3      **PRESIDING COMMISSIONER SAWYER**:  Because

4  the last one was '05, September.

5      **INMATE SINN**:  Yes, 9/02/05.  We really

6  got into depth on that one.

7      **PRESIDING COMMISSIONER SAWYER**:  Yeah, you

8  did.  Again, I'm not going to reread that.  We

9  gave a synopsis of the crime.  Okay.  I'm going

10  to read the observations, the comments and

11  recommendations.  It says:

12          "No mental or emotional problems

13          that would interfere with granting

14          parole at this time.  Inmate Sinn

15          has strong family support in the

16          community and has numerous job

17          offers in Ohio as well as

18          California.  He spoke about how

19          much damage he has done to society

20          and others by his criminal

21          actions.  He stated that he is

22          determined to get help for others,

23          benefit others and become a

24          blessing to others when he is

25          released.  He does have good

26          insight and self-awareness.  He's

27          made significant changes over the

25

```
 1          years in a positive direction.
 2          The prognosis for a successful
 3          adjustment to the community is
 4          excellent."
 5     This is from Dr. Macomber, M-A-C-O-M-B-E-R,
 6     Ph.D. dated 9/2 of '05.  Additionally I have in
 7     your file, I have letters.  I have a letter of
 8     support from your mother, a letter of support
 9     from your wife, approximately a page and a half.
10     Is the York Circle the address?
11          INMATE SINN:  Yes.
12          PRESIDING COMMISSIONER SAWYER:  Okay.
13     Your mother's letter was undated.  Your wife's
14     letter is undated.  I have a letter of support
15     that's dated August 19, 2005 from your daughter,
16     Christina (phonetic) Sinn Salazar.  That's her
17     married name?
18          INMATE SINN:  Salazar, yes, correct.
19          PRESIDING COMMISSIONER SAWYER:  She does
20     kind of an analysis for us.
21          INMATE SINN:  Yes.
22          PRESIDING COMMISSIONER SAWYER:  Okay.
23     Candace (phonetic) Ontiveros.
24          INMATE SINN:  Correct.
25          PRESIDING COMMISSIONER SAWYER:  O-N-T-I-
26     V-E-R-O-S, this is also a daughter.  She talks
27     about not only the lot of support but about
```

26

1 housing.  Is this the property we were talking

2 about in the previous --

3      **INMATE SINN:**  This is one, one of the

4 apartments, correct.

5      **PRESIDING COMMISSIONER SAWYER:**  Okay,

6 very good.  Okay.  Does she own this apartment?

7      **INMATE SINN:**  No, she is a manager.

8      **PRESIDING COMMISSIONER SAWYER:**  Manager.

9 Okay.  And then I have a letter from another

10 daughter, Carrie (phonetic).  It says 8/17 of

11 '05.  It's a two page -- And by the way, you can

12 pass this back to your daughters if you'd like.

13 They do a very nice job writing letters.

14      **INMATE SINN:**  Thank you.

15      **PRESIDING COMMISSIONER SAWYER:**  They're

16 very literate and very organized in their

17 thoughts.  This is Carrie Sinn's letter.

18 Obviously a letter of support.  I have a letter

19 dated 8/26 of '05 from your son Chad.

20      **INMATE SINN:**  Correct.

21      **PRESIDING COMMISSIONER SAWYER:**  And it's

22 certainly a letter of support.  He talks about

23 how much he's missed you.  And probably the best

24 letter of all is from your grandson.

25      **INMATE SINN:**  Isaiah.

26      **PRESIDING COMMISSIONER SAWYER:**  Isaiah.

27 Thank you for clarifying that because I couldn't

27

1  read that part.  But he's eight years old?

2         INMATE SINN:  Correct.

3         PRESIDING COMMISSIONER SAWYER:  Okay.

4  And this is dated August 29.  His handwritten

5  letter is certainly of support.  I also have a

6  letter from your father-in-law.  No, your son-

7  in-law, Ruben.

8         INMATE SINN:  Ruben, son-in-law, yes.

9         PRESIDING COMMISSIONER SAWYER:  And

10  what's his last name?

11         INMATE SINN:  That's the one that's with

12  my daughter Candace.

13         PRESIDING COMMISSIONER SAWYER:  Candace

14  Ontiveros?

15         INMATE SINN:  Yes.

16         PRESIDING COMMISSIONER SAWYER:  In

17  support.  Have you ever met him?

18         INMATE SINN:  All the time.  He comes up

19  here all the time to see me, yes.

20         PRESIDING COMMISSIONER SAWYER:  Visits?

21         INMATE SINN:  Yes.

22         PRESIDING COMMISSIONER SAWYER:  Okay.

23  And who is Walter?

24         INMATE SINN:  That's my brother.

25         PRESIDING COMMISSIONER SAWYER:  That's

26  your brother.  And he lives in Canfield, Ohio

27  and he's got one of those businesses that --

28

1        **INMATE SINN:**  Seven.

2        **PRESIDING COMMISSIONER SAWYER:**  He's got

3    seven businesses that would be available to you

4    someday in Ohio.  Okay, this is a letter of

5    support, a letter of support from Darlene.

6        **INMATE SINN:**  Sister.

7        **PRESIDING COMMISSIONER SAWYER:**  Liddle,

8    L-I-D-D-L-E.  And it's dated August 29, 2005.

9    Certainly a letter of support.  A letter of

10   support from your nephew -- your niece, I'm

11   sorry, Debra Gregory.

12       **INMATE SINN:**  It's Debbie, yes.

13       **PRESIDING COMMISSIONER SAWYER:**  And she's

14   a niece?

15       **INMATE SINN:**  Correct.

16       **PRESIDING COMMISSIONER SAWYER:**  August

17   29, 2005, she lives in Portola Hills,

18   California.  A letter of support.  And from

19   Lakeland, Florida we have your, these are your

20   in-laws?

21       **INMATE SINN:**  Klaciks.

22       **PRESIDING COMMISSIONER SAWYER:**  K-L-A --

23       **INMATE SINN:**  C-I-K.

24       **PRESIDING COMMISSIONER SAWYER:**  C-I-K,

25   Klacik.

26       **INMATE SINN:**  Yeah, in-laws.

27       **PRESIDING COMMISSIONER SAWYER:**  John and

29

1    Rose Marie, the parents of Rachel your wife,

2    okay. They're offering any assistance and

3    offering support. And now from Canfield, Ohio I

4    have a letter from Velma, V-E-L-M-A --

5         **INMATE SINN:** Glista.

6         **PRESIDING COMMISSIONER SAWYER:** Glista,

7    G-L-I-S-T-A. Offering support. Even offering a

8    place to live. And then a letter from Ed Klacik

9    of Canfield, Ohio, a brother-in-law. He's

10   willing to help you reestablish in the community

11   in Ohio. That's certainly support. Klacik

12   Trucking, Youngstown, Ohio from Rick Klacik.

13   That's your brother-in-law, another brother-in-

14   law. Offering support. Carol Bernard from

15   Austintown, Ohio dated August 19, 2005, one of

16   your sister-in-laws, offering support, a home.

17   A handwritten letter from Victor --

18        **INMATE SINN:** Tomich.

19        **PRESIDING COMMISSIONER SAWYER:** T-O-M-I-

20   C-H.

21        **INMATE SINN:** Correct.

22        **PRESIDING COMMISSIONER SAWYER:** Okay,

23   that's an uncle. He claims that he and his wife

24   would help you in any way possible. And where

25   do they live?

26        **INMATE SINN:** Florida also.

27        **PRESIDING COMMISSIONER SAWYER:** Florida.

30

1  Okay, I have got a letter from a cousin from

2  Youngstown, Ohio.  He has a farm and you're

3  welcome there as a place to stay.  This is Tracy

4  (phonetic) Sinn, dated September 17, 2004.

5  Terry Gatrell (phonetic), August 19, 2005, a

6  cousin and that's in Salem, Ohio.  Certainly a

7  letter of support.  Okay, very good.

8  Commissioner Mitchell.

9        **DEPUTY COMMISSIONER MITCHELL:**  Yes.  For

10  this portion of the hearing Mr. Sinn, I reviewed

11  your Central File, post-conviction progress

12  reports, the life prisoner evaluation report

13  prepared for the June 2005 calendar by

14  correctional counselor F. I. DeGuzman, D-E-G-U-

15  Z-M-A-N, and a psychological evaluation prepared

16  by Dr. Melvin Macomber, Ph.D. dated September 2,

17  2005, that's the dictation date.  And I'm sure

18  counsel received that, did you not?

19        **ATTORNEY DEFILIPPIS:**  Yes.

20        **DEPUTY COMMISSIONER MITCHELL:**  The prior

21  hearing occurred on June 1, 2004 making this

22  your second Subsequent Parole Consideration

23  Hearing.  The last hearing the Board took action

24  and denied parole for one year.  The Board

25  subsequently scheduled a hearing for September

26  27 of 2005 but it was postponed as your attorney

27  at the time was ill.  The recommendations at the

31

1    previous hearing were to request a new

2    psychological report.  That's not your

3    responsibility but you were asked to cooperate

4    with the clinicians.  That was done, it appears

5    that you have done that.  To continue with self-

6    help.  And I'm going to refer to the Board

7    transcript of what you have done and I have

8    current chronos from self-help.  Yes you have

9    continued to participate in Alcoholics Anonymous

10   and remain disciplinary-free, which you have

11   complied with.  So you have complied with all

12   the Board's expectations from the last hearing.

13   Your housing classification score: You have an

14   actual score of zero.  You have a mandatory

15   score of 19.  That was the same case last time

16   you appeared before the Board.  You've

17   maintained your custody of Medium-A.  Just for

18   the record, you cannot receive a classification

19   score of less than 19, as you well know, as a

20   lifer without a parole date and your Medium-A

21   custody is the lowest custody definition you can

22   have as a life term prisoner without a parole

23   date.  As far as enemies, there is none on file,

24   there is no gang affiliation.  Your current

25   assignment is maintenance plumber.  Is that

26   correct, sir?

27        **INMATE SINN:**  Correct.

32

1     **DEPUTY COMMISSIONER MITCHELL:**  The most
2     current chrono is dated October 25, 2005.  I've
3     noted numerous years, several years you have
4     participated as a maintenance plumber and you
5     have excellent grades.  It was already brought
6     up you got your high school diploma as such.  It
7     looks like you got your GED from Western High
8     School in 1972, based on file material.  Then
9     you took an examination in state prison on July
10    19, 1997 and qualified for high school
11    graduation as far as the equivalency at that
12    same time.  Vocational training: There was so
13    much done in the previous transcript I'm just
14    going to go back to it.  And counsel submitted a
15    document that lists most of the stuff, maybe all
16    of it.  And I'll cover both items.  In the last
17    transcript under vocational training it was
18    noted that you received certificates in small
19    appliance repair and you were certified as an
20    optical technician.  You received certificates
21    in welding and in machine shop as a die maker, a
22    certificate in blueprint reading and functions
23    as a journeyman plumber.  I noted that in your
24    file going back to the year 2000 a number of
25    laudatory chronos including one for vocational
26    training.  And this was 59 months that you
27    completed in the optical lab at the Richard J.

33

1    Donovan Correctional Facility in San Diego.  Is

2    that correct, sir?

3         **INMATE SINN:**  Correct.

4         **DEPUTY COMMISSIONER MITCHELL:**  I also

5    noted here that you received laudatory chronos

6    as an active member of the men's advisory

7    council, that's 1998, a couple of chronos for

8    that.  Another one -- let's see, I think

9    subsequent to that.  It doesn't have the date on

10   it.  You received a laudatory chrono in January

11   of 1998, academic teacher's aide.  In 1992, that

12   would be January, a vital member of the

13   maintenance plumbing crew.  February 22, 2000,

14   Impact workshop, 14 weeks you completed.

15   February 20, 2002 you completed the Muslim

16   Development Center's anger management course.

17   January 29, 2002, prevention, treatment and

18   management of HIV/AIDS; the same thing for

19   Hepatitis in 2001; the same thing for

20   Tuberculosis in 2000.  On July 13, 2001 a

21   comment from a correctional officer as an

22   excellent worker as a porter and that you also

23   completed the same prevention, treatment and

24   management-type program in sexually-transmitted

25   diseases, according to your file material.

26   Counsel submitted a document here, a laundry

27   list of different things you've completed.

34

1   These are your self-help programs.  Let me see
2   if you have got anything more vocational I need
3   to address.  Vocationally, counsel noted in this
4   document that was apparently prepared by
5   yourself the vocational optical lens maker,
6   which is verified by file material.  Your
7   welding, blueprint reading, machinist, die
8   maker, small engine repair with the
9   corresponding dates and maintenance plumber.  Is
10  there anything in addition as far as vocational
11  training that I have not addressed, sir?

12          **INMATE SINN:**  No, that's it.

13          **PRESIDING COMMISSIONER SAWYER:**  Okay.  In
14  the self-help groups what counsel has listed
15  besides what I noted here, starting in 1993
16  going through 2005, Alternatives to Violence,
17  Hands of Peace, anger management and advanced
18  training, parenting training, Breaking Barriers,
19  Impact program, tuberculosis awareness,
20  sexually-transmitted disease awareness,
21  Hepatitis awareness, anger management course,
22  HIV/AIDS awareness, nonviolence, several for
23  Alcoholics Anonymous self-help group.  A
24  document here from Dr. Gordon's family effective
25  training.  You also have another one from
26  Alcoholics Anonymous self-help group, another
27  anger management and again, Impact Victims'

35

1    Rights.  The most current chronos in your file

2    for Alcoholics Anonymous are dated -- the oldest

3    one I went back to would be January 20, 2004.

4    You have chronos in March of 2004, January 2005,

5    February 2005, April 2005 and October of 2005,

6    all noting your active participation in

7    Alcoholics Anonymous.  I noted older chronos

8    that said you had requested to be placed in

9    Alcoholics Anonymous on November 26, 2001 and

10   waited some period of time to get into the

11   program.

12        **INMATE SINN:** Correct.

13        **PRESIDING COMMISSIONER SAWYER:** Counsel

14   also submitted a yellow chrono here, it's an

15   informational chrono dated September 23, 2004

16   from R -- is it Cauntay?  C-A-N -- pardon me, C-

17   A-U-N-T-A-Y, senior librarian.  It indicates

18   that you have successfully completed Dr. Thomas

19   Gordon's family effective training, that's what

20   I read earlier, in the home self-help program.

21   This program consists of six two-hour sessions

22   covering the following topics: A credo for your

23   relationships.  Let's see.  Rule-setting,

24   solving problems, your own, the pitfalls of

25   punishment and rewards, helping others find

26   solutions to their own problems, resolving

27   conflicts peacefully, dealing with values,

36

1  collisions and courage for learning new skills

2  and rewards for using them.  And the program is

3  recognized by the staff at this institution,

4  psychology staff, as a beneficial, limited-

5  instruction self-help program.  Two of the

6  chronos that counsel gave me here, one is dated

7  March 28, 2005 by C. Brown, Ph.D.  And this is

8  thanking you for your interest in the self-

9  esteem for lifers group.  Apparently they were

10  over -- Let's see, what is this?  They had too

11  many persons apparently participating in the

12  program, you couldn't get in.  Are you still on

13  the waiting list?

14      **INMATE SINN:**  Correct.

15      **DEPUTY COMMISSIONER MITCHELL:**  And a

16  comment here from a vocational small engine

17  repair instructor J -- is it Keithly?  K-E-I-T-

18  H-L-Y.  This does not have a date on it.  And it

19  says, during his assignment in vocational small

20  engine repair Inmate Sinn displayed an excellent

21  attitude and good work habits and has no

22  objection to having Mr. Sinn reassigned to the

23  program.  I thought I'd just note this for a

24  little detail.  On June 17, 1997 an

25  informational chrono, a laudatory chrono

26  pertaining to your PIA optics involvement.  It

27  says here,

37

1          "During the 59 months that Inmate

2          Sinn has been assigned to the

3          department he has learned all

4          operations in the bench area.  His

5          primary job is now working in our

6          mini-lab as a critical eyewear

7          manufacturer.  This position takes

8          an advanced amount of skill to

9          perform.  In addition he is one of

10         our critical workers.  Inmate Sinn

11         has achieved recognition as a

12         reliable and skillful worker.  It

13         is further noted that Inmate Sinn

14         has not been a disciplinary

15         problem of any sort.  He has shown

16         he has the ability to work with

17         staff and other inmates.  His

18         attendance record is excellent.

19         This chrono serves as a record for

20         Inmate Sinn's progress during his

21         time in the PIA program."

22    Moving over to mental health issues.  There is

23    no indication that you have a mental health

24    difficulty at all.  No severe mental illness,

25    you are not receiving any kind of treatment for

26    it, and you have a current GAF score, that's a

27    Global Assessment of Functioning of 80.  And

38

1   that was noted out of the December 31, 2005
2   psychological evaluation.  Your disciplinary
3   record shows you have received in your total
4   history one rule violation report.  That's a 115
5   dated July 26, 1993 for use of alcohol and a
6   total of two counseling chronos, the last one
7   dated September 9, 1992 for essentially being
8   out of bounds.  That's what it appears to me
9   when I read the chrono.
10          **INMATE SINN:**  Correct.
11          **DEPUTY COMMISSIONER MITCHELL:**  In the
12  correctional counselor's evaluation I just
13  simply noted the portion of the summary that
14  suggests that before you were released you could
15  benefit by remaining disciplinary-free and
16  continuing to participate in self-help programs
17  when available.  The psychologist's report, I
18  should note for the -- Let's see, the self-help
19  programming.  It more or less repeats what I've
20  already noted here.  It indicates you
21  participated in Alternatives to Violence, anger
22  management, Impact, the parenting program, Hands
23  of Peace and the communicable disease program.
24  He has been in Alcoholics Anonymous for three
25  years.  He has also read --
26          (The tape was turned over.)
27          **DEPUTY COMMISSIONER MITCHELL:**  Okay,

39

1   we're back on record.  And the psychologists

2   note that you need to continue to be involved in

3   self-help to face, discuss, understand and cope

4   with the stress in a non-destructive manner.

5   Until progress is made the prisoner continues to

6   be unpredictable and a threat to others.

7       ATTORNEY DEFILIPPIS:  Excuse me, is that

8   -- Are you reading from the psychological

9   report?

10      DEPUTY COMMISSIONER MITCHELL:  Let me get

11  back to this and see what I've got.

12      ATTORNEY DEFILIPPIS:  That appears to be

13  a statement read out of BPT form 1000A.

14      DEPUTY COMMISSIONER MITCHELL:  Let me

15  look here again, I think you're --

16      ATTORNEY DEFILIPPIS:  That's not a --

17      DEPUTY COMMISSIONER MITCHELL:  It's a

18  psych report -- I don't know where I found that.

19      ATTORNEY DEFILIPPIS:  That was a Board

20  Hearing.

21      DEPUTY COMMISSIONER MITCHELL:  You're

22  right, I'm sorry.  I was trying to read the part

23  of the positive.  This is what the panel had

24  said before.  Let me get to the psych report.

25  The psych report, this is the one by

26  Dr. Macomber, the newest one.  Yes.  Just a

27  brief comment here.  He talks about your sense

40

1   of remorse appears to be sincere and genuine.

2   He says, as a result of Sinn's incarceration he

3   has matured a great deal over the last 20 years.

4   He described how he has learned to handle

5   potentially violent and explosive situations

6   that occur with other inmates in the prison

7   environment.  He does not know how to resolve

8   problems and conflicts -- Pardon me.  He does

9   know how to resolve problems and conflicts in a

10  responsible manner.  He has developed a strong

11  interest in Bible studies and spiritual growth.

12  As a result, material things are no longer

13  important to him.  He understands what his quest

14  for material things has cost him and his family.

15  He describes how his thinking has changed and he

16  now understands that there are other things that

17  are far more important than material things.

18  Such as his family's health and growth that he

19  has not been able to participate in, the loss of

20  fellowship with his wife and children, the

21  importance of love and service to others' needs,

22  et cetera.  Instead of a life dedicated to the

23  pursuit of material things his life at this

24  point in time is dedicated to developing skills

25  that will enable him to aid others in need.  He

26  has completed the 26 FEMA, F-E-M-A, disaster

27  relief courses, which you have listed in the

41

1  documents you gave me.  He has also participated

2  in numerous self-help groups such as

3  Alternatives to Violence, anger management

4  courses and Impact courses.  Under the

5  assessment of dangerousness he notes that your

6  potential, Mr. Sinn's potential for dangerous

7  behavior in the institution in comparison to

8  other inmates is definitely below average.  His

9  potential for dangerous behavior if released to

10  the community, the psychologist agrees with the

11  conclusion of Dr. Howlin, H-O-W-L-I-N, and

12  Dr. Gamard, G-A-M-A-R-D.  They concluded that

13  Inmate Sinn does not pose any more threat to the

14  public if released on parole at this time than

15  the average citizen.  He has definitely learned

16  his lesson, his values and thinking have changed

17  dramatically over these 20 years of

18  incarceration.  He is no longer motivated to

19  acquire materialistic things.  He understands

20  that he is accountable to his creator and that

21  God will hold him accountable for his

22  irresponsible actions.  Inmate Sinn is pro-

23  social in his values.  He has a strong work

24  ethic and he has been gainfully employed over

25  the years before he engaged in the criminal

26  activity.  He has numerous skills that will

27  enable him to support himself and his family in

42

1  the community.  He is licensed as a funeral

2  director and he has jobs in that field waiting

3  for him when he is granted parole.  He also is a

4  vocational optic and lens maker.  He is a

5  skilled welder.  He is a machinist and die

6  maker.  He also is skilled as a maintenance

7  plumber.  He is doing this work at this time in

8  the institution.  The observations: There are no

9  mental or emotional problems that would

10  interfere with granting parole at this time.

11  Inmate Sinn has strong ties -- pardon me --

12  strong, family support in the community.  He has

13  numerous job offers in Ohio as well as

14  California.  He spoke about -- He spoke about

15  how much damage he has done to society and to

16  others by his criminal actions.  He stated that

17  he is determined to help others and benefit

18  others and becoming a blessing to others when he

19  is released.  He does have good insight and

20  self-awareness.  He has made significant changes

21  over the years in a positive direction.  The

22  prognosis for successful adjustment in the

23  community is excellent.  So it's obvious that

24  the psychological report is very positive.

25  Counsel, is there anything that you or your

26  client would like me to address I haven't

27  mentioned in the post-conviction factor area?

43

1    **ATTORNEY DEFILIPPIS:** I don't believe so.
2  If there's anything else I'll cover it in
3  closing.

4    **DEPUTY COMMISSIONER MITCHELL:** Thank you.
5  Mr. Chairman.

6    **PRESIDING COMMISSIONER SAWYER:** Okay,
7  thank you.  Ms. Rose, do you have any questions?
8    **DEPUTY DISTRICT ATTORNEY ROSE:** I do.
9  Could you ask the inmate, please -- Here it is.
10 Who is Flora Steen Lacey (phonetic)?

11   **PRESIDING COMMISSIONER SAWYER:** You may
12 answer it.

13   **INMATE SINN:** Flora Steen Lacey?
14   **DEPUTY DISTRICT ATTORNEY ROSE:** Uh-huh.
15   **INMATE SINN:** I have no idea.

16   **DEPUTY DISTRICT ATTORNEY ROSE:** Okay.
17 Could you ask the inmate who is Eddie Williams?
18   **INMATE SINN:** Eddie Williams, I know him
19 as Sam Douglas.

20   **ATTORNEY DEFILIPPIS:** It appears that
21 counsel is getting into circumstances relating
22 to the offense, and as she's well aware,
23 Mr. Sinn is not discussing the circumstances of
24 the offense.

25   **DEPUTY DISTRICT ATTORNEY ROSE:** I'll
26 change my focus.  Could you ask the inmate what
27 is different now?  When he was employed by

44

1   Lucky's he had numerous skills before the crimes
2   and had four children to support.  He was a
3   licensed funeral director before the crimes.
4   What is different now?

5        INMATE SINN:  What is different in what
6   respect?  Can you elaborate a little more on
7   what you want to know?

8        **DEPUTY DISTRICT ATTORNEY ROSE:**  The
9   psychologist says he has a strong work ethic and
10  that's one reason he should be released.  So
11  that's my question.  What's different with the
12  work ethic now than it was before the crime
13  spree?

14        **INMATE SINN:**  Okay I understand.  The
15  difference is now is all my children are grown.
16  My mother has remarried, financially stable.  I
17  don't have all that stress on me when I went on
18  strike.  I had just bought a new home.  We saved
19  up for seven years every dime we had, just
20  pinching.  To put a down payment back then you
21  had to put 20 percent down as a first home
22  buyer.  The interest rate was 13.9 percent.
23  Everything we had went into the house and then
24  boom, Lucky's went on strike.  I mean, I saw the
25  rug being pulled out from underneath me.  I
26  mean, I was out of control.  I had no idea where
27  the next dime was coming.  My wife and I both

45

1  worked for Lucky stores at the time. And when
2  we went on strike the retail clerk union went on
3  strike also at the same time. And all I could
4  see was the world crashing down below me.
5  Everything I worked so hard for was gone. And
6  my work ethics back then. Yes, I could have
7  gone someplace else at the time. At the time I
8  was an emotional wreck. I had no idea what I
9  was doing. I was out of control, that I
10 understand. And I see now how I was. Back then
11 as a funeral director I was not -- my
12 certification has to be certified every year.
13 All morticians have to be certified every year.
14 We were on strike, you had to report for strike
15 duty every day, union meetings every day. My
16 world was just turned upside down. It was a
17 total wreck and I was out of control and there
18 was no excuse for that. What's different now?
19 Okay. Well, through extensive self-help
20 programs I now know there's alternatives, which
21 I had no idea back then. I mean, now there's
22 state aid. Now you can call, you know, your
23 lender, pay interest-only on your loans and
24 stuff like that. I had no idea what was
25 available to me back then at that time because I
26 never had a problem in my life. I always worked
27 hard, I always had money. I was never without

46

1    financial means.  I was never in a situation

2    where I knew what would happen if the rug ever

3    pulled out from underneath me.  And today I

4    strive every day to be a better man than I was

5    yesterday.  And there is nothing in this world

6    that would ever make me go back to that type of

7    activity again.  I mean, there is nothing

8    important in my life anymore besides my family,

9    my friends and God.  So a dollar sign has no

10   value to me now.

11        **DEPUTY DISTRICT ATTORNEY ROSE:**  I have no

12   other questions.

13        **PRESIDING COMMISSIONER SAWYER:**  Do you

14   have any questions, Mr. Defilippis?

15        **ATTORNEY DEFILIPPIS:**  Just briefly on

16   that same line, and Dr. Macomber talked about it

17   at length.  You weren't working, you kind of

18   lost your income.  One of the things he talked

19   about is that you acknowledged to him that you

20   were very materialistic at the time.  Is that an

21   accurate description?

22        **INMATE SINN:**  Well, back at that time,

23   you know, I was under the delusion that a man

24   was classified by his surroundings, which was

25   materialistic back then.  And now I know family

26   is your life now.  It's not the dollar, it's not

27   what you have.  Man is not defined by what he

47

1   carries around with him.

2       **ATTORNEY DEFILIPPIS:**  Having gone through

3   the experience you have gone through, you have

4   lost everything, correct?

5       **INMATE SINN:**  I lost everything except my

6   family and my friends.

7       **ATTORNEY DEFILIPPIS:**  So you have been

8   fortunate enough that your family and friends

9   have stuck by you, even through what happened

10  here.

11      **INMATE SINN:**  Yeah, they can relate to

12  the problems.  They knew my actions were wrong

13  and they know that -- To be straight honest with

14  you, I'm a better man coming to prison.

15  Learning my mistakes and learning alternative

16  steps.  I'll be a better man walking out of here

17  for it.

18      **ATTORNEY DEFILIPPIS:**  That's all I have.

19      **PRESIDING COMMISSIONER SAWYER:**  Ms. Rose,

20  would you like to close.

21      **DEPUTY DISTRICT ATTORNEY ROSE:**  Thank

22  you.  I'll start with chronologically what the

23  inmate just said, he's lost everything.  The

24  question that immediately comes to mind is,

25  where's that $20,000 certificate of deposit?

26  Why isn't that donated with this new find-God

27  man?  Why isn't it donated to the victim's

48

1   family who cannot work, who did not choose to be

2   murdered, so that they could have some money?

3   Because the man is the --

4        **ATTORNEY DEFILIPPIS:**   I am going to

5   object, that is an improper argument.   The money

6   does not belong to Mr. Sinn, as was previously

7   testified to.   That money is his mother's money

8   that is being put towards assisting him.

9        **PRESIDING COMMISSIONER SAWYER:**

10  (Inaudible).

11       **DEPUTY DISTRICT ATTORNEY ROSE:**   Okay.

12  What we have here, unfortunately, is a man who

13  has so self-deceived that people around him are

14  beginning to believe that his motivation for his

15  crimes was financial.   I am going to show this

16  Board that his motivation was not financial, and

17  if it was that he's even more dangerous than if

18  it wasn't.   So we're going to have two things

19  here.   We're either going to say, this is a

20  financial motive and he's actually more

21  dangerous because when one goes back to the

22  documents that are before the Board one sees

23  that this financial motive of a man who owns his

24  own home and put 20 percent down was only $150.

25  Let me cite the Board to -- There is one

26  statement that he did the crimes, he said,

27  because of tools that were worth $150 and then

```
 1  repeatedly it talks about the $150 that he was
 2  found with that was the money he received for
 3  the crimes.  If in fact $150 to a homeowner who
 4  could get a home equity line -- He was 32 years
 5  old and home equity lines with 20 percent down.
 6  Maybe he couldn't get a home equity line, but
 7  everyone knows that there's welfare.  He said
 8  now he knows there's state aid.  Okay, if one
 9  committed these crimes for $150 he is a real
10  danger and he will never be able to overcome
11  that.  But in fact that seems unreasonable.  The
12  man was bright enough to get a mortician's
13  license, he was -- He apparently is not an
14  ignorant, low-IQ individual.  So what was the
15  motivation for the crimes?  Because without
16  understanding the motivation for these crimes,
17  himself and the Board, he is a danger.  If the
18  Board understands his motivation and it's
19  something you can look at and say, okay, now he
20  doesn't have that motivation, he is a safer
21  individual to put out on the streets, that's
22  fine.  But without knowing what it is,
23  unfortunately for Mr. Sinn, until he starts
24  accepting that he didn't do it for the money, or
25  if he did he's particularly stupid because he
26  didn't even search the people in the first
27  robbery at the gambling house, then he's still a
```

50

1    danger.  We don't know why he committed these

2    crimes.  The problem with this psych report is

3    that the whole basis for it is that he was

4    financially motivated.  When you take that out

5    you have nothing in the psych report because

6    they say, well now he's not financially

7    motivated.  Well he wasn't then.  Now let me go

8    on.  Let's see.  It says on the 12/31/02 psych

9    report that it wasn't until this time, that is

10   the very end of '02, that he in detail described

11   the offense.  When we're talking about the

12   offense what's -- I'm going to skip around a

13   little bit because I know you can follow me.

14   What's extremely troubling is here we have a

15   person who has been convicted of murder but he

16   does not feel responsible for the murder.  He

17   says he does but then look what he says on

18   12/31/02 on page four, quote, I am guilty for

19   being there.  I am guilty.  This is about the

20   victim was shot to death.  And then he says, he

21   says it was accidental.  He still as of 12/31/02

22   on page six, quote, the victim tried to use a

23   kick box to knock away his gun, missed, kicked

24   him in the chest and that the gun went off by

25   accident.  So he still just a few years ago was

26   saying that it's accidental.  And counsel here

27   has made the statement a few moments ago to the

51

1  Board that the inmate acknowledges his guilt.
2  He doesn't acknowledge his guilt.  He's saying,
3  I'm not the ringleader, I was just there.
4  Somebody said they were going to give me some
5  money and I was in all this financial trouble.
6  Well he lied even in '02, the end of '02, the
7  last day of '02, because he said when he was
8  asked if he didn't commit more robberies he
9  acknowledged only one robbery in the gambling
10  house.  Then he said he also admitted robbing
11  someone at a car wash.  We have a third incident
12  of robberies.  This is page six.  On page six,
13  quote, although it is hard to believe that he
14  never participated in criminal activities prior
15  to this crime spree and his denial of being the
16  leader during these crimes was not very
17  convincing.  Well, how do we know he's the
18  leader?  On the -- there it is, page five.  He
19  ordered the three victims into the house and he
20  told the man who committed the murder, who
21  actually shot the gun, where to go to the front
22  of the house.  And that is the man who shot the
23  victim to death.  He ordered, that's in there.
24  He still maintained as of just -- this is '05,
25  the last day of '02 -- that he did not use his
26  gun.  It states right on page five, however the
27  testimony of the man that owned the house where

52

```
 1  the shooting occurred, Tommy Bolton states he
 2  held up what looked like to be a .38 revolver,
 3  flashed a badge and said freeze, police.  The
 4  inmate says that the things went awry.  This is
 5  with the murder.  Awry implies that they went
 6  off, way off base from where they should have
 7  been and no one should have been murdered.  So
 8  then why on two more times -- and it's incorrect
 9  on the psych report.  It says two months later,
10  it's two weeks later.  Two weeks later he's in
11  this gambling house robbing all these other
12  people by gunpoint.  And sometime within a week
13  of that time he's been in that gambling house
14  robbing people.  And he has the third robbery
15  that everybody is ignoring that he admitted to
16  at a car wash.  Now the other thing where he's
17  still lying to this Board is that he says in
18  here that he did this because he robbed bad
19  people he's basically saying.  I robbed people
20  who I knew wouldn't report it to the police.
21  Yet there's a quote in here where he says before
22  he beats someone up himself.  Here it is, quote.
23  This is in the -- page ten of the appellate
24  report.  Defendant told the group, quote, you
25  all know what this is, end quote.  He added,
26  quote, I understand the last time I was here you
27  guys called the police.  Well I don't like that,
```

53

1    end quote.  Then he said he missed a lot of

2    money during the previous robbery.  This is what

3    shows the People if money were the issue he

4    would have gotten the money from the people.

5    You don't rob them and then don't rob them

6    because he didn't search anyone.  So what kind

7    of robbery is that?  And so when he found money

8    in Big Lonnie's coat he took him into the

9    adjacent room and beat him.  This is on page

10   ten.  So these three robbers collected

11   everyone's money in a patron's hat and left.

12   This is all for this $150.  He denied and denied

13   and denied that he did this but on that page it

14   says four people identified him at trial.  This

15   is not civilized conduct, this taking Big Lonnie

16   into the room and beating him.  This is not a

17   person who it went awry so I'm not going to have

18   loaded guns, or at least guns that just two

19   weeks later on at least two occasions.  He

20   denied there was any thrill.  This is on page

21   two of the psych report.  And apparently the

22   psychologist believed him.  And it says, and it

23   says, he accepts responsibility for his

24   behavior.  Yet when you look at his version, the

25   more current versions, he leaves out all of the

26   details about what happened to these people and

27   how it affects their lives.  He doesn't even

54

1   know the names of his victims.  He doesn't know,

2   he doesn't even care it appears from everything

3   that is in this packet, as to how pointing a gun

4   at someone affects them and their family for the

5   rest, may affect them for the rest of their

6   lives.  And studies show it does.  Just how he's

7   changed and he's not financially motivated, even

8   though he wasn't financially motivated before.

9   If he was he's pretty stupid.  I pointed out in

10  my questioning there is nothing different with

11  regard to his ability to earn a living then it

12  was when he committed these crimes.  And finally

13  the People point out also that it's important to

14  deal with the ringleader issue because that is a

15  part of his denial and his denial is what the

16  People feel makes him still a danger.  And the

17  fact that he had the walkie-talkie, the

18  binoculars, the holster, the handcuffs, the

19  loaded guns and of course the badge, all implies

20  that he was more involved than just standing

21  around.  Many people, thousands of folks have

22  been out of work due to grocery strikes and

23  didn't go around with guns robbing innocents or

24  murdering.  So at this point the People believe

25  that he is not ready to receive a parole date.

26  Not until he starts being more honest with

27  himself and then the Board.  Thank you.

55

1          **PRESIDING COMMISSIONER SAWYER:**    Thank

2     you.   Mr. Defilippis?

3          **ATTORNEY DEFILIPPIS:**    Thank you.    There

4     were a few things I agreed with that the

5     district attorney said.  I certainly don't agree

6     with any of the characterizations that she made

7     or the manner in which she said it.   What she

8     has done is essentially taken this entire case

9     and cast it into quite a different light than

10    what it really exists in.  Let's take just a

11    couple of the things that she said.   She says

12    that Mr. Sinn doesn't care for the effect that

13    he has on the victims or the victims' families.

14    Right in one of the last sentences in

15    Dr. Macomber's report, he spoke about how much

16    damage he has done to society and to others by

17    his criminal actions.   He talks about he has

18    good insight and self-awareness.   He's made

19    significant changes over the years in a positive

20    direction.   Now what's that talking about is

21    that's talking about that he does understand

22    what he did.   He does understand the magnitude

23    of the harm that he caused.   You'll see that

24    through the various psych reports where he talks

25    about the effect that he had on the victims.

26    The effect that he had on the victim's family.

27    She says, well he doesn't acknowledge what he

56

1  did. Of course he acknowledges what he did. He
2  was just there. In terms of the homicide,
3  that's what his responsibility is for. He was
4  there at a robbery. He was participating in a
5  robbery and he was found guilty of felony
6  murder. So because he was there he was guilty
7  of the felony murder. When he says that he
8  didn't do the act, he didn't do the act of
9  killing the victim. That was done by a
10  codefendant. When he describes that as
11  accidental, it's not accidental that they're
12  there robbing the place. What's accidental is
13  the version that is given by the codefendant.
14  It's not given by Mr. Sinn. Mr. Sinn is not the
15  one who describes how the -- I believe it's
16  Mr. Russell, came at him and attempted to kick
17  the gun out of the codefendant's hand and struck
18  the codefendant in the chest and that's when the
19  gun went off. So it was the codefendant that
20  gave that version of an accidental killing that
21  occurred. That's not Mr. Sinn's words. And so
22  you certainly can't, in attempting to evaluate
23  Mr. Sinn you can't fault him for simply relating
24  what it is that he's been told. Now when you
25  look at the circumstances of what happened,
26  Mr. Sinn got involved in this -- the only thing
27  you can call it is a crime spree. It was a

57

1  spree of robberies that occurred.  He got
2  involved in that at a time when he was
3  financially strapped.  He got involved in it at
4  a time when he had just purchased a home.  He
5  had his mother to take care of, his I believe it
6  was a sister-in-law that he was taking care of,
7  and suddenly he doesn't have any income from his
8  work and he commits these series of crimes.
9  Well after the crimes are committed, that brief
10  period of time that these happened, what
11  happens?  Well, he ends up getting arrested not
12  on the homicide but gets arrested and he's out
13  on I think it was a $10,000 bail.  Now at that
14  point in time something significant occurs.  The
15  codefendant, the one who committed the -- was
16  the actual shooter in the crime, gets killed.
17  And he gets killed by a motorcycle gang, the LA
18  Deuces.  And now Tommy Bolton and Russell and
19  that group where the robbery was occurring were
20  all members of the LA Deuces.  The LA Deuces in
21  retaliation for the homicide and robbery killed
22  the individual that was the actual trigger man.
23  It was at that point in time, and there were
24  threats that were being made at the time to
25  Mr. Sinn.  There were incidents of his children
26  being followed to school.  All of these types of
27  things were going on and that's when he flees to

58

1   Indiana.  Well he's out of custody for that next
2   period of approximately two years.  During that
3   time he doesn't get involved in any criminal
4   activity.  He becomes responsibly employed, he
5   goes back into the truck driving business.  He's
6   able to maintain himself in a law-abiding manner
7   for that two year period of time during which he
8   doesn't commit any crimes.  So he's working.  So
9   we know that there was a financial motivation
10  that caused the aberrant behavior that was
11  uncharacteristic for him.  And then after that
12  situation when he goes to another area,
13  relocates, gets himself a job, he's not back
14  into the criminal lifestyle.  Now there's an
15  effort on the part of the district attorney to
16  say, well this was all a power thing with the
17  use of the badge.  No, it wasn't, it was a
18  financial motivation.  Because if it was a power
19  thing it would have continued in Indiana and you
20  would have a string of these types of robberies
21  that would have happened in Indiana during that
22  two year period of time.  It wouldn't have
23  stopped.  It was financially motivated and that
24  was the entire basis for it.  Now the before and
25  after I think is starkly different in this case.
26  You have Mr. Sinn back at the time that this
27  occurred, very materialistic, very wrapped up

59

1    into what he has as being who he is.  And now
2    he's had literally the opportunity to see what
3    it's like to lose everything.  Because when you
4    get arrested and you get sent to prison on a 25
5    to life sentence, you've lost everything.  What
6    he's been fortunate enough not to lose are the
7    people that are close to him.  That would be his
8    wife, his mother, his children, his family.  All
9    of these people that have written.  I think
10   there was -- I believe I counted 19 support
11   letters that were submitted here.  So we have,
12   you know, some good, strong support that he's
13   maintained.  But in terms of material things,
14   he's lost everything.  Now going through that
15   experience what he's told you is now he
16   recognizes what the important things are in
17   life.  It's his family, it's God, it's his
18   basically his ability to be there for his
19   family.  To have the relationships with them.
20   To see what's going to happen with them.  Help
21   his, now what will be his grandchildren growing
22   up because he missed a lot of the formative
23   years of his own children.  So what you have is
24   a stark difference between then and now and that
25   I think is clearly established through the
26   psychologist.  Counsel attempted to read some
27   portions of the 2002 report.  What she glossed

60

1    over and didn't even mention were all of the
2    positive things that that doctor said.  That
3    doctor says, his prognosis for maintaining his
4    present gains in the community is excellent.  He
5    says, if released to the community his violence
6    potential is estimated to be no higher than the
7    average citizen.  That means the average
8    citizen.  That means the district attorney, that
9    means myself, that means all of us that are out
10   there in society.  He has no higher violence
11   potential than the average citizen.  And the
12   reason for that -- And I've heard people
13   question.  You know, how could a psychologist
14   come to that type of a conclusion?  The reason
15   you come to that type of conclusion is if you
16   have an individual who commits an act that goes
17   to the high end of criminality, which murders
18   always are.  We're always here on high end
19   criminality in these hearings.  What he's done
20   is he's recognized now the potential that he has
21   in his life.  He's now taken the steps to look
22   at, how do I avoid those type of things?  How do
23   I avoid getting angry?  And I think that, you
24   know, this is one of the more impressive lists
25   of self-help groups that I've seen.
26   Alternatives to Violence, Hands of Peace, anger
27   management, parental training, Breaking

 1  Barriers.  He did the Impact program in 2000,
 2  did it again in 2005.  He's taken all of the HIV
 3  et cetera courses that are offered here.  I
 4  can't think of any other -- Dr. Gordon's family
 5  effectiveness, another anger management this
 6  year.  I can't think of any other program that's
 7  available here at this institution that he has
 8  not gotten into.  In fact, what he's done is
 9  he's gone the extra step and gotten involved in
10  Alcoholics Anonymous.  And I've had a number of
11  clients that have done that without drinking or
12  drug problems but they get into Alcoholics
13  Anonymous because it's a self-help group.  And
14  it offers a 12 step program, it's offers a 12
15  step approach to life that can be used.  I mean,
16  you know the 12 steps of Alcoholics Anonymous
17  are used in Narcotics Anonymous, Overeaters
18  Anonymous.  Any anonymous group that you talk
19  about utilizes those 12 step principles which
20  have a foundation that goes back to some very
21  spiritual and religious principles that were
22  used by the founders of AA back in the '30s.
23  So, you know, this is something that he takes
24  and utilizes in order to make himself a better
25  person.  And when you have somebody who does
26  that what they're showing you is they have shown
27  you the ability to rehabilitate themselves.

62

1   They've shown you that they can come into
2   prison, they can do what they're supposed to do,
3   do their time, rehabilitate themselves and get
4   themselves into a situation of where he now does
5   not present an unreasonable risk of harm to
6   society if released.  I didn't hear counsel talk
7   about anything except for the crime and I think
8   that that's the situation that we're faced with
9   here.  Yes, this is a first degree murder.  Yes,
10  there were a string of robberies that occurred.
11  However, if the individual had not died in this
12  case this would have been a determinant sentence
13  case.  It would have been a case where years
14  ago, many years ago, Mr. Sinn would have gone
15  home and been out in society conducting himself
16  out there.  When you're talking about what it is
17  that we're looking to parole him on we're
18  looking to parole him on the murder, the murder
19  that occurred.  Yes there was a series of
20  robberies and yes that was a foundation for why
21  the murder occurred.  But to take those and then
22  boost it up into something that says that now
23  he's not an individual who could ever be
24  released I think stretches the concepts that
25  we're trying to deal with here.  We're trying to
26  deal with dangerous people that literally go
27  around doing things that kill people.  There's a

63

1   difference with somebody who gets involved as he

2   did, financially motivated, getting involved in

3   a series of robberies. Somebody dies but not at

4   his hands. And that's a significant difference

5   here. The death was not at Mr. Sinn's hands.

6   And so when you're looking at this crime and

7   saying, is this something that -- To take it in

8   the *Dannenberg* terminology, is it more than the

9   minimum elements necessary for the crime of

10  murder? No it's not. It can't be because A, he

11  is not the trigger man, B, there is absolutely

12  no proof whatsoever anywhere that there was

13  intent to kill. This is not an expressed malice

14  murder. This is not even a normal premeditated

15  and deliberated first degree murder. What it is

16  is a felony murder. It's a murder that occurs

17  where someone is killed as a result of the

18  commission of a felony, in the course of the

19  commission of a felony. And because of that he

20  is guilty. So when you're looking at this crime

21  and saying, is there more than the minimum

22  elements necessary for the crime of murder?

23  Absolutely not. Once you get beyond that then

24  you need to look at, okay, is there something

25  that he's done during his time in prison that

26  would indicate to us that he is still a

27  continuing danger to society if paroled?

64

1   Absolutely not.  This man has done everything
2   that he can possibly do since coming to prison
3   to turn himself around.  He has bettered himself
4   in every way that he possibly can.  He is not
5   the same individual who came into prison.  He is
6   older, he is more mature.  He has gone through
7   all the programming that we offer here.  There
8   is nothing more that additional time will give
9   him.  And as a result of that it is my position
10  that Mr. Sinn is entitled to have a parole date
11  set at this time consistent with the matrix.
12  That doesn't necessarily mean that he gets to
13  walk out of the prison doors.  I think he's been
14  in here 19 years and some small change so he's a
15  little short of, he's a little short of 20 years
16  on a -- This crime falls in the 27, 28 range on
17  the matrix.  He's probably still going to have a
18  brief period of time that he needs to do.  But
19  he's suitable for a date.  He is a suitable
20  candidate for parole.  When you're looking at
21  the group of first degree murders and attempting
22  to say, where does this fall within that range,
23  this is down at the low range in terms of types
24  of first degree murders.  And based upon that I
25  would ask that you set a date consistent with
26  the matrix and give him that opportunity to
27  prove himself to you.  I think this will be one

65

1  of your success stories out in the streets.

2      **PRESIDING COMMISSIONER SAWYER:** Thank

3  you.  Mr. Sinn, this is your opportunity to tell

4  us why you feel you are suitable for parole.

5      **INMATE SINN:** Well, I'm going to leave it

6  pretty much short and brief.  You know, I have

7  always accepted responsibility for Tommy's life,

8  you know.  I might not have been the trigger man

9  but I was involved and I'll carry that the rest

10 of my life.  And like the district attorney

11 said, you know, obviously I was pretty bad at

12 robbing.  I had no idea what I was doing.  I was

13 out of control.  And every day I remember what

14 happened and that's why I strive so hard with

15 these self-help programs.  To understand what

16 happens when you put a gun in someone's face.

17 And that's why I said the Impact class is the

18 best class the institution has to offer.  You

19 get to hear from the victims.  You get to feel

20 what they feel.  And knowing that you could

21 never terrorize or put something, put a human

22 being in a situation like that again.  That

23 could never happen.  Whatever you decide today,

24 no matter what, I still will strive to make

25 myself a better man tomorrow than I have today.

26 Whatever they have to offer here on the programs

27 in here or out on the streets.  Basically that's

66

1   all I have to say, thank you.

2        **PRESIDING COMMISSIONER SAWYER:**   Okay,

3   thank you very much.   It's 10:27 and we will

4   recess for deliberations.

5                    **R E C E S S**

6                     --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

67

1      **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                    **D E C I S I O N**

3      **DEPUTY COMMISSIONER MITCHELL:** We are on

4   record.

5      **PRESIDING COMMISSIONER SAWYER:** Okay.

6   The time is 10:50. I neglected to ask counsel

7   if there was any confidential material that

8   would be used in this hearing and there was not,

9   and we did not consider any confidential --

10     **ATTORNEY DEFILIPPIS:** I know, I thought

11  about that during the hearing but I realized

12  that none was being used, it appeared.

13     **DEPUTY COMMISSIONER MITCHELL:** There is

14  some in his file but nothing (inaudible).

15     **ATTORNEY DEFILIPPIS:** Thank you.

16     **PRESIDING COMMISSIONER SAWYER:** And the

17  other issue in doing my clean-up here, the other

18  issue was I did not swear you in. But you

19  weren't speaking about the crime, the life

20  crime. I normally swear every inmate in and I

21  neglected to do that. I apologize but the

22  information that we talked about was, we felt it

23  wasn't necessary. Do you have any problem with

24  that?

25     **ATTORNEY DEFILIPPIS:** No, not at all. In

26  fact, you know, in my discussions with Mr. Sinn

27  **GARY SINN   D-57219   DECISION PAGE 1   12/06/05**

68

1   he was, I think probably under the impression

2   that he was speaking under penalty of perjury.

3         **PRESIDING COMMISSIONER SAWYER:**   I just

4   wanted to make sure the record reflected my

5   errors in this case, okay.   The time is 10:50;

6   we have reconvened in the matter of Mr. Sinn.

7   The panel reviewed all the information received

8   from the public and relied on the following

9   circumstances in concluding the prisoner is not

10  suitable for parole and would pose an

11  unreasonable risk of danger to society or a

12  threat to public safety if released from prison.

13  As you probably figured out we can't get by the

14  crime.   That's where we're having a problem.

15  This crime has ten counts of robbery and one

16  count of first degree murder here.   It was done

17  in a dispassionate and calculated -- it was very

18  calculated.   You were out there on a short crime

19  spree then you fled the state.   You were

20  successful for two years in not owning up this

21  particular, these particular crimes that

22  occurred on 12/12 of 1983 at 7:15, the first

23  one.   You identified yourselves as police

24  officers with your crime partners, handcuffed

25  the victims, taken inside of a house, remained

26  -- Miller remained outside the house.   Shortly

27  **GARY SINN   D-57219   DECISION PAGE 2   12/06/05**

69

1   after this Victim Russell came to the house and

2   was shot by Codefendant Miller.  Sinn and the

3   codefendants fled the scene.  1/7 of 1984, a

4   couple of weeks later, you gained entry into a

5   gambling establishment located on 92nd and

6   Central where you robbed the patrons at

7   gunpoint.  You attempted to avoid prosecution by

8   fleeing the court's jurisdiction.  Arrested on

9   11/21 of 1986 in Fort Wayne, Indiana,

10  transported back and stood trial and found

11  guilty of first degree murder and the associated

12  robbery offenses.  We are going to -- We are

13  going to deny your parole for one year.  We

14  still feel strongly the distance from this

15  particular crime, it was -- The motive for it is

16  trivial, clearly.  If it was just money, write

17  some bad checks, you know.  That doesn't hurt --

18  That's not good, I'm not advocating writing bad

19  checks.  But if you're going to commit a crime

20  do a crime that doesn't hurt people, doesn't

21  traumatize people, doesn't murder.  Anybody

22  pointing a gun at anybody else, and I've had

23  guns pointed at me, it's terrifying and it could

24  have an influence on the rest of somebody's

25  life.  So it's something you need to -- You

26  know, what's passed is passed and we can't

27  **GARY SINN    D-57219    DECISION PAGE 3    12/06/05**

70

1    change that but this crime was cruel.  You were

2    cruel to people.  Whether it was because of the

3    trauma you were suffering in your life with four

4    children and a wife and house payments and car

5    payments and all the other things that we all go

6    through, certainly there is no justification for

7    what you did here.  Okay, I'm not going to beat

8    you up any more.  You have no previous record,

9    which is -- We discussed this, Commissioner

10   Mitchell and I discussed this.  Your whole -- We

11   discussed why you're here and how you presented

12   yourself and I want to compliment you first on

13   -- a lot of people come in here, just their mere

14   presence is sometimes threatening.  You're

15   comfortable.  I always try to come up with

16   something in the beginning of the hearing to

17   kind of relax people a little bit.  That was the

18   cotton-stuffer joke.  We both felt that you were

19   -- certainly you've made tremendous progress,

20   and which I'll talk about in a second.  But what

21   baffles us is you going from no crime to this

22   crime and then back to no crime.  That's a

23   question nobody will be able to answer, you

24   know, as --

25        **INMATE SINN:**  Once all the pressure got

26   off me, you know, after I left California,

27   **GARY SINN    D-57219    DECISION PAGE 4    12/06/05**

71

1 everything was gone.  All the pressure was gone,

2 my senses came back.  I was out of control.  And

3 there's no excuse for what I did and I'm not

4 going to try to make any excuses.

5      **PRESIDING COMMISSIONER SAWYER:**  One of

6 the problems -- There is no excuse for what you

7 did, there's no question about that.  But one of

8 the problems that we had was, we're looking here

9 at a guy who is a truck driver, a Mason, a

10 mortician, a paramedic.  Were you a security

11 officer too?  You were.

12      **INMATE SINN:**  I had a security company,

13 yeah.  Back at the same time I was a mortician,

14 you know, a little money on the side.

15      **PRESIDING COMMISSIONER SAWYER:**  You were

16 a smart guy.  So you're working at Lucky's.  You

17 know after working at Lucky's, why not just

18 quit, turn in your union card and walk away from

19 that and go get a job.  That was the question we

20 had.  I'm not interested in the answer because

21 it didn't happen.

22      **INMATE SINN:**  Yeah.

23      **PRESIDING COMMISSIONER SAWYER:**  The

24 reason for the crime is baffling to us.  And

25 we've done a lot of analysis here in a short

26 period of time but that's, you know.  And I

27 **GARY SINN    D-57219    DECISION PAGE 5    12/06/05**

72

1  bring it up during this part of the hearing

2  because the previous record is zero.  You were

3  just a regular guy.  Your institutional

4  behavior.  What can I say?  Two 128s, the last

5  one in '92; one 115 in '93.  You have certainly

6  distanced yourself from those, they're clearly

7  not a factor.  There is no consistency there,

8  consistency in a bad terminology.  You know, one

9  a year, one ever three years or something, and

10  you want to maintain that.  You put together a

11  very nice parole plan.  It appears that

12  Mr. Defilippis has got some fingerprints on this

13  but you probably did this.

14      **ATTORNEY DEFILIPPIS:**  Actually no, he did

15  that entirely by himself.

16      **PRESIDING COMMISSIONER SAWYER:**  Is that

17  right?

18      **ATTORNEY DEFILIPPIS:**  Yeah.

19      **PRESIDING COMMISSIONER SAWYER:**  You

20  didn't give him any advice?

21      **ATTORNEY DEFILIPPIS:**  Not a bit.

22      **PRESIDING COMMISSIONER SAWYER:**  Your

23  self-help starting in '93.

24      **DEPUTY COMMISSIONER MITCHELL:**  Excuse me,

25  I need to turn the tapes.

26      (Tape One was changed to Tape Two.)

27  **GARY SINN   D-57219   DECISION PAGE 6   12/06/05**

73

1     **DEPUTY COMMISSIONER MITCHELL:**   Back on

2   record.

3     **PRESIDING COMMISSIONER SAWYER:**   Okay,

4   thank you.  We just rolled the tapes over.  Or

5   put in new tapes?

6     **DEPUTY COMMISSIONER MITCHELL:**   New tapes.

7     **PRESIDING COMMISSIONER SAWYER:**   New

8   tapes.  And this is the matter of Mr. Sinn.   In

9   the area of self-help training you made a

10  comment that I was particularly impressed with

11  so you want to make sure you write it down in

12  your closing statement.  That you were a better

13  man since you've come to prison.  You're

14  probably a better man that if you had stayed out

15  on the street.

16    **INMATE SINN:**  That's what I said, yes.

17    **PRESIDING COMMISSIONER SAWYER:**   You're in

18  the college of hard knocks here and you've taken

19  advantage of it.  We see people come in here and

20  say, I signed up for the program and I haven't

21  got it yet and they've got one or two

22  insignificant programs hanging behind them.  But

23  you've taken advantage.  Since 1993 Alternatives

24  to Violence, Hands of Peace, anger management,

25  advanced training, Breaking Barriers, parenting

26  training, you've gone through the Impact program

27  **GARY SINN   D-57219   DECISION PAGE 7   12/06/05**

1  twice and you even attached a copy of the Impact

2  program you -- Especially your body language

3  indicated that you really enjoyed Impact

4  training so you've taken it again and maybe next

5  time you can teach it.  Tuberculosis awareness,

6  sexually transmitted disease, Hepatitis.  Do you

7  have Hepatitis?

8      **INMATE SINN:**  No.

9      **PRESIDING COMMISSIONER SAWYER:**  Okay,

10  good.  Stay away from the needles.  Another

11  anger management course, HIV/AIDS awareness,

12  nonviolence, AA.  And I agreed with your counsel

13  when he -- I think it was you, Mr. Defilippis,

14  that said you joined AA, or maybe it was the

15  inmate.  And it's more than just -- Yes, it was

16  you.  It's 12 steps in life, it talks about

17  life.  And hopefully while there's no alcohol or

18  drugs behind this case it is a helpful program.

19  It's a self-help program.  And certainly it can

20  lend itself to even help you on the outside with

21  sponsors and maybe employment opportunities or

22  something down the road once you make some

23  connections.

24      **INMATE SINN:**  Well, I use some of the --

25  I mean, not being an alcoholic, but there's

26  some, a lot of steps in there everybody can use

27  **GARY SINN   D-57219   DECISION PAGE 8   12/06/05**

75

1   in their life, you know.

2        **PRESIDING COMMISSIONER SAWYER:**

3   Absolutely.  You do have victims in this case.

4        **INMATE SINN:**  Right.

5        **PRESIDING COMMISSIONER SAWYER:**  And you

6   do have others -- There's lots of tenets of that

7   so it is self-help, clearly.  Dr. Gordon's

8   Family Effective Training.  And again, anger

9   management as well as recently again the Impact

10  and victims' rights.  So those self-help

11  training programs are clearly to anyone's

12  advantage, not just to you sir.  Psychiatric

13  factors in this case.  Dr. Macomber, although

14  things are going to be changing in regards to

15  this they did have a pretty good psych.  As you

16  indicated it gave you the opportunity to talk

17  about the crime.  And there's a certain benefit

18  to that.  And I know you didn't want to talk

19  about it here and that's fine.  You talked about

20  it where we could read about it in this

21  controlled setting.  The assessment of

22  dangerousness is very low, he feels, given the

23  fact -- given your behavior in the institution

24  as well as your self-help and vocational areas.

25  There's no mental or emotional problems

26  interfering with granting parole.  Good family

27  **GARY SINN   D-57219   DECISION PAGE 9   12/06/05**

76

1    support, numerous job offers both in Ohio and

2    California.  You spoke about the damage done to

3    society and your own family, of course, by your

4    criminal actions.  He stated,

5            "He's determined to help others,

6            benefit others, become a blessing

7            to others if he's released.  Does

8            have good insight and self-

9            awareness.  He's made significant

10           changes over his life in a

11           positive direction.  Prognosis for

12           a successful adjustment in the

13           community is excellent."

14   And the date on that is September 2, 2005.  Your

15   parole plans, outstanding, what can I say.

16   They're outstanding.  A handyman/plumber

17   position, apartment.  You've got about four

18   different places you can go, your mother's home

19   along with your wife.  Your children, it's an

20   empty nest now, your children are establishing

21   their own life.  You've got skills in the

22   funeral business, the paramedic.  You've got

23   some money waiting for you out there that will

24   take off some of the additional pressures.  Your

25   wife has a new Honda CRV.  Now when I read both

26   the -- and it's in the same paragraph, it

27   **GARY SINN    D-57219    DECISION PAGE 10  12/06/05**

1  appeared to me to be a little materialistic, you

2  know.  Although it's related to your, you've got

3  money out there, which is a good indication that

4  you won't have the pressure of what you had

5  before and you've got a new car that would be

6  available to get you back and forth to work.

7       **INMATE SINN:**  See, but that's her car.  I

8  have my own car, which is an '86 Chevy sitting

9  in the garage.

10      **PRESIDING COMMISSIONER SAWYER:**  Okay,

11 that's not very materialistic.  You clearly have

12 marketable skills.  Your vocations in welding,

13 blueprint reading, machinist, die maker, small

14 engine repair, maintenance plumbing as you're

15 doing now from 2000 as well as your vocational

16 optical and lens maker.  Did you complete that

17 program?

18      **INMATE SINN:**  I completed it state and

19 federal.  I have an ABO also.

20      **PRESIDING COMMISSIONER SAWYER:**  Okay.

21 And you received laudatory chronos for that as

22 well.  You're just full of marketable skills.

23 There shouldn't be any pressure put to bear on

24 you or your family in terms of your marketable

25 skills.  There's a response from the District

26 Attorney's Office by Ms. Rose for a denial of

27 **GARY SINN   D-57219   DECISION PAGE 11   12/06/05**

78

1 parole.  You should be commended, again, on your

2 behavior while you're here.  You should also be

3 commended for your educational while you've been

4 here.  Have you done all the FEMA courses?

5     INMATE SINN:  All that I can take without

6 a computer.

7     PRESIDING COMMISSIONER SAWYER:  Okay.

8 You've got how many?

9     INMATE SINN:  Twenty-six.

10     PRESIDING COMMISSIONER SAWYER:  Twenty-

11 six FEMA courses, okay.  You've got education,

12 again, from the American Board of Opticians,

13 Frederick Community College.  How many units did

14 you achieve?

15     INMATE SINN:  That's the FEMA classes I

16 took through Frederick's.

17     PRESIDING COMMISSIONER SAWYER:  Do they

18 give you college units?

19     INMATE SINN:  Yeah.

20     PRESIDING COMMISSIONER SAWYER:  Community

21 college units?

22     INMATE SINN:  Yes.

23     PRESIDING COMMISSIONER SAWYER:  How many

24 do you get?

25     INMATE SINN:  You get three.

26     PRESIDING COMMISSIONER SAWYER:  For doing

27 **GARY SINN    D-57219    DECISION PAGE 12    12/06/05**

79

1  the 26 courses?

2        **INMATE SINN:**  Yeah.

3        **PRESIDING COMMISSIONER SAWYER:**  Okay.  Do

4  you have any additional college units?

5        **INMATE SINN:**  From mortuary science when

6  I was, you know.  You have to go to college to

7  become, for mortuary, yeah.

8        **PRESIDING COMMISSIONER SAWYER:**  Through a

9  mortuary school?

10        **INMATE SINN:**  Yeah.

11        **PRESIDING COMMISSIONER SAWYER:**  Okay.

12  You should be commended on those FEMA courses.

13  You never know when they're going to need a FEMA

14  Director.  As well as, again, your self-help

15  training.  And you received, you've been

16  involved with the MAC (phonetic).  You've

17  received laudatory chronos as a teacher's aide

18  and in maintenance plumbing, your current

19  vocation, your current work.  Do you have a pay

20  number for that?

21        **INMATE SINN:**  Yes.

22        **PRESIDING COMMISSIONER SAWYER:**  And you

23  received excellent and exceptional supervisor's

24  work reports during the last two years here.

25  You're just doing a, you're doing a great job

26  and we want to encourage you to continue to do

27  **GARY SINN   D-57219   DECISION PAGE 13   12/06/05**

80

1 that job. I know you're probably disappointed

2 on the one hand that you didn't earn a parole

3 date but the more time you get away from that

4 crime the better you look. And that's all we're

5 basing it on. Everything else is absolutely

6 sterling. The recommendation is to continue

7 what you're doing. Continue your self-help,

8 continue to stay discipline-free and continue to

9 earn those positive chronos. Do you have

10 anything you'd like to say, Commissioner?

11 **DEPUTY COMMISSIONER MITCHELL:** Briefly,

12 since you did such a good job. There was a

13 question I had. It says you graduated from high

14 school in 1972. I think the doc file says you

15 got a GED in 1972.

16 **INMATE SINN:** It's from the same high

17 school, yeah.

18 **DEPUTY COMMISSIONER MITCHELL:** So if it's

19 a GED instead of a high school diploma then it

20 may be misleading so you may want to clarify it.

21 **INMATE SINN:** Change it to GED?

22 **DEPUTY COMMISSIONER MITCHELL:** No one is

23 going to question you (inaudible).

24 **INMATE SINN:** Okay.

25 **DEPUTY COMMISSIONER MITCHELL:** I don't

26 see it as a problem but it might be worth it.

27 **GARY SINN   D-57219   DECISION PAGE 14   12/06/05**

81

1   And I saw a typo in here, check the spelling on

2   it.  There is no doubt in my mind, Mr. Sinn, you

3   are going to get a release date one day.  I have

4   no doubt.

5         **INMATE SINN:**  I appreciate that.

6         **DEPUTY COMMISSIONER MITCHELL:**  You are

7   not the typical prisoner, you are not the

8   typical background for a prisoner.  This was a

9   bizarre episode in your life that went real sour

10  and that's our great concern.  Other than that,

11  you can't do better than you've done.  Just

12  maintain what you're doing.  Do not get

13  depressed and go lose what you've gained so far.

14        **INMATE SINN:**  No, like I said before, I

15  will make myself a better man tomorrow than I

16  have been today.  That's my goal.

17        **DEPUTY COMMISSIONER MITCHELL:**  All right.

18        **PRESIDING COMMISSIONER SAWYER:**  Good,

19  very good.

20        **DEPUTY COMMISSIONER MITCHELL:**  Good luck

21  to you.

22        **PRESIDING COMMISSIONER SAWYER:**  Good luck

23  to you, sir.

24        **INMATE SINN:**  Thank you.

25        **PRESIDING COMMISSIONER SAWYER:**  It's

26  11:09.

27  **GARY SINN   D-57219   DECISION PAGE 15   12/06/05**

82

1          **ATTORNEY DEFILIPPIS:**  Thank you,

2     gentlemen.

3                         --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23     **PAROLE DENIED ONE YEAR**              **'APR 0 5** 2006

24     **THIS DECISION WILL BE FINAL ON:** _____

25     **YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT**

26     **DATE, THE DECISION IS MODIFIED.**

27     **GARY SINN   D-57219   DECISION PAGE 16   12/06/05**

83

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated transcriber,

PETERS SHORTHAND REPORTING, do hereby declare and

certify under penalty of perjury that I have

transcribed tape(s) which total two in number and

cover a total of pages numbered 1 - 82, and which

recording was duly recorded at CORRECTIONAL TRAINING

FACILITY, SOLEDAD, CALIFORNIA, in the matter of the

SUBSEQUENT PAROLE CONSIDERATION HEARING OF GARY SINN,

CDC NO. D-57219, ON DECEMBER 6, 2005, and that the

foregoing pages constitute a true, complete, and

accurate transcription of the aforementioned tape to

the best of my ability.

I hereby certify that I am a disinterested

party in the above-mentioned matter and have no

interest in the outcome of the hearing.

Dated December 26, 2005, at Sacramento County,

California.


RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

# EXHIBIT "B"

90

1       **CALIFORNIA BOARD OF PRISON TERMS**

2                   **D E C I S I O N**

3       **DEPUTY COMMISSIONER LOPEZ:** We're on record.

4       **PRESIDING COMMISSIONER LAWIN:** Thank you,

5   and all parties have returned to the room in the

6   hearing for Gary Sinn. Mr. Sinn, I'll tell you

7   that our decision was a difficult one. Ultimately

8   we have denied your parole for one year. You have

9   programmed exceptionally well. But we have some

10  lingering doubts and I'll get to those in a

11  moment. The Panel did review all information

12  received from the public and relied on the

13  following circumstances in concluding that the

14  prisoner is not suitable for parole and would pose

15  an unreasonable risk of danger to society or a

16  threat to public safety if released from prison.

17  The commitment offense was the murder of Tommy

18  Russell. It was committed by a crime partner of

19  the inmate's, apparently at, during the course of

20  what was to be a robbery. And this was one of

21  several crimes that the inmate committed during

22  the course of a two or three month period where he

23  had robbed others and committed another crime

24  after the murder of Mr. Russell. But at the time

25  that Mr. Russell was shot, the inmate and his

26  crime partners had gone into the home of the

27  **GARY SINN    D-57219   DECISION PAGE 1    02/27/03**

```
1   victims.  Mr. Russell was one of those that was
2   ultimately at the home and at some point one of
3   the crime partners of Mr. Sinn shot Mr. Russell.
4   They then fled the scene and it was about three
5   weeks after that that Mr. Sinn then committed the
6   robbery for which he's also serving time,
7   robberies, of several people in a gambling shack.
8   Clearly, these crimes were carried out in a
9   fashion that shows a lack of regard for the life
10  and suffering of another.  The inmate was armed in
11  these incidents.  He also displayed a badge on a
12  couple of occasions utilizing that power,
13  apparently, to attempt to get his victims to
14  cooperate.  This was also carried out in a fashion
15  that was cruel, people were terrorized, they were
16  robbed of their belongings, they were misled into
17  thinking that the inmate was a law enforcement
18  officer.  And, obviously, also, the inmate was not
19  dissuaded from committing other crimes as he
20  committed the robberies on January 7th, for which
21  he's serving time, and the murder of Mr. Russell
22  occurred on December 12th, 1983.  In terms of
23  participation in self-help, Mr. Sinn has been
24  extremely active.  He has much to be commended for
25  in terms of his institutional programming.  He's
26  to be commended for the fact that he has his high
27  GARY SINN    D-57219    DECISION PAGE 2    02/27/03
```

92

1    school equivalency, GED, that he, since he's come

2    into the institution, he's become an optician, has

3    completed small engine repair, blueprint reading,

4    welding, machine die making.  He also has

5    participated in a variety of work assignments,

6    including PIA textiles, as a porter, a clerk,

7    teacher's aide, yard crew, PIA optical,

8    maintenance crew, plumbing, PIA metal fab and has

9    been assigned as the MAC chair.  He's currently in

10   the plumbing shop.  In terms of self-help, he has

11   participated in Impact, Sexually Transmitted

12   Disease, Infectious Disease courses, Anger

13   Management, Alternatives to Violence, MAC,

14   Parenting program, Hands of Peace, Conflict

15   Resolution and Breaking Barriers.  He has received

16   laudatory chronos for his vocational participation

17   and work there.  He has received laudatory chronos

18   for his participation in self-help.  He has

19   generally shown positive programming.  He has one

20   115 in his record and that was for a positive UA

21   for alcohol dated July 26th, 1993.  He's had

22   nothing for 10 years.  And there are two 128(a)

23   counseling chronos, the last of those September of

24   1992, for unauthorized area.  However, the Panel

25   feels that he has not yet sufficiently

26   participated in beneficial self-help programming.

27   **GARY SINN**   **D-57219**   **DECISION PAGE 3**   **02/27/03**

93

1   The report by Dr. Gamard, dated December 31st,
2   2002, is positive.  Here's where the doubts that
3   the Panel have come into play and we have asked
4   that a new psychological evaluation be completed.
5   It doesn't have to be thorough, an addendum to the
6   current one is appropriate.  But the Panel's
7   interest is into your insight into why this
8   happened.  I know you've told us that you were
9   unemployed, essentially unemployed, you were off
10  work because of the strike.  That you had all of
11  these pressures on you.  But this Panel felt that
12  there's something missing, that you haven't yet
13  grasped about yourself that brought you to the
14  point of committing these crimes.  Whether it was
15  a power trip, whether it was the thrill of being
16  involved in criminal of activity, whether it was
17  your relationship with other people.  But we just
18  felt that there was, there is something missing in
19  your insight into what led you to this point in
20  your life.  We would like for you to explore that
21  and that's why we're asking the doctors to speak
22  with you so that they can look into that aspect of
23  your behavior as well.  You had a, what seemed to
24  be a very stable background.  You had a job.  You
25  were employed.  You had a family.  And yet
26  something as odd, as strange as your involvement
27  GARY SINN    D-57219    DECISION PAGE 4    02/27/03

1    in this crime spree occurs.  What's to say it's

2    not going to happen again?  Those same pressures

3    come to bear upon you when you get out of the

4    institution and you decide you found a way to make

5    some easy money.  I'm not saying you will, but

6    that's what we're concerned about.  So we're

7    asking that the psychologist take another look in

8    that area.  Therefore, the Panel finds that the

9    prisoner needs continued participation in

10   self-help in order to further delve into the

11   causative factors for his participation in this

12   life crime.  And until further progress is made,

13   he continues to be unpredictable and a threat to

14   others.  During the course of the next year, the

15   Panel recommends that you remain disciplinary-free

16   and just continue your positive programming.

17   Continue to participate in whatever self-help

18   becomes available.  You have a lot of time to do.

19   We could have given you a date today.  It's

20   extremely unusual that we even gave a one-year

21   denial on an initial.  But you are doing a

22   wonderful program, there's absolutely no doubt.

23   Just meet with the clinicians and think about what

24   I've said regarding your insight and I wish you

25   good luck.

26         **INMATE SINN:**  Well under the insight.  I'm

27   **GARY SINN      D-57219     DECISION PAGE 5     02/27/03**

95

1    already working on that.  I'm on the waiting list,

2    Dr. Fischbeck here as a program, it's a six-month

3    course and it's group therapy, and I'm on the

4    waiting list for that, it should come up any time.

5            **PRESIDING COMMISSIONER LAWIN:**  Excellent.

6    Good deal.

7            **INMATE SINN:**  All right, thank you for your

8    time.

9            **PRESIDING COMMISSIONER LAWIN:**  Commissioner.

10           **DEPUTY COMMISSIONER LOPEZ:**  That's the

11   Lifers Group is that correct?  That's the Lifers

12   Group?

13           **INMATE SINN:**  Yes.

14           **DEPUTY COMMISSIONER LOPEZ:**  Okay, good.  And

15   I wish you the best, sir.  Nothing else.

16           **PRESIDING COMMISSIONER LAWIN:**  Thank you.

17   That will adjourn this hearing.  It is 10:50.

18           **INMATE SINN:**  Thank you.

19                         --o0o--

20

21

22

23

24

25   **PAROLE DENIED ONE YEAR**

26   **FINAL DATE OF DECISION**_____ MAY 2 8 2003 _____

27   **GARY SINN    D-57219    DECISION PAGE 6    02/27/03**

96

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, VALERIE C. LORD, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 through 95, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY at SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of GARY SINN, CDC No. D-57219, on FEBRUARY 27, 2003, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated March 11, 2003, at Auburn, California.

Valerie C. Lord
Transcriber
**CAPITOL ELECTRONIC REPORTING**

1          CALIFORNIA BOARD OF PRISON TERMS

2                    D E C I S I O N

3          PRESIDING COMMISSIONER RISEN:  Okay.  Everyone.

4    who was previously in the room has returned.  The time

5    is 11:35 a.m.  The Panel reviewed all information

6    received from the public and relied on the following

7    circumstances in concluding that the prisoner is not

8    suitable for parole and would pose an unreasonable

9    risk of danger to society or a threat to public safety

10   if released from prison.  Again it's a one year.

11   First of all, the commitment offense was carried out

12   in an especially violent and brutal manner.  The

13   offense was carried out in a dispassionate and

14   calculated manner.  The prisoner was involved in

15   multiple robberies that were carefully planned and had

16   inside help on some of the robberies.  The Statement

17   of Facts:  On December the 12th, 1983 the prisoner,

18   Sinn, S-I-N-N, and codefendants Rodney Harris and

19   Tyrone Miller went to the rear of 129th Street in Los

20   Angeles, identified themselves as police officers.

21   They handcuffed the victims Bolton and Henry.  Victim

22   Bolton, Henry and Turner were taken inside the house

23   by prisoner Sinn and codefendant Harris while

24   codefendant Miller remained outside the house as a

25   lookout.  Shortly after this Victim Russell came up to

26   the house and was shot by codefendant Miller.  Victim

27   **GARY SINN   D-57219      DECISION PAGE 1   6/4/04**

1   Russell died as a result of that shooting. The crime
2   partners Sinn and Harris were inside the house at the
3   time of the shooting and did not know that Russell had
4   been shot. However, later that day after they had all
5   fled the scene they found out that Russell had been
6   shot. The murder of the victim did not deter the
7   prisoner from committing other criminal offenses. On
8   January 7th, 1984 prisoner Sinn and codefendant Byron
9   Jackson gained entry into a gambling establishment on
10  92nd Street in Los Angeles where they robbed the
11  patrons at gunpoint. Prior to this the prisoner had
12  been involved in a robbery of the same location and
13  this was prior to even the 12/12/83 robbery where
14  there was a murder. At the time of the prisoner's
15  arrest in his truck they found a fake badge for Orange
16  County Sheriff's Department, loaded guns -- loaded
17  handguns, a walkie-talkie, ammunition and a pair of
18  binoculars, a shoulder holster, a handcuff case as
19  well as drug paraphernalia that appeared to be cocaine
20  and marijuana. It was never tested. Mr. Sinn went on
21  bail, bailed out, and then approximately four months
22  after he was on bail he fled, went to Fort Wayne,
23  Indiana. He was arrested approximately two years
24  later and returned to California. It should be noted
25  and made clear that Mr. Sinn was not the trigger man
26  in this shooting. The psychological evaluation of
27  **GARY SINN   D-57219        DECISION PAGE 2   6/4/04**

1    12/31/02 authored by William Gamard, G-A-M-A-R-D,
2    staff psychologist, is not totally supportive of
3    release. He states on page six, if released to the
4    community his violence potential is estimated to be no
5    higher than the average citizen in the community.
6    This is based upon the following considerations, and
7    we'll go down. It says: It is hard to believe that
8    he never participated in criminal activity prior to
9    this crime spree and his denial of being the leader
10   during these crimes was not very convincing. It does
11   seem likely that after he bought the police badge
12   facsimile at the gun show this inspired opportunistic
13   thinking that led to this particular crime spree of
14   robbing victims and posing as a policeman. From this
15   the psychologist is inferring that the prisoner has
16   not come to terms totally with his involvement in this
17   commitment offense. And the psychologist goes on to
18   the next page. When inmate Sinn was arrested and his
19   truck was searched the fake badge was found together
20   with loaded handguns, a walkie-talkie, ammunition, a
21   pair of binoculars, a shoulder holster, a handcuff
22   case as well as drug paraphernalia and what appeared
23   to be cocaine and marijuana. Again, it was never
24   tested. All of this material found in the car would
25   indicate that it was equipment used in these robberies
26   and he was the leader and he was in charge of all this
27   **GARY SINN   D-57219        DECISION PAGE 3   6/4/04**

1   equipment, that's why it was in his vehicle.  His
2   parole plans were fine.  The Hearing Panel notes that
3   in response to the 3042 notices the District
4   Attorney's Office of Los Angeles County appeared at
5   the hearing, participated and was opposed to parole.
6   The Panel makes the following findings: 'The prisoner
7   needs to continue self-help to face, discuss,
8   understand and cope with stress in a non-destructive
9   manner.  Until progress is made the prisoner continues
10  to be unpredictable and a threat to others.  The
11  prisoner should be commended for receiving no 115s
12  since 1993, for receiving excellent work reports in
13  plumbing and the PIA plumbing, vocational certificates
14  were received in small appliance repair and he was
15  certified as an optical technician.  He received
16  certificates in welding and in machine shop as a die
17  maker, a certificate in blueprint reading and he
18  functions as a journeyman plumber.  He's also received
19  a GED.  Self-help: He's participated in alternatives
20  to violence, anger management, impact, the parenting
21  program, hands of peace and the communicable disease
22  program.  He's been in AA for three years.  He also
23  has read a self-help book on nonviolence.  However,
24  these positive aspects of the prisoner's behavior do
25  not outweigh the factors of unsuitability.  The Panel,
26  again, gives a one year denial.  Recommendations:
27  **GARY SINN   D-57219        DECISION PAGE 4   6/4/04**

1    Remain disciplinary-free, participate in any self-help
2    that's available and cooperate with clinicians in the
3    completion of a new clinical evaluation before the
4    next Board Hearing in one year. That concludes the
5    reading of the decision. Comments?

6           **DEPUTY COMMISSIONER MCBEAN:** Yes, thank you.
7    Mr. Sinn, the Panel's concern here really has to do
8    with, I would say, insight and the fact that your
9    crime was a very sophisticated crime. It was not a
10   spur of the moment, kind of, I need some money, type
11   of event that happened one time. It was a series of
12   robberies. Based on the kinds of things that were
13   found in your vehicle at the time of your arrest you
14   were fully prepared to continue in your robbery
15   sprees. You seem to have it very well-planned, well
16   thought out. You had an inside person at the gambling
17   place. And we never did see an amount of money that
18   was confiscated, if it was confiscated. I don't know
19   how much money you actually got out of it. The only
20   thing we saw was about $150. So even though you may
21   not have been getting much money out of it to
22   accomplish the goal you said you were after, that is
23   to support the family, the house, the cars, the stuff,
24   you didn't seem to be getting a lot of money from it,
25   as far as we can tell from the record. So then one
26   wonders why you were continuing. And it might have
27   **GARY SINN   D-57219        DECISION PAGE 5   6/4/04**

1    been the badge, as you have talked about.  The power.
2    It might have been just the thrill of the crime.  But
3    the interesting thing is that even after the murder
4    you continued to commit more robberies, risking the
5    possibility that more people would be killed.  There's
6    always that possibility when you're talking guns and
7    crime.  So we have a really hard time understanding
8    what really was going on with you.  What led you to
9    that crime, what kept you there, and we don't have
10   reason to believe that it would have stopped but for
11   the fact that you were arrested and there was a
12   possibility you could have hurt more people.  You have
13   done an excellent program and we certainly do
14   acknowledge you for that.  You've done more in your
15   incarceration period than we generally see for people
16   who have done more time than you have.  I was very
17   impressed with that.  You're a very smart man, you
18   know what the Board expects and you're trying to give
19   us that, and we recognize that.  We want to encourage
20   you to continue to do that.  That is very important
21   for you.  You're very employable, but you were very
22   employable at the time of the crime.  You're smart,
23   but you were smart at the time of the crime.  The
24   difference is, what you're telling us today is  that
25   money doesn't mean anything.  And a concern is, again,
26   is that what would happen out there in the real world
27   GARY SINN   D-57219        DECISION PAGE 6   6/4/04

1    if you experienced tremendous financial pressures
2    again, as most people do.  Money is a stressor out
3    there, and it's going to continue to be a stressor.
4    But what we'd like you to do, and I saw in, I think
5    the previous decision, that you were trying to get
6    involved in some therapy.  I don't know if you can do
7    that.

8            **INMATE SINN:**  There's none available.  None.
9            **PRESIDING COMMISSIONER RISEN:**  It's going to be
10   very hard because I know resources are scarce in CDC
11   and they save those real intense therapy programs for
12   people in the mental health services delivery system.
13   But I like what you said that you're going to continue
14   to try to get involved in everything and anything that
15   you can.

16           **INMATE SINN:**  Yes, that's not going to change.
17           **DEPUTY COMMISSIONER MCBEAN:**  Including reading.
18   And continue to try to gain more insight into what
19   actually got you there.  We're also concerned about a
20   possibility of drug use in your life.  You were
21   arrested with syringes, a possibility of cocaine and
22   marijuana, so I'm glad you're in AA.  If there's any
23   possibility that, you know, drugs was or was becoming
24   a problem for you.  And the steps are very valuable
25   anyway and most people find that they can use them in
26   their everyday life.  So in conclusion, Mr. Sinn,
27   GARY SINN   D-57219        DECISION PAGE 7   6/4/04

1    you're doing an excellent program, we encourage you to
2    continue to do that.  There's still something missing
3    here for us with you in terms of insight.  We're not
4    convinced that you, given the same kind of stressors,
5    that you might not return to the same kind of
6    thinking.  Because there's such a big leap in-between
7    what you did before and all of a sudden all these
8    robberies and then, oh yeah, maybe I shouldn't have
9    done that.  Like something happened in there.  Things
10   don't usually happen that fast to people.  We want you
11   to focus in on that to the extent that you can and
12   really try to understand what those precursors were so
13   that we can understand it as well and feel confident
14   that given the same kind of stressors you might not
15   return to the same kind of life of crime and risk
16   hurting people tremendously and killing people.  So I
17   want to wish you good luck.

18           **INMATE SINN:**  Thank you.

19           **DEPUTY COMMISSIONER MCBEAN:**  Thank you very
20   much.

21           **PRESIDING COMMISSIONER RISEN:**  Okay.  Good luck
22   also.  We'll terminate the hearing at 11:50.

23   **PAROLE DENIED ONE YEAR**
                                      OCT - 2 2004
24   **THIS DECISION WILL BE FINAL ON:**_____

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **GARY SINN   D-57219       DECISION PAGE 8   6/4/04**

109

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages number 1 through 108, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of GARY SINN, CDC No. D-57219, on JUNE 4, 2004, and that the foregoing pages constitute a true, complete and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above captioned matter and have no interest in the outcome of the hearing.

Dated June 25, 2004, at Sacramento County, California.

Ramona Cota
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT   "C"

*MENTAL HEALTH EVALUATION FOR THE BOARD OF PRISON TERMS*
*(REVISED AUGUST 1998)*
*PAROLE CONSIDERATION HEARING*
*SEPTEMBER 2005 LIFER CALENDAR*

*CORRECTIONAL TRAINING FACILITY, SOLEDAD*
*SEPTEMBER 2, 2005*

### ADDENDUM EVALUATION:

*NAME:*      SINN, GARY
*CDC #:*      D-57219
*EVALUATION DATE*: 09/02/05

### IDENTIFYING INFORMATION:

This is an addendum to Dr. William Gamard's evaluation on 12/27/02. Dr. Gamard's
evaluation is extensive, and it is still current and valid.

On 02/27/03, the Board of Prison Terms' panel asked for a new psychological evaluation,
with the request that a psychologist explore inmate Sinn's insight into his involvement in
crime.

In response to that request, Dr. Jeff Howlin reinterviewed inmate Sinn. His addendum is
dated 11/18/03. This evaluation discussed the dynamics and details of the commitment
offense, and it is still current and valid.

However, on 06/04/04, the BPT panel again requested a new psychological evaluation to
address this inmate's violence potential, the extent to which he has explored the
commitment offense, and his understanding about the underlying causes, and the need for
further therapy.

Reading page four of the BPT minutes, the panel is confused as to why a man from a
prosocial background, a stable history, who was employed, would engage in a series of
sophisticated criminal acts. They wanted this issue to be addressed by the psychologist.

### REVIEW OF LIFE CRIME:

When asked about why he engaged in these criminal acts, inmate Sinn stated that at that
point in his life, at the age of 32, he was working as a truck driver. He took on the
responsibility of supporting his mother after his father's death, plus his wife's sister. In
addition, he had his own four children, and they were purchasing a home. He was
financially strapped to the limit. They were living week-to-week on his paycheck and his
wife's income. Both of them worked for Lucky Stores, and Lucky then went on strike.
They were thrown out of work and could not make house payments. He saw his financial
dilemma as a major disaster. He was overwhelmed. He stated that at that point in his

*SINN, GARY*
*CDC NUMBER: D-57219*
*BPT MENTAL HEALTH EVALUATION*
*PAGE TWO*

life, he was a very materialistic individual who thought that maintaining his financial responsibilities was the most important thing in life.

Inmate Sinn tried to help out a woman who was crying on the street corner because she had been robbed by a drug dealer. He decided, like a good Samaritan, to help her out. He had a fake police badge that he had used in the past to get his family into the drive-in movie theater free. He approached the drug dealer with the fake police badge and demanded his money, which he returned to the woman, whom he later learned was a prostitute. At that point, he realized that he might be able to solve his financial problems by the use of his police badge, robbing dope dealers of their money. He felt that, since they were criminals, he would not be reported. He stated that he never intended to hurt anybody. The commitment offense occurred in the midst of one of these robberies of individuals in a motorcycle gang who had just stolen some property. Unknown to inmate Sinn, in the garage, another man named "Bull" knew about inmate Sinn's plans, decided to enter in on his own, and with a gun apparently accidentally shot someone. This man was later on killed by the motorcycle gang in retaliation. Two months later, inmate Sinn engaged in another robbery of a gambling house. He then left to start over in the mid-west.

The motivation for this behavior, which seems so far out of character for a prosocial, responsible, working family man, was unmitigated greed and desire for materialistic success. Inmate Sinn thought that he had a full-proof plan that would raise money gained from illegal sources to pay his own bills. The thought that his behavior would result in the death of an innocent individual never occurred to him. Although inmate Sinn felt powerful when using a fake police badge to force others into giving him their money, and he was surprised at how cooperative they were, that was not the reason why he was engaged in this behavior. He denied that there was any "thrill" to this criminal behavior. His thinking at the time was foolish, immature, short-sighted, and he definitely used poor judgment. At that point in his life, he was very materialistic, and he felt overwhelmed by his financial problems.

Since that time, inmate Sinn has changed dramatically. Inmate Sinn spoke at length about the fact that, because he engaged in this criminal activity, another man died, even though he was not aware of it at the time. If he had not been engaged in robbing this motorcycle gang, the other man would not have had the courage to try to join in, unknown to inmate Sinn, which resulted in the victim's death. Therefore, inmate Sinn fully realizes that he is responsible for the victim's death, even though he was not there in the vicinity where it occurred. Since inmate Sinn is a parent himself, he fully understands the devastating loss that the victim's parents must have experienced. He described the "ripple effect" of his criminal actions, which affected not only his own family, but others in the community. His sense of remorse appears to be sincere and genuine.

As a result of inmate Sinn's incarceration, he has matured a great deal over the last 20 years. He described how he has longed to handle potentially violent and explosive situations that occur with other inmates in the prison environment. He does know how to resolve problems and conflicts in a responsible manner. He has developed a strong

*SINN, GARY*
*CDC NUMBER: D-57219*
*BPT MENTAL HEALTH EVALUATION*
*PAGE THREE*

interest in Bible studies and spiritual growth. As a result, material things no longer are important to him. He understands what his quest for material things has cost him and his family. He described how his thinking has changed. He now understands that there are other things that are far more important than material things, such as his family's health and growth that he has not been able to participate in, the loss of fellowship with his wife and children due to his incarceration, the importance of love and service to others in need, etc. Instead of a life dedicated to the pursuit of material things, his life, at this point in time, is dedicated to developing skills that will enable him to help others in need. He has completed 26 FEMA Disaster Relief Courses. He also has participated in numerous self-help groups such as Alternatives to Violence, Anger Management courses, Impact courses, etc.

## ASSESSMENT OF DANGEROUSNESS:

A.    In considering his potential for dangerous behavior in the institution, inmate Sinn has remained disciplinary-free. This is a notable achievement. His values are not antisocial or criminal. His values and thinking are definitely prosocial. He participates enthusiastically in any self-help programs that he can. His violence potential, in comparison to other inmates, is definitely below average.

B.    In considering his potential for dangerous behavior if released to the community, I agree with the conclusions of Dr. Howlin and Dr. Gamard. They concluded that inmate Sinn does not pose any more threat to the public if released on parole at this time than the average citizen. He has definitely learned his lesson. His values and thinking have changed dramatically over his 20 years of incarceration. He is no longer motivated to acquire materialistic things. He understands that he is accountable to his Creator, and that God will hold him accountable for his irresponsible actions. Inmate Sinn is solidly prosocial in his values. He has a strong work ethic and he has been gainfully employed over the years before he engaged in his criminal activities. He has numerous skills that will enable him to support himself and his family in the community. He is licensed as a funeral director, and he has jobs in that field waiting for him when he is granted parole. He also is a vocational optical and lens maker. He is a skilled welder. He is a machinist and dye maker. He also is skilled as a maintenance plumber. He is doing this work at this time in the institution.

C.    There are no significant risk factors in this case. Inmate Sinn has never been a drug or alcohol user.

## CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

There are no mental or emotional problems that would interfere with granting parole at this time. Inmate Sinn has strong family support in the community. He has numerous job offers in Ohio, as well as in California. He spoke about how

*SINN, GARY*
*CDC NUMBER: D-57219*
*BPT MENTAL HEALTH EVALUATION*
*PAGE FOUR*

much damage he has done to society and to others by his criminal actions. He stated that he is determined to help others, benefit others, and become a blessing to others when he is released. He does have good insight and self-awareness. He has made significant changes over the years in a positive direction. The prognosis for successful adjustment in the community is excellent.

*M. Macomber, Ph.D.*
*Clinical Psychologist*
*Correctional Training Facility, Soledad*

*Bill Zika, Ph.D.*
*Senior Supervising Psychologist*
*Correctional Training Facility, Soledad*

*MM/gmj*

*D: 09/02/05*
*T: 09/07/05*

*D:\Word Files\BPT - 2005\SINN, GARY   D-57219   09-05   MACOMBER.doc*

**PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS**
**(REVISED AUGUST 1998)**
**PAROLE CONSIDERATION HEARING**
**FEBRUARY 2004 LIFER CALENDAR**

**CORRECTIONAL TRAINING FACILITY, SOLEDAD**
**NOVEMBER 18, 2003**

This is an addendum psychological evaluation for the Board of Prison Terms on inmate Gary Sinn, CDC# D-57219. This report is based on personal clinical interviews conducted with the inmate on 11/18/03 and 12/04/03. Additionally, a review of his unit health record and Central file were conducted. The reader is referred to the most recent complete and thorough psychological evaluation by Dr. Gamard, dated 12/27/02. Both clinical interviews and the review of all pertinent documents were for the express purpose of preparing this brief addendum.

Inmate Sinn is a 51-year-old, married, Caucasian male. His date of birth is 05/05/52. No unusual physical characteristics were noted.

Inmate Sinn was properly dressed and groomed. He was cooperative, calm and alert throughout the interview. His speech was clear and readily understandable. His affect was broad. There were no hallucinations nor delusions noted. He was fully oriented, and his intellectual functioning is estimated to be in the high average range compared to this level II inmate population. There was no evidence of a mood or thought disorder. His insight and judgment appeared to be intact.

There have been no significant changes for inmate Sinn since his last psychological evaluation, completed less than one year ago. He is attending Alcoholics Anonymous on a regular basis, he stated. He works in the plumbing shop, and continues to attempt to enroll in any self-help programs as available. He is, in fact, on a waiting list for my own lifer's group. He also said he has completed self-help book reports offered by the Mental Health Department. He produced a chrono documenting this. He also stated he has enrolled in college courses, and has completed three.

Apparently, inmate Sinn was involved in a "crime spree" before his commitment offense. Inmate Sinn discussed in detail the events leading to the "crime spree." He stated that he and his wife had recently purchased a new home. They both worked for the same company, and went on strike shortly after buying the home. Therefore, no income was coming in. He had four children, and was concerned about losing the home and having the related problems that may arise from that. He said, "My biggest fear was losing everything I had. It was all about the money." He said the crime spree started when he witnessed a woman who was sobbing on a corner. He said that he had bought a sheriff's badge about six months prior to this, and, characteristic to his personality, wanted to help. He stated that, with her help, they sought out the drug dealer, and he flashed his badge. He stated that all he wanted to do was get the woman's money back, and said, "It was a macho thing."

He said after this experience, he realized that he may be able to get more cash to help with his financial difficulties through the use of the badge. He said that it was less than a month's period of time between this first crime of seeking out the drug dealer, to the commitment offense. He admitted using the badge four times in efforts to get money and

SINN, GARY
CDC NUMBER: D-57219
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

income to help with his problems. He denied the use of drugs or alcohol in any of the crimes.

In regards to the commitment offense, inmate Sinn went into more detail. He stated there was never any plan to commit a murder, only to generate more cash flow. He admitted to carrying a gun, and also having a badge. He was not the individual who committed the murder, he stated. He stated that he accepts full responsibility, however, for the victim's death, and added that, even though he carried a gun, he had no plans to use it.

After discussing the commitment offense, and when I asked about how he felt during this crime spree, and what it was like to carry the badge and use it in such a fashion, inmate Sinn denied getting any kind of thrill related to these experiences. He did admit, however, to "being surprised by the power of the badge." He discussed in more detail the interplay between being in positions of power, and how it may relate to control.

It is probable that inmate Sinn perceived his life as "out of control" related to what appears to be a real threat of losing material assets, and the effects it might have on his family. He did demonstrate insight into how these subtle factors, such as power and control, can relate to choices people make. It appears that he has matured, and insight around these areas is better now, as compared to earlier on in his life. When asked what he would do differently, he stated that he would seek help, such as counseling, or services offered by the church.

As far as any additional conclusions or recommendations, the reader is referred to the last complete psychological evaluation, dated 12/27/02, and prepared by Dr. Bill Gamard. I agree with these conclusions.

JEFF HOWLIN, Ed.D.
Staff Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

B. ZIKA, Ph.D.
Senior Supervising Psychologist
CORRECTIONAL TRAINING FACILITY, SOLEDAD

JH/gmj

D: 11/18/03
T: 12/11/03

SINN        D-57219        CTF-CENTRAL        11/18/03        gmj

### PSYCHOLOGICAL EVALUATION FOR THE BOARD OF PRISON TERMS
### (REVISED AUGUST 1998)
### PAROLE CONSIDERATION HEARING
### FEBRUARY 2003 LIFER CALENDAR

### CORRECTIONAL TRAINING FACILITY, SOLEDAD
### DECEMBER 27, 2002

This is the fourth psychological evaluation for the Board of
Prison Terms on inmate Gary Sinn, CDC# D-57219.   This report
is the product of a personal interview, conducted on
12/27/02, as well as a review of his Central file and unit
health record.  This single contact interview is for the
express purpose of preparing this report.

The inmate was informed of the nature and the purpose of the
interview, and the lack of confidentiality inherent in the
present assessment.  He was also informed that a report for
the Board of Prison Terms would be prepared.  He understood
this and agreed to participate.

This is actually the first detailed psychological evaluation
that inmate Sinn has agreed to because on previous occasions
he maintained that, since his case was on appeal, he had
been instructed by his attorney not to discuss the case with
anyone.

### PSYCHOSOCIAL ASSESSMENT

#### I.    IDENTIFYING INFORMATION:

Inmate Sinn is a 50-year-old, married, Caucasian male.
No unusual physical characteristics were noted, and he
denied the use of any nicknames or aliases.

#### II.   DEVELOPMENTAL HISTORY:

Inmate Sinn was the second of three children, having
one older brother, and one younger sister.  He was
raised by both parents.

He stated there were no prenatal or perinatal concerns
or birth defects.  He had no abnormalities of
developmental milestones.  All speech, language and
motor development occurred unremarkably.  He denied any
history of cruelty to animals, enuresis or acts of
arson.  He stated he had no significant childhood
medical history, and denied a childhood history of
physical or sexual abuse as either a perpetrator or a
victim.

| SINN | D-57219 | CTF-CENTRAL | 12/31/02 | gmj |

SINN, GARY
CDC NUMBER: D-57219
BPT PSYCHOLOGICAL EVALUATION
PAGE TWO

### III. EDUCATIONAL HISTORY:

Inmate Sinn completed eleven years of high school, then completed a GED in 1972. Subsequent to that, he spent one year taking college courses in psychology and other areas, and then spent two years at the Los Angeles Mortuary Science College, where he obtained a certificate (dated 1974).

### IV. FAMILY HISTORY:

Inmate Sinn's father died in 1975. His mother and siblings are living, and he has regular contact with all of them.

### V. PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Inmate Sinn is a heterosexual male. He denied any history of high-risk sexual behavior or sexual aggression.

### VI. MARITAL HISTORY:

Inmate Sinn married Rachelle in 1974, and they had four children, who are now grown, and have children of their own. He states that he is contact regularly with his wife, and all of his children through letters and occasional phone calls.

### VII. MILITARY HISTORY:

Inmate Sinn states that he was briefly in the Marine Corp. He went to boot camp, but had to drop out because of torn ligaments in his knees.

### VIII. EMPLOYMENT/INCOME HISTORY:

At the time of his arrest for his present offense, inmate Sinn was working as a truck driver for Lucky Stores. His father was a truck driver, and the inmate began working in this field at a young age. He also worked for a mortuary as an ambulance driver and medical technician. On the side, he has bought and sold guns for many years.

Since his incarceration, inmate Sinn has worked steadily as a teacher's aide, as a PIA optical lens

SINN, GARY
CDC NUMBER:  D-57219
BPT PSYCHOLOGICAL EVALUATION
PAGE THREE

inspector, and currently he is working in the plumbing
shop.  In addition, he has completed vocational
welding, vocational optical, vocational blueprinting,
vocational small engine repair, and has partially
completed tool and dye.

## IX.  SUBSTANCE ABUSE HISTORY:

Inmate Sinn denied any history of problems with alcohol
or street drugs.  He said that he was too scared to use
amphetamines as a truck driver.

## X.  PSYCHIATRIC AND MEDICAL HISTORY:

Inmate Sinn reports current problems with high blood
pressure and high cholesterol, as well as a recent skin
cancer problem, for which he had surgery in February
2002.  Inmate Sinn currently takes the following
medications:  Atenolol and Lipitor.

Inmate Sinn denied any history of psychiatric
hospitalizations.  He denied any history of serious
accidents or head injuries.  He has had no history of
suicidal ideation or suicide attempts.  He has had no
seizures or other neurological conditions.

## XI.  PLANS IF GRANTED RELEASE:

Should inmate Sinn be given a parole date, he states
that he would live with his wife in Anaheim,
California, and work for his sister, who can get him a
job managing an apartment complex.  Eventually,
however, he would want to return to the mortuary
business.

### CLINICAL ASSESSMENT

## XII.  CURRENT MENTAL STATUS/TREATMENT NEEDS:

Inmate Sinn appears to be his stated age of 50.  He
was appropriately dressed and groomed.  He was
coherent, cooperative, calm and alert throughout the
interview.  His speech was clear and readily
understandable.  His flow of thought and affect were
within the normal range.  There were no hallucinations
nor delusions noted.  He was fully oriented.  His
intellectual functioning was estimated to be in the

SINN     D-57219     CTF-CENTRAL     12/31/02     gmj

SINN, GARY
CDC NUMBER:  D-57219
BPT PSYCHOLOGICAL EVALUATION
PAGE FOUR

high average range.  His attention and concentration
were adequate for the purposes of this examination.
There was no evidence of a mood or thought disorder.
His insight and judgment appeared to be intact.  He
showed good insight into his commitment offense.

**CURRENT DIAGNOSTIC IMPRESSIONS:**

**AXIS I:**    No Contributory Clinical Disorder.
**AXIS II:**   No Contributory Personality Disorder.
**AXIS III:**  1)  Hypertension.
               2)  Hypercholesterolemia.
**AXIS IV:**   Incarceration.
**AXIS V:**    GAF = 80.

Should this inmate at this time be given a parole or
release date, his prognosis for maintaining his present
gains in the community is excellent.

**XIII. REVIEW OF LIFE CRIME:**

Inmate Sinn described the circumstances surrounding
his commitment offense for the first time in detail.
In a brief psychological evaluation for the Board of
Prison Terms, dated 04/11/90, it is stated, "He denies
participating in the murder, as well as having any
knowledge of the murder."

Inmate Sinn no longer maintains that he knew nothing
about the shooting, and admits being there at the time
the victim was shot to death.  He said, "I'm guilty for
being there.  I'm guilty.  I think about it all the
time, and the effect that it had on the victim's
family, and on my family.  I accept responsibility for
everything I've done, and I will do anything to make up
for it."

About his crime partners, he stated that Rodney Harris
was acquitted by claiming that he was not there at the
scene of the crime, and that the other partner, who was
the shooter, Tyrone Miller, was killed within three
months of the incident.

Inmate Sinn explained that the circumstances at the
time were that he had just bought a new house, but
Lucky's Supermarket went "on strike," so he was short
on cash.  And his crime partner, Rodney Harris, wanted

SINN, GARY
CDC NUMBER:  D-57219
BPT PSYCHOLOGICAL EVALUATION
PAGE FIVE

> to buy a car from him, but lacked the money.  Inmate
> Sinn agreed to exchange the car for a set of power
> tools (valued at about $150) which Mr. Harris said
> could be robbed from some people who had themselves
> burglarized the tools.  Inmate Sinn arrived at the
> scene with his two crime partners, and that's when
> things went awry, when the victim approached the house,
> and was shot to death by crime partner Miller (after
> which all of the crime participants fled the scene).
>
> Inmate Sinn admits to being involved in a series of
> robberies, during which he falsely presented himself as
> a police officer, by presenting a facsimile of an
> Orange County Deputy Sheriff's badge, along with
> handcuffs, and other paraphernalia that made him seem
> more convincing as a police officer.  The inmate
> maintains that he never wished nor intended for anyone
> to be hurt during these crimes, and he said it was
> unnecessary to use his gun, since usually the badge
> sufficed.
>
> On this particular occasion, inmate Sinn maintains that
> he did not use his gun.  (However, the testimony of the
> man that owned the house where the shooting occurred,
> Tommy Bolton, states that the defendant held what
> appeared to be a .38 revolver, "flashed" a badge, and
> said, "Freeze!  Police!").  His companion also had a
> gun.  Then, after ordering both of them to lie down,
> the defendant handcuffed one, while his partner
> handcuffed another victim.  Then, he ordered the three
> victims into the house, and told the "shorter, black
> gunman" to go to the front of the house.  This
> "shorter, black gunman" was the man that shot the
> victim to death.
>
> When asked if he was the leader in these crimes, the
> inmate denied it, and then presented himself as a
> novice in crime, and said that he had never been
> involved in any criminal activity before this incident.
>
> Inmate Sinn admitted using his badge to rob a couple of
> heroin dealers in partnership with a prostitute, and
> said he really couldn't explain how he got involved,
> "for the first time" in his life in criminal activity,
> except that it all started when he bought the facsimile
> of a deputy sheriff's badge at a gun show.  He denied
> going to the motel where a "sting" operation was set-up

SINN        D-57219        CTF-CENTRAL        12/31/02        gmj

SINN, GARY
CDC NUMBER:  D-57219
BPT PSYCHOLOGICAL EVALUATION
PAGE SIX

> to arrest him (the operation failed, but the hotel
> clerk gave a description of his coming there,
> presumably with intent to rob).
>
> Inmate Sinn definitely acknowledges knowing that the
> victim was shot to death, because he said that the
> shooter, Tyrone Miller, explained that the victim tried
> to use a kick-box to knock away his gun, missed, kicked
> him in the chest, and that the gun went off by
> accident.
>
> Asked if he didn't commit more robberies of drug
> dealers using the badge, inmate Sinn admitted robbing a
> gambling establishment, and robbing patrons at gunpoint
> (although he said he only did this at this location
> once, not twice), as well as in a smaller "gambling
> shack," which he described as a garage, and he also
> admitted robbing someone at a car wash.

## XIV. ASSESSMENT OF DANGEROUSNESS:

- **A.** Inmate Sinn has received only one CDC-115 violation
  during his entire incarceration of nearly 20 years
  (in 07/93 for a positive alcohol blood test).
  Therefore, it is felt that he would pose a less
  than average risk for violence when compared to
  this Level II inmate population.

- **B.** If released to the community, his violence
  potential is estimated to be no higher than the
  average citizen in the community.  This is based on
  the following considerations:

  There are no records of any arrests for criminal
  behavior prior to this crime spree.  He has not
  shown a single sign of violent behavior during his
  entire incarceration.  In many ways, he has been a
  model inmate, with many positive written notes
  about his work in a number of fields.  Although it
  is hard to believe that he never participated in
  criminal activities prior to this crime spree (and
  his denial of being the leader during these crimes
  was not very convincing), it does seem likely that
  after he bought the police badge facsimile at a
  gun show, this inspired opportunistic thinking
  that led to this particular crime spree of robbing
  victims while posing as a policeman.

SINN      D-57219      CTF-CENTRAL      12/31/02      gmj

SINN, GARY
CDC NUMBER:  D-57219
BPT PSYCHOLOGICAL EVALUATION
PAGE SEVEN

> When inmate Sinn was arrested and his truck was
> searched, the fake badge was found, together with
> loaded handguns, a walkie talkie, ammunition, a
> pair of binoculars, a shoulder holster, and a
> handcuff case, as well as drug paraphernalia, and
> what appeared to be cocaine and marijuana.

C.  The only significant risk factor which could be a
precursor to violence for this inmate should he be
released would be a return to owning guns.

## XV.  CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS:

A.  This inmate is competent and responsible for his
behavior.  He has the capacity to abide by
institutional standards.

B.  This inmate does not have a mental health disorder
which would necessitate treatment, either during
his incarceration period or following parole.

C.  As this inmate denies having a problem with
alcohol or drug abuse, no recommendations are made
in this area.


*William Gamard, PhD*

**WILLIAM GAMARD, Ph.D.**
**Staff Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

*B. Zika, Ph.D.*

**B. ZIKA, Ph.D.**
**Senior Supervising Psychologist**
**CORRECTIONAL TRAINING FACILITY, SOLEDAD**

WG/gmj

D:   12/27/02
T:   12/31/02

# EXHIBIT "D"

LAW OFFICES OF

# Picone & Defilippis

A PROFESSIONAL CORPORATION

625 NORTH FIRST STREET

SAN JOSE, CALIFORNIA 95112

(408) 292-0441    Fax: (408) 287-6550

STEVE M. DEFILIPPIS

STEPHEN S. PICONE

RYAN A. RAMSEYER

TRACI S. MASON                    ***VIA CERTIFIED MAIL ***

January 22, 2007

CTF-Soledad
Attn: *Records/BPT Desk*
P.O. Box 686
Soledad CA 93960-0686

RE: Inmate Gary Sinn, D-57219

To Whom It May Concern:

Enclosed please find support/employment letters regarding inmate Gary Sinn, D-57219, for the hearing that is currently scheduled for February 07, 2007 at 8:30 a.m. Please immediately deliver these letters to the Board for that hearing.

If you have any questions please contact this office immediately.

Very truly yours,

TRACI S. MASON

TSM/dh

Enclosures (support/employment letters)

cc: Client
    Rachelle Sinn

Dear Parol Board,                    January 3, 2007
        My letter is in regards to Gary Sinn
D57219. Gary Sinn is my father. I am
writting you today because my dad's
parol hearing is comming next month. Dispite
prison Gary has been involved in my life since
birth. He went to prison when I was six years or
Growing up in prison atmospher you really get
to see people. You see hopelessness, pride, drugs, depression
and some really dumb people, and every so often
you see a humble, good guy. I have seen all
different types of inmates. In all I've seen
and met, I can say the only inmate that
seems like a positive role modle and an
example of rehabilation is Gary Sinn. Not just
because he's my father. I've seen men and
woman in his shoes and have only temporaly change
or not at all. I challenge you to look at the
facts. Please look at his behavior and his files.
See who he is today. Even though Gary is my
father, I didn't always see him as perfect. Or the best
father. It was in my teen years that I really
started to have a true relationship with him. He wasn't
just the man I'd see every other weekend. He was
becoming a role modle, a helper, a friend, but still
a father. Who wasn't just concerned with himself. He
was concerned with what I was doing in my life. I
was able to open up to him. I didn't see him as

a murder or a convicted felon. I enjoyed
see him, He helped me on lifes struggles. He even
helped me decide if I should marry. As I grew
up, got married and had children of my own
I've kept a close relationship with my dad.
My children have grown to love him. By there
choice, They enjoy him alot. In fact thats why
these letters are hand written my two older ones.
Wanted to write letters to you. Gary's past is not
a lie to my children or is it kept a secret. I don
make them see him or portray his as a perfect man.
And each of us love him, and are connected
to him. He's great person and loving father
and grand father. My 9½ year old son, Isaiah
he knows the truth, he admire my dad for his wisdom
and can't wait to go with him camping. My dad
Wrote a childrens book. Isaiah loved and wrote
a report on for school. He askes to see him ale
and they write letters back and forth. Isaiah get
to see right from wrong in this relationship He
Sees that people can change and how he can learn
from others mistakes. Having a relationship with his
grandpa he is learning to make good choices when
peers and life lead him in another direction. My
daughter Mariah who is 5½. enjoys her Pappy
(my dad) so much. She thinks hes fun and loves
coloring pictures to him. She colored one to you with
her and her pappy climing a tree. She can't wait

to see him again, I encourge her relationship
with her grandpa (pappy) so as she grows and
gets to a point where she has pressures from peer.
and can't talk to mom or dad, she'll have her
Pappy. He'll help her discern a boys mind or
guide her to make wise choices. Just like he did
for me. He may have not been the best dad
for me but, he pushed through and became the best
he could and still does for his grandchildren. I
admire my dad's willingness to never give up
and push to be the best you can, no matter
what curve ball is thrown at you. To me having
someone to give you wisdom, guidence and
love dispote prison walls, that's the best dad. or
the best grandfather. He is not the same
convicted felon he was 20 years ago. His not out
for personal gain. He care's for others and their
lives. I cherish my time with my dad. I'd love
to show him how much I love him and am thankful
to have him outside of prison. Would you please
allow that to happens. Thank you for letting me
ask you.

Sincerely

Candace Ontiveros

Debra Gregory
7155 Gentry Way
Stanton, Ca 90680

To whom this may concern,

I am writing this letter today on behalf of my uncle, Gary Sinn (#D57219). This is yet another attempt to show that Gary has a line of love and support waiting for him when he is released on parole. It has been quite a few years that I have been writing these types of letters with hopes that one day they will be answered with the release of my uncle. It has been a long time since Gary has been able to join our family for holidays, weddings, births of children, and just everyday life and I speak for the entire family when I say, its his time to be able to be a part of our lives again, in person. He has been the person we miss every time there is an event in one of our lives, especially his own children's lives.

It seems that every year there has been a major milestone in one of our lives and it is never complete without the entire family. Sadly, Gary has missed every one of his kids birthdays for the past 20 some years, every graduation, every wedding, every birth of his grandchildren, and every moment that happens once in a lifetime for his entire family. When I think of how we as his family feels of his absence, I can only imagine the emptiness in his heart and the sadness he must feel to not be able to be there for his family. Sitting in prison thinking how things might be going on those days, wishing he could be there. That is more than enough punishment a human deserves. Although, Gary has spent many years in prison and has been kept far away from his family, he has never been forgotten during these moments in our lives. He has just as much love and support now then he has had before he went to prison.

As his family, we believe in him. We believe that when he is released from prison, his life will be filled with people who love him, along with faith to guide him to be a good person, and the drive to be a successful and hard working citizen. Although the world today is very different then it was 20 some years ago, there isn't a doubt in our minds that with the network of support Gary has available to him, he will be able to acclimate to the ever changing society that we live in today. He has a loving and secure family waiting to embrace him.

Even though it is impossible to pick up where we all left off when he was sent to prison, we are all ready to do what it takes to help Gary with the transition from prison to home life. He has his wife, mother, children, siblings, nieces, nephews, grandchildren, and in-laws who will all provide Gary with the mental, emotional, and financial support he will need during the transition and finding his place in the world.

Gary's attitude, behavior, will, and family should all be taken into account when reaching a conclusion with regards to his release. Every year that he has been up for parole, our hopes are demolished when he is told one more year. It always amazes me that there are sex offenders and child molesters that live right next door, but my uncle is kept in prison after 25 years with good behavior and ethics. It is his time to be released. It is our time to have him back in our lives in person. Please let him come home this time.
Sincerely,

Debra Gregory

To whom it may concern:                    January 9, 2007

I am writing this letter on behalf of my father, Gary Sinn D57219, who is in Soledad State Prison. My dad has been locked up for 20 years which me being 23 mean that he was arrested when I was only 3 years old. For the past couple years I've wrote a letter to ask you to release my dad and with every year I get older. I am the youngest of four children yet to have settled down and get married.

My sisters didn't get the chance to have our father at their wedding and walk them down the isle so they asked me to step in and I tried to take his place but it was not my place to take. For 20 years we have had to settle with not having our dad at important events and we really don't know him outside of prison. All that I am asking is for the chance to get to know my father before I become one. We all have our separate lives ahead of us and it wont be long before we stray away from our own family's.

I would just like the chance to spend some time doing the father - son bonding things that we've never had the chance to do. Whether it be going on camping trips or as simple as sitting at home watching a football game together. It's all the things that I have missed growing up. I know that given the chance he will be there for all of us and would not ever do anything to jeopardize that again.


Best Regards,

*Chad Sinn*
Chad Sinn

1/1/01

dear Parole Board,

My name is Ruben Contreras, I'm writing in behalf of my father in law. I have known him for 7 years. Durring these 7 years I have devolped a father son Relationship. It started when I asked him to marry his daughter from then on he has always treated me like his son he has helped me in life struggles, including finances, parenting, and even marriage. I admire him because he has always wanted the best for me and my family. He has coached me to by my first house, and to chose the best city for my family. As of today he has helped me recieve my Cal Commercial drivers license and also helped me in working on my truck, I admire Gary for his wisdom and knowledge and belive he's not the same man as when he went in 20 years ago If you grant him to be released I am here to help him reestablish his life. and bless him

Dear, Parole Board

My name is Isaiah I am nine
years old Pappy is my granapa.
I miss him very much. I like
Writing to him I want him to
see are new house In Colorado.
I know he did some bad stuff, but
I think he has learned his lesson.
Would you please look at him and
see if hes good. I bet he's good know.
He is good to me. So would you please
let him go.

thanks Isaiah Ontiveros

Dear, parole board

My name is Isaiah I'm nine years old. Pappy is my Grandpa. I miss him very much. I like writing to him. I want him to see are new house in Colorado. I know he did some bad stuff, but I think he has learned his lesson. Would you please look at him and see if he's good. I bet he's good know. He's good to me. So would you please let him go.

thanks Isaiah Ontiveros





1356 N. Ferndale St
Anaheim, CA 92801

To whom it may concern,

My name is Jesus Gabriel Garcia and I am writing on behalf of my new father-in-law Gary Sinn D57219. He is up for parole this year and I ask that you take all of our words and pleas into consideration.

I met my father-in-law in 2005 in prison. One of the hardest things to do was to ask my father-in-law for his daughter's hand in marriage. It was hard because we were unable to have an intimate conversation with him due to everyone being around. It was also hard because I knew my wife wanted to wait to get married until her father was home. But Gary wouldn't have it any other way. Not having her father there for her on that day special day was hard on her as well as all of us.

When Gary comes home he will be able to stay with us for as long as he needs. I will be there to help him readjust into society; to help him find a job, look for a home, and any other help I can be. I feel he has paid his debt to society and is no longer a danger to himself or anyone else. I ask that this time he will get a release date so we can all move forward with our lives together as a family.

Thank you for taking this time to read these letter in hopes to bring our family together again.

Sincerely,

Jesus Gabriel Garcia

Jesus Gabriel Garcia

Dear Sir or Madam,                                                                                                January 2007

I am writing on behalf of my father, Gary Sinn D57219, currently reciting at Soledad State Prison. This is the 4Th year I have to try and compose a heartfelt letter to you. What more can I write about. It's been 20 years. You already know he has missed out on me growing up, getting married, having my children. One of them being a newborn. It doesn't matter what I write. All your going to say is try again next year. To be honest with you I really hate doing these letters. It takes me a while to think of what to say and then it takes me about 2-3 hours to type out. All while I am cooking dinner, helping my 6 year old with homework, and tying to keep my 3 month quiet long enough to get this letter done. Why? Because I love my father. I do this for him in hopes that one day you will finally let this man come home where he belongs. He is the most caring, honest, remarkable man I have ever met. He has been living in your hell hole for 20 years now and he has never given up. Do you know how hard that is? Keeping a look over your shoulder so you don't get stabbed or beaten , staying out of trouble, working the program. Knowing at a moments notice you may have to defend your life and all your hard work as a model inmate is gone.

What really gets me is all this talk about "Overcrowding in the Prison System". You went from being the Department of Corrections to the Department of Corrections and Rehabilitation. Where is the rehabilitation? All I see and hear is the need for more prisons. Is it really necessary? The population is exploding and facilities are so crowded prisoners sleep 3 to a bunk inside gyms. There is 33 in California alone and the annual cost of housing one adult inmate in 2004 was $30,929. It is estimated by 2012 the number of prisoners will reach 189,925. Donald Spector, director of Prison Law Office, said sentencing and parole overhaul is vital to solving the prison crisis. Our governor said that rehabilitation is impossible if prisons stay crowded. What is stopping you from doing something about it? Parole inmates who have been reformed. Those who are model prisoners, have completed all mandatory counseling and classes, and have served their time. California prisons have among the highest prisoner-to-staff ratios in the country. The average number of inmates per correctional officer in a California prison is 6.5. Inmates have already filed court papers seeking a limit of new convicts admitted to the prisons until there is a declined in numbers thus violating the Eight Amendment's statue on cruel and unusual punishment. Population caps, health care, inmate abuse and parole are among the major legal issues facing the system.

I am asking you hopefully for the last time to PLEASE let my father come home. Let 1 man who's counselor states he is rehabilitated go free. Isn't that what you should focus on? Help the population caps. I beg of you. Give this man his life back outside your walls. 66% of released prisoners return within three years of being released. I assure you he will not be in that percentile. Thank you so much for reading my letter. I pray you will make the only sensible decision in this matter.

Sincerely,

Christina Sinn-Salazar
512 W. Victor Ave
Anaheim, CA 92801

To whom it my concern,

I am writing on behalf of my father Gary Sinn D57219. It has now been twenty years since my father has been home. Twenty years of the life's most precious time gone. Every year we write letters hoping and praying that someone really reads them and will consider bringing a loving father, husband and son home.

This past year my father has missed out on so many memories that he cannot get back. One of the most important and memorable events in my life was my wedding. In October 2005, I got engaged to a man that my father had to meet in prison. They got along great. My husband waited to ask me to marry him until he went to see my dad and asked his permission face to face. In September of 2006 I got married. It was supposed to be the happiest day of my life, but it wasn't what I had dreamed. He was not there to walk me down the isle or to share that one special father daughter dance. Instead I carried a picture of my father with me during the ceremony like both of my sisters did. It was not the same as him being there, but I had him there in my heart and mind. After the ceremony I was able to talk to him on the phone but nothing could have been better than him there.

Also this year he has missed out on two grandsons being born, his daughter purchasing and moving into her first home, and his only son moving back home to try and build their relationship. I do not want my father to miss out on me having children, buying my first home, or anything else in my life no matter how big or small it may seem.

Being the great person that my father is, he has never once asked any of his children to put their lives on hold for him. I am asking that you please bring him home so he can share many more memories with us. Memories that can never be replaced if missed.

Thank for your time and I pray you will release him this year.

Sincerely,

*Carrie Garcia*

Carrie Sinn-Garcia
2140 W. York Circle
Anaheim, CA 92804

My name is Maggie
I am 6 years old please
let Pappy come home I
miss him very
want to play much I
And let him with him
my house come to
the knotts we
please my berry can go
him. Nana farm misses

Maggie Salazar

My name is Maggie I am 6 years old please let Poppy come home I miss him very much I and a let him play with him My house the we can have very farm be my hang miss him

Maggie Salazar

# PACSAN MANAGEMENT CORP.

6033 W. Century Blvd., Suite 1020, Los Angeles, CA 90045
Tel (310) 568-4075 Fax (310) 568-4077

Wednesday, January 8, 2007
In regards to: Gary Sinn D572419

To whom it may concern:

My name is Darlyne Liddle and Gary Sinn is my brother.  This letter is my only opportunity to express my hopes to you that you will grant my brother a parole.  I would like to tell you a little bit about my knowledge of Gary and to inform you of my willingness to help Gary become acclimated back into society once granted his parole.  I am in a position to help my brother with a job and an apartment.

I manage several apartment complexes and I am in complete charge of all of the personnel needed to manage them.  Gary has taking every course that was offered to him during his incarceration.  That type of attitude along with his various training can only be an asset to our company.

Let me tell you about my brother Gary Sinn!  First of all I would like to say that even through his long incarceration we have remained very close.  I wish that I could see him more often but we do speak often by telephone.  I can and shall testify to his current state of mind and his good character.

Gary is truly a remarkable man.  Not only has Gary managed to serve so much time without becoming bitter he has taken every opportunity available to him to better himself, please see the attached letters of completions for the various courses he has taken while doing that time.  Gary has even tried to help other inmates.   He has shown nothing but respect to the prison personnel and I think you will agree that his record is outstanding.   He has done all in his power to stay a part of this family as well as his personal family.  He is in constant touch with his mother, his brother, his cousin's and his children.  I know that not one of his four children would make any important decisions without first speaking with their father.  That in it's self is a great testament to a great father. Credit must also be given to his wife Rachelle, even though it has been extremely hard for her to raise four children without their father's daily influence she has done a great job.

She has loved and stood by Gary all of this time. I know that Rachelle is so excited about putting her family back together.  I also know that with her help Gary will be ok.  Our whole family is very close and each of us will pledge our lives to helping Gary in any way needed. **I can only hope that each of you know just how many lives your decision effects.**  Do you know that my mother prays each night to live long enough to see her son come out of prison? She also has spent so much of her life savings trying to see that he does.  I had to take control of what little savings my mother had left before she spent it all on hopes of seeing Gary free.   Whatever Gary may have gotten into surely his debt has been paid in full.

You should also be aware of our family's health problems because time is very precious. Our father died of a heart attack at the age of 47, his brother died at the age of 46, my brother Walter had a serious heart attack at the age of 47, my mother is a recovered cancer patient, and my brother Gary has had some major health problems already. Whatever time Gary may have left, please let it be as a son, a brother, a cousin, a husband, and most of all as a father, not as an inmate.

Thank you for your time and consideration,

Darlyne Liddle
Director of Property Manager
Pacsan Management, Inc

January 9, 2007

Re:    Gary Allen Sinn

To whom it may concern:

I would like your consideration of parole for my son-in-law, Gary Allen
Sinn. Gary and my daughter Rachelle have been married for over 30 years.
He is a good man, devoted father of four children, grandfather of six and
loving husband.

My wife and I recently moved back to Ohio from Florida. Our home is here
for Gary and Rachelle as long as they need a place to live.

If you allow them to move back to Ohio, there are ample employment
opportunities for him and Rachelle.

Please I ask of you, Gary should be with his wife and children. Thank you
for your consideration of parole.


Very truly yours,

John Klacik

John Klacik
5193 Pinecrest Drive
Austintown, Ohio  44515

Mr. & Mrs. Leonard Glista
6237 Kirk Road, Canfield Ohio 44406
330-793-9473

January 8, 2007

Re:    Gary Allen Sinn

To whom it may concern:

We are requesting your consideration of parole for our brother-in-law, Gary Allen Sinn. Gary has been and is a dedicated father and husband.

Our home is open to Gary and his wife, Rachelle, for as long as they need a place to stay to re-establish their life together.

Our family has various employment opportunities available for Gary. My husband Leonard is presently working as a supervisor for Hively Construction (jobs could include laborer, masonry, trucking, landscaper, etc.) Leonard also does part-time work building homes, of which Gary could be employed.

We are very proud of his commitment to his family. Rachelle is my sister; raised their four children alone while being dedicated to her husband. We gratefully ask your consideration granting his parole.

Sincerely,

Velma Glista

Walter G. Sinn
PO Box 643
Canfield, Ohio 44406

Parole Board;
Gary A. Sinn will be coming up for parole soon; I am his brother Walter
Sinn. Gary has served a long time for charges against him. I would strongly
ask that you consider granting him parole. Gary has been a model prisoner
and I'm sure he will be a model citizen at his release. Before prison Gary
worked with me in the funeral business, drove truck plus various other jobs.
I'm sure with his background he will be a hard worker at which ever job he
would pursue. I would make every effort to help him find employment and
housing for his family and himself.

Please give him the opportunity to share the rest of his life with family,
especially his mother whose only wish in life is, that her son is released
while she is alive.

Please take this information into consideration as his opportunity for parole
comes up next month.

Sincerely
Walter S. S.
Walter G. Sinn

Larry R. Asdell
656 Wyndclift Cir.
Austintown, OH 44515
330/799-0186

January 11, 2007

State of California Board of Parole Hearings
Post Office Box 4036
Sacramento, CA 95812-4036

This letter is a request for consideration in the up-coming parole hearing for inmate Gary A. Sinn.

I have known Gary since 1969, at which time we were co-workers at Lane Funeral Home in Austintown, OH. During the several years I had the privilege of working with Gary, I found him to be a reliable and compassionate man. He never displayed any violent actions in my presence.

I would appreciate any consideration you could give him for parole at this time. Feel free to contact me for further information.

Sincerely,

Larry R. Asdell

Klacik Trucking
4496 Mahoning Ave PMB 231
Youngstown, OH 44515
Phone 330-779-0441 or 330-793-1889
Fax 330-793-1713

TO WHOM IT MAY CONERN:

My name is Rick Klacik. I'm Gary Sinn's brother-in-law. Gary is a
respected man and has been my friend as well as part of my family since he
married my sister Rachelle. We have kept in touch throughout the years.
He calls when he can and I enjoy our relationship and understand his desire
for his wife and children to be reunited as a family.

I am willing to help him in any way possible once he is released. I have my
own business and I would like to offer Gary the opportunity to work for my
trucking company. I know he is a hard worker. My wife and I will open our
home to him while he and his family settle and find a home of their own.

Please feel free to contact me at the above address should a need arise. I ask
that you give consideration to his release from prison, and grant him this
parole.

Thank you for taking the time to read my letter and I hope to be hearing
from you with positive feed back on this matter.

Sincerely,

Rick Klacik
Owner



# Klacik

Heating and Cooling

Bonded and Insured. Contractor License ID #28980

6223 Kirk Rd.          •          Canfied, Ohio 44406          •          330-792-8664

John Edward Klacik III (Ed)
6223 Kirk Rd.
Canfield, Ohio 44406
330-793-4280

re: Gary Sinn
D57219

To whom it may concern

I, Ed Klacik, am the brother-in-law of Gary Sinn. Gary has been an important part of our family since he married my sister Rachelle. From speaking to Gary and my sister on the phone, I know that he has been devoted husband and father, even though he has been away from home.

I am willing and able to help re-establish him in the community, when he is released. I have my own business and I am willing to give him a job. My home is also available to him and my sister, to help them in getting on their feet. I am willing to help in any way I can to assist in his release. Please feel free to contact me at the above address should the need arise. I pray for your consideration of his release from prison.

Thank you for taking the time to read my letter.

Sincerely,

Ed Klacik

To whom it may concern,

Once again I am writing to you in regards to my husband of 32 years in March, Gary Sinn D57219. I request that you please give him a release date this time and send him home. The last three hearings the parole bar has requested another psychological exam on him and ever time it has come back as "Gary is not a threat to society, he is a role model inmate, and that he will not be a threat to society." Do you think that will change year after year? Who else do you need to hear an excellent review from? He has been there for twenty years now and as you can tell our children have been able to move on with their lives but I haven't. Because my life is not complete with out the man I married and stood by all theses years.

Every year that passes by I send letters pouring out my heart and soul expressing my pain as a wife, mother, and grandmother. The desire to want a life with my husband has never decreased after all these years. I still have strong hopes and beliefs that one-day we will be together again. We have continued to be a close family through your bars and will remain close despite the separation. Gary is a husband, father, grandfather, son, and brother; as you can see we all would like the chance to have him home again.

I know that one day he will return home to us by the grace of God. I cannot explain what happened many years ago and I will not try too, but I do know that if you release Gary he will never return to the system. He deeply regrets putting himself into the situation that put him there and has been dealing with the consequences every since. I ask that you will look beyond the situation and charges brought against him, and see the man that he is now and will continue to be. He has more than paid the price for mistakes done in the past.

You know all about his case. If the trial went differently and he accepted the plea; he would have been home years ago. We cannot change the past, we can only look to the future. Gary has gone above and beyond the state requirements to be paroled as well as being a model inmate. The court system allows drug dealers, murders, sex offenders, and child abusers a second chance. All I am asking is that he be given the same chance as everyone else. A chance to prove to everyone that he is a changed man and will never get himself in situations like that again.

I have been a faithful and devoted wife to him all these years and will remain one. So no matter what the outcome is, we his family, will continue to receive phone calls and will visit him regularly. Gary has missed out on seeing two beautiful grandsons come into this world this year. In total he has missed six grandbabies. I pray that he will be able to watch his grandchildren grow up since he was not able to see his own. Our only son moved back home to California to be closer to his father. Our youngest daughter got married this past September and Gary was not able to

walk her down the isle or to give her away, her brother did. I want to spend the rest of our golden years together and truly live as husband and wife. Deep down I do believe in our system and I know that in this case justice will be served soon.

I am a Christian woman who prays daily over my family and the system which I have faith in. Our lord is a perfect example of no matter what happens he will always stand by our sides giving us the strength to go on. Our Lord who gives us more chances than any one could ever ask for nor deserve. We live in a world were every day is a battle to do right. Sometimes we slip up but that is what makes us human. Furthermore society wants to lock the doors and never let some people have that second chance.

I due agree that some people deserve what is given to them. Those who have been given chance after chance and never change, those who have no support to help them readjust to society. In my husbands case I completely agree with the psychiatrists and counselors that Gary needs a second chance to prove to himself and everyone else that he has changed. What a joy it would be to have him home and make new memories with all of us. As you can see he has a future and people waiting for him, giving him support, a job, and a family. Over the years none of that has changed. If anything it has gotten stronger. I pray that this is our year.

Thank you for taking the time to read all of theses letters to support Gary. May God bless you and you family as he has for us. I appreciate all of your time and consideration for this man, husband, father, grandfather, son, and brother.

Sincerely,

Rachelle Sinn

2140 W. York Cir
Anaheim, CA 92804

To whom it may concern:

I am Gary Sinn's mother. I have written a letter for years. Praying, wishing, hoping he will get to come home. With each letter I write the tears run down my face. Two years ago I thought I was dieing and I almost did. I prayed so hard to live to see my son come home. I will be 76 next week and I know the lord will make this come true but he needs your help and everyone else's to make this happen. Gary's has been praying and he is a changed man, a good father, husband, and son. He has 6 grandchildren and he wants so bad to hold them in his arms and say, "I am your pappy". His arms ache for his wife, 3 daughters' and his son. He also has a brother and a sister. He has all kinds of work offers and he's always been a good worker. I want so bad to say, "welcome home son".

Best,

Donna Cristofaro
2140 W. York Circle
Anaheim, CA 92804

**Terry Gatrell**
2957 State Rt. 9
Salem, Oh. 44460

To whom it may concern;

We are writing this letter in regard to Gary A. Sinn, who is an inmate in a California State Prison. Gary is due to come up for parole the end of February.

We have known Gary for at least 48 years and would like to see him home again with his family. We feel that he has served his time and that he should be released. He has a wife and children and grandchildren now and we feel they need him. This world is hard enough to grow up in but it is harder when you don't have parents or grandparents to turn to.

Growing up, Gary has always been there for us and others in our family. He was someone that you could always trust and believe in. He was always a hard worker and a loving person. He needs the chance to get back into a normal life. The world has changed a lot since Gary was imprisoned and we would like to see him get out and give him what ever he needs to build his life up again. I am sure that with the help of the Lord, his family and his friends, Gary will not have any trouble doing this. So once again, please consider giving Gary this parole and in doing so you will be helping to make their family whole again.

Sincerely,

Raymond & Terry Gatrell

Cheryl Bernard
5168 Pinecrest
Austintown, Ohio  44515
330-799-6403

re: Gary Sinn
D57219

To whom it may concern

I am Cheryl one of Gary Sinn's sister-in-laws. I have considered Gary a friend and a part of my family since he married my sister Rachelle over thirty years ago. From speaking to my sister on the phone I know that Gary has been a devoted husband and father throughout these difficult years away from his beloved family.

I am willing to help him in any way possible.  My home is available to him and my sister, to help them get on their feet, when he is released.  Please feel free to contact me at the above address should you have any additional questions. I ask that you give consideration to Gary's release from prison.

Thank you for taking the time to read my letter and consider my request.

Sincerely,

Cheryl Bernard

To Whom It May Concern:

I am writing this letter to ask for parole for one of your inmates, Gary Sinn.

Gary is my cousin and we spent several years together working on the farm where my wife and I now live with our two sons. Our farm is just outside of Youngstown, Ohio . Gary will always be welcome here, if he would ever need a place to stay, and the help on the farm would be greatly appreciated.

I talk to Gary at least once a month and he seems to have a more positive attitude. I feel it would benefit him greatly if he were to be reunited with his family. His wife, children and grandchildren, as well as his extended family miss him a great deal. They have had a difficult life without him. Please consider him for parole. I am confident you will not be disappointed with the direction his life has taken.

Thank you for your consideration and your time.

Sincerely,

Tracy L. Sinn

**Darlyne Liddle**

---

**From:**     Gary Roesger [aircrafthardware@sbcglobal.net]
**Sent:**     Saturday, January 13, 2007 7:10 AM
**To:**       Gary LANE Roesger
**Subject:** TO WHOM IT MAY CONERN

### ROESGER'S ENGINEERING CORPORATION
### 203 SOUTH PACIFIC AVENUE
### SAN PEDRO, CALIFORNIA 90731
Tel (310) 548-5454 Fax (310) 548-6966

RE: Gary Sin D572419

To whom it may concern:

The reason I am writing this letter is to offer Gary Sinn employment after his parole.

I was asked by Darlyne Liddle to do this for her brother. My association with Miss Liddle started about sixteen years ago. I owned a mortgage company called Double R Funding. I leased a suite from one of the buildings she managed. I was the Real Estate Broker for that company and others. Miss liddle has a real estate license and at one time I was her broker of record. We have kept in touch over the years within this business related fields.

Roesger's Engineering was Incorporated November of 1986. I have been associated in the aircraft and automotive industries for most of my life. Roesger's Engineering manufactures and distributes aircraft fittings and hardware to these related fields. We have two facilities one in San Pedro and the other in Gardena, California. We also import and export related material from other countries.

Miss liddle had confide in the past to me that her brother was in prison. It was just this past week she had explained that her brother was up for parole. I would be willing to give him employment to start a new life.

sincerely,
Gary Lane Roesger
Owner,
Roesger's Engineering Corporation

1/17/2007

KITTY'S PROPERTY MANAGEMENT
1800 SMOKE TREE LANE, UNIT #53
PALM SPRINGS, CA. 92264
760-218-0922

1/11/06

RE: GARY SINN D572419

TO WHOM IT MAY CONCERN

MY NAME IS KITTY CAMPBELL, I AM THE OWNER OF KITTY'S PROPERTY MANAGEMENT.
I AM A PROPERTY MANAGER IN THE PALM SPRINGS, CALIFORNIA AREA. I MANAGE
OVER 15 BUILDINGS IN THE IMMEDIATE AREA.

I AM WILLING TO OFFER GARY SINN A FULL TIME JOB OVERSEEING THE MAINTENANCE
OF THE BUILDINGS THAT I MANAGE.

GARY WOULD BE DEALING WITH THE LANDSCAPING AND GENERAL MAINTENANCE
THAT WOULD BE REQUIRED TO KEEP UP WITH ALL THE PROPERTIES.

IF I CAN BE OF ANY FURTHER ASSISTANCE, PLEASE FEEL FREE TO CONTACT
ME.

SINCERELY,

KITTY CAMPBELL

# EXHIBIT "E"

# *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

DEPT 100

| Date: | MAY 4, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH003982
In re,
GARY ALLEN SINN,
    Petitioner,
On Habeas Corpus

Counsel for Respondent:

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

    The Court has read and considered petitioner's Writ of Habeas Corpus filed on December 6, 2006. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings (" Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

    Petitioner was received in the Department of Corrections on May 22, 1987 after a conviction for first-degree murder, as well as two counts of attempted robbery and six counts of robbery in the second degree. He was sentenced to twenty-five years to life. His minimum parole eligibility date was March 19, 2004. The record reflects that on December 12, 1983 petitioner and two crime partners went to the victims' home to commit a robbery. They identified themselves as police officers in order to gain entry. One of the crime partners waited outside as a lookout while petitioner and the other partner handcuffed two victims and brought them into the house to rob them. A third victim arrived at the house and was shot by petitioner's partner who was waiting outside. The three robbers fled. Several weeks later, on January 7, 1984, petitioner and another crime partner robbed a gambling establishment at gunpoint. Petitioner fled the jurisdiction and was apprehended on December 21, 1986 in Fort Wayne, IN.

    The Board found petitioner unsuitable for parole after a parole consideration hearing held on December 6, 2005. Petitioner was denied parole for one year. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on his commitment offense.

    The Court finds that there is some evidence to support the board's finding that "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*In re Scott* (2004) 119 Cal.App.4th 871, at 893). In this case the motive for the first-degree murder was robbery. The Board was justified in determining that the "motivation to obtain money" is materially less significant than those which conventionally drive people to commit murder. (*In re Honesto* (2005) 130 Cal.App4th 81, 95.)

1

| Minutes Entered |
|---|
| 05-04-07 |
| County Clerk |

# *SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES*

DEPT 100

| Date: | MAY 4, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | J. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

(Parties and Counsel checked if present)

BH003982
In re,
GARY ALLEN SINN,
    Petitioner,
On Habeas Corpus

Counsel for Respondent:

The record reflects that there is some evidence that "multiple victims were attacked, injured or killed in same or separate incidents." " (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) Although only one person was killed in the robbery, two others with handcuffed and forced into a dwelling to be robbed. In a separate incident, petitioner robbed the people at the gambling establishment at gunpoint. The Board found that pointing a gun at someone's head is traumatizing, terrifying and " could have an influence on the rest of someone's life." (*Reporter's Transcript*, December 6, 2005, p. 69.) This is some evidence to support the Board's one-year denial of parole.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent to counsel for the petitioner via U.S. Mail as follows:

PICONE & DEFILIPPIS, APLC
Steve M. DeFilippis, Esq.
Traci S. Mason, Esq.
625 N. First Street
San Jose, CA 95112
Counsel for Petitioner Gary Allen Sinn

Department of Justice
Office of the Attorney General of the State of California
110 West A Street, Suite 1100
San Diego, CA 92101
Attn: Ms. Cynthia Lumely

2

Minutes Entered
05-04-07
County Clerk



THE DOCUMENT TO WHICH THIS CERTIFICATE IS
ATTACHED IS A FULL, TRUE AND CORRECT COPY
OF THE ORIGINAL ON FILE AND OF RECORD IN
MY OFFICE.

ATTEST     MAY 0 0 2007

JOHN A. CLARKE, Executive Officer/Clerk of the
Superior Court of the State of California for the County
of Los Angeles.

By _____ , Deputy
JOSEPH M. PULIDO, S.C.C.
23219

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | **CONFORMED COPY**<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>MAY 0 9 2007 |
| PLAINTIFF/PETITIONER:<br><br>GARY ALLEN SINN | John A. Clarke, Executive Officer/Clerk<br>By _____ , Deputy |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH003982 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time           ☑ Order re: Writ of Habeas Corpus dated May 4, 2007
☐ Order to Show Cause             ☐ Order re: Writ of Mandamus
☐ Order for Informal Response       ☐ Order re:
☐ Order for Supplemental Pleading     ☐ Copy of

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

May 9, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____ , Clerk
       Joseph M. Pulido

PICONE & DEFILIPPIS, APLC
Steve M. DeFilippis, Esq.
Traci S. Mason, Esq.
625 N. First Street
San Jose, CA 95112
Counsel for Petitioner Gary Allen Sinn

Department of Justice
Office of the Attorney General of the State of California
110 West A Street, Suite 1100
San Diego, CA 92101
Attn: Ms. Cynthia Lumely

# EXHIBIT "F"

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

COURT OF APPEAL - SECOND DIST.

F I L E D

AUG   1 2007

_____ Clerk

_____ Deputy Clerk

| | |
|---|---|
| In re | B200790 |
| GARY SINN | (Super. Ct. No. BH003982) |
| on | (Steven R. Van Sicklen, Judge) |
| Habeas Corpus. | **O R D E R** |

THE COURT:

The court has read and considered the petition for writ of habeas corpus filed July 26, 2007. The petition is denied. The record submitted reflects some evidence to support the challenged decision. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 664-665.)

_____        _____        _____
TURNER, P.J.                    MOSK, J.                         KRIEGLER, J.

S155858

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re GARY SINN on Habeas Corpus

---

The petition for writ of habeas corpus is denied. (See *People v. Duvall* (1995) 9 Cal.4th 464, 474.)

SUPREME COURT
FILED

FEB 2 0 2008

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
Chief Justice

Gary Sinn D-57424
P.O. Box 689
Soledad, CA 93960-0689

LEGAL MAL

Clerk of the Court
United States District Court
Northern District of California
P.O. Box 36060
450 Golden Gate Avenue
San Francisco, CA 94102



UNITED STATES POSTAGE
$ 04.60⁰
MAILED FROM ZIP CODE 93960



Gary San Diego
P.O. Box 689
Soledad, CA 93960-0689



RECEIVED
MAR 27 2008
BY: ____

Clerk of the Court
United States District Court
Northern District of California
P.O. Box 36060
450 Golden Gate Avenue
San Francisco, CA 94102

LEGAL MAIL

UNITED STATES POSTAGE
$ 04.60⁰
02 1W
0004253462    MAR 26 2008
MAILED FROM ZIP CODE 93960

Gary Sinn, D57219
P.O. Box 689
Soledad, CA 93960-0689

LEGAL MAIL

Clerk of the Court
United States District Court
Northern District of California
P.O. Box 36060
450 Golden Gate Avenue
San Francisco, CA 94102



UNITED STATES POSTAGE
$ 04.60°
MAILED FROM ZIP CODE 93960